IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY,
FLORIDA

NANOTECH ENTERTAINMENT, INC.,
a Nevada Corporation,

CASE NO:

CIRCUIT CIVIL DIVISION

       Plaintiff,

v.

R&T SPORTS MARKETING, INC., a Florida
corporation; LONG SIDE VENTURES, LLC, a
Florida limited liability company; BEN
KAPLAN, an individual; and DANIEL
KAPLAN, an individual,

       Defendants.

_____/

## COMPLAINT

NANOTECH ENTERTAINMENT, INC. by and through its undersigned counsel and

pursuant to the Florida Rules of Civil Procedure hereby files it Complaint against R&T SPORTS

MARKETING, INC., LONG SIDE VENTURES, LLC, BEN KAPLAN and DANIEL

KAPLAN, and in support thereof, states as follows:

### PARTIES, JURISDICTION AND VENUE

1.    The amount in controversy in this lawsuit exceeds $15,000, excluding interest,

costs, and attorneys' fees. Accordingly, this Court has jurisdiction pursuant to Fla. Stat § 26.012.

2.    Pursuant to Chapter 47, *Florida Statutes*, venue is proper in Broward County,

Florida, because at least one of the Defendants resides in Broward County, Florida and the

causes of action complained of herein occurred in Broward County, Florida.

3.    NANOTECH ENTERTAINMENT, INC. ("**Plaintiff**" or "**NanoTech**") is a

1

Nevada corporation with its principal place of business in the State of California.

4.   R&T SPORTS MARKETING, INC. ("**R&T**"), is a corporation organized and existing under the laws of the State of Florida with its principal place of business in Broward County, Florida.

5.   LONG SIDE VENTURES, LLC ("**Long Side**"), is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Broward County, Florida.

6.   BEN KAPLAN ("**B. Kaplan**") is an individual, managing-member of Long Side, a resident of Miami-Dade County, Florida and is otherwise *sui juris*.

7.   DANIEL KAPLAN ("**D. Kaplan**") is an individual, president of R&T, a resident of Miami-Dade County, Florida and is otherwise *sui juris*.

## FACTUAL ALLEGATIONS

*The Loan Transactions-Long Side Loan Agreements*

8.   Between June 23, 2010 and April 29, 2011 B. Kaplan, communicated with principals of Plaintiff NanoTech, Robert Dekett and David Foley, regarding Defendant Long Side's interest in lending capital to NanoTech.

9.   Based on such communications, B. Kaplan, on behalf of Long Side, verbally agreed to lend NanoTech a total of $166,000.00.

10.   Prior to memorializing the parties' agreement for funding, as a material term of their agreement, B. Kaplan represented to Plaintiff, as an inducement to enter into loan agreements, that NanoTech would have the exclusive right to convert the loan amounts into shares of common stock of NanoTech to pay off debt under any and all loan agreements executed by the parties.

Composite Exhibit A

11.     Shortly thereafter on or about June 23, 2010, Long Side and NanoTech entered into a Convertible Note Subscription Agreement (hereinafter referred to as "**CNS1**") and a Convertible Note Promissory Note (hereinafter referred to as "**CPN1**") memorializing a loan agreement in the amount of $30,000.00.  A true and correct copy of the CNS1 and the CPN1 are attached hereto as **Composite Exhibit "A."**

12.     On or about August 12, 2010, Long Side and NanoTech entered into a Convertible Note Subscription Agreement (hereinafter referred to as "**CNS2**") and a Convertible Note Promissory Note (hereinafter referred to as "**CPN2**") in the amount of $26,000.00.  A true and correct copy of the CNS2 and the CPN2 are attached hereto as **Composite Exhibit "B."**

13.     On April 1, 2011, Long Side and NanoTech entered into a Convertible Note Subscription Agreement (hereinafter referred to as "**CNS3**") and a Convertible Note Promissory Note (hereinafter referred to as "**CPN3**") in the amount of $55,000.00.  A true and correct copy of the CNS3 is attached hereto as **Composite Exhibit "C."**

14.     Lastly, on April 8, 2011, Long Side and NanoTech purportedly entered into a Convertible Note Subscription Agreement (hereinafter referred to as "**CNS4**") and a Convertible Note Promissory Note (hereinafter referred to as "**CPN4**") in the amount of $55,000.00.  A true and correct copy of the CNS4 and the CPN4 are attached hereto as **Composite Exhibit "D."**

15.     The CNS1/CNP1, CNS2/CNP2, CNS3/CNP3, and CNS4/CNP4 entered into between Long Side and NanoTech is hereinafter referred to as the "**Loan Agreements**" or "**Long Side Loan Agreements.**"

16.     Pursuant to the Loan Agreements, NanoTech was purportedly obligated to pay Long Side interest on the respective principal amounts in the amount of fifteen percent (15.00%) per annum, in addition to a quarterly "royalty" payment based upon one and one half percent

3

(1.5%) of NanoTech's gross sales not to exceed 2.5 times the respective principal amounts thereof.

17.     On or about December 6, 2010 and June 25, 2012, Long Side, in violation of the terms of the corresponding Long Side Loan Agreements, attempted to convert the CPN2 into shares of stock of NanoTech by remitting notices of conversion to NanoTech and demanding immediate conversion of the subject debt into equity.

18.     Throughout the terms of all underlying notes, Long Side further breached the Long Side Loan Agreements through numerous written and oral mandates to Plaintiff to convert shares under said notes without any right of conversion whatsoever.

19.     Based on the foregoing, Long Side breached the underlying Loan Agreements and attempted to usurp NanoTech's exclusive right to elect to convert the subject debt into equity pursuant to the terms thereof in addition to the other conduct complained of herein.

20.     Notwithstanding the foregoing, the Loan Agreements seek to collect exorbitant, unconscionable and usurious interest for the use of money, contrary to Florida law.

21.     The rate of interest, when factoring the amount of "royalties" of up to **2.5 times the Principal Amount** into the computation of interest, results in an annual interest rate far exceeding forty five percent (45%) per annum and constituting a third degree felony pursuant to *Fla. Stat.* § 687.071.

22.     Long Side's promotion of its usurious "loan sharking" scheme, renders the Loan Agreements an unenforceable debt in the courts of this State pursuant to *Fla. Stat.* § 687.071.

*The Kaplan Brothers and Defendant Companies Conspiracy to Defraud*

23.     On or about August 14, 2012, under no contract whatsoever with NanoTech, Defendant R&T remitted a notice of conversion to NanoTech demanding immediate conversion

4

of debt into equity.

24.     At all material times, NanoTech had no knowledge of Defendant R&T until the foregoing notice of conversion was issued.

25.     Upon investigating the motive behind the issuance of the notice by Defendant R&T, NanoTech was informed that the principal of Defendant R&T was Dan Kaplan, the brother of Ben Kaplan.

26.     Ben Kaplan and Dan Kaplan ("Kaplan Brothers") and the Defendant Companies, under the false belief that Long Side maintained a right of conversion under the Long Side Notes, conspired to create a promissory note and subscription agreement for a loan amount of $55,000.00 to circumvent a conversion cap contained in the Long Side Notes and Subscription Agreements in violation of applicable securities laws.

27.     The conversion cap in each Long Side Note and Subscription Agreement caps the amount of shares permitted to be sold by an individual and/or entity on the open market over a certain period of time. *See* **CNS4** and **CPN4** attached hereto as **Composite Exhibit "D"**.

28.     Accordingly, by attempting to unlawfully transfer the obligations under the April 8, 2011 Long Side Note to Defendant R&T under the false belief the Defendant Companies would maintain conversion rights under the note instruments, the Defendants acted in concert to circumvent the conversion cap contained in these instruments and attempt to establish Defendant R&T as a creditor to the severe detriment of Plaintiff NanoTech.

29.     NanoTech has not and did not enter into any loan agreement with Defendant R&T although Defendant R&T may have provided funding, on behalf of Defendant Long Side, under the Long Side Notes in light of the familial relationship between the principals of Defendant Companies.

5

30. Indeed, the Defendants conspired to defraud Plaintiff NanoTech at the time of the August 14, 2012 Notice with the intent to unlawfully convert shares in Plaintiff's company by fabricating the **CNS5** and **CPN5** attached hereto as **Composite Exhibit "E"**.

31. In furtherance of the conspiracy to defraud Plaintiff NanoTech, the Defendants clearly copied the signature blocks of the April 8, 2014 subscription agreement (CNS4) and used same to fabricate the CNS5 along with fabricating the CPN5, both attached hereto as **Composite Exhibit "E"**.

32. A comparison of the signature blocks referenced in the preceding paragraph evidences Defendants' criminal, fraudulent and conspiratorial scheme.

33. Also in furtherance of this scheme to defraud Plaintiff of its stock, Defendant R&T has filed an action claiming a right of conversion under the fabricated **CPN5** and **CNS5** notwithstanding the right of conversion under any relevant note instrument belongs to Plaintiff NanoTech. The foregoing frivolous and fabricated action was filed as Case No.13-03138 (08) in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida.

34. Proceeding under the false and disingenuous belief that it retains rights of conversion under the Long Side Notes, Defendant Long Side has also filed a separate action under Case No. 13-03103 (03) in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida.

35. Case No.13-03138 (08) and Case No. 13-03103 (03) have been consolidated under the latter case. [1]

36. NanoTech has been required to retain legal counsel and pay reasonable attorneys' fees in order to initiate this action.

---

[1] Concurrently with the filing of this action, Plaintiff will file a Motion for Fraud on the Court in Case No.13-03138 (08) and Case No. 13-03103 (03) based on the unlawful conduct of the Defendants set forth hereinabove.

Composite Exhibit A

37.     All conditions precedent to this action have been waived, discharged or satisfied.

## COUNT I
## BREACH OF CONTRACT
### (As to Long Side)

38.     NanoTech realleges and incorporates the allegations contained in paragraphs 1 through 37 as if fully set forth herein.

39.     This is an action for breach of contract arising out of the respective Long Side Loan Agreements entered into between Long Side and NanoTech as alleged above and as incorporated and fully set forth herein.

40.     Throughout the terms of all underlying notes, Long Side further breached the Long Side Loan Agreements through numerous written and oral mandates to Plaintiff to convert shares under said notes without any right of conversion whatsoever among other breaches such as refusing to fully fund the subject loan agreements.

41.     For example, on or about December 6, 2010 and June 25, 2012, Long Side, in violation of the terms of the corresponding Loan Agreements, attempted to convert the CPN2 into shares of NanoTech by remitting the Notices to NanoTech and demanding the immediate conversion of the subject debt into equity.

42.     The Long Side Loan Agreements do not authorize Long Side to convert the CPN2 or any of the Long Side Loan Agreements into shares of stock of Plaintiff NanoTech.

43.     In fact, the provisions of the Long Side Loan Agreements make it clear that only NanoTech has the right to convert the debt into shares of NanoTech.

44.     For example, Paragraph 7 of the CNS2 titled "Conversion of Note," provides that the term 'conversion is defined fully in the Note attached hereto as Exhibit "A" (the CPN2).' Pursuant to Article II of the CPN2 titled "Conversion Rights," "[t]he Borrower [NanoTech] shall

7

have the right to convert the principal and any interest due under this Note into Shares of the Borrower's [NanoTech's] Common Stock…"

45.    Paragraph 2.1 of the CPN2 titled "<u>Conversion into the Borrower's Common Stock</u>" further provides:

> **The Borrower [NanoTech] shall have the right** from and after the date of the issuance of this Note and then at any time until this Note is fully paid, **to convert** any outstanding and unpaid principal portion of this Note (in whole or in part), and accrued interest, **at the election of the Borrower [NanoTech]** (the date of giving of such notice of conversion being the "Conversion Date") into fully paid and nonassessable shares of Common Stock as such stock exists on the date of issuance of this Note . . .

46.    Additionally, Paragraph 2.2 of the CPN2 titled "<u>Method of Conversion</u>" also provides that "[t]his Note may be converted by the Borrower [NanoTech] in whole or in part as described in Section 2.1(a) . . ."

47.    Long Side's attempt to convert the Long Side Agreements, which all contain the above-cited language in Paragraphs 32-34, constitutes a breach of same and the corresponding Long Side Loan Agreements.

48.    NanoTech also deems Long Side's repudiation of the subject loan agreements as an anticipatory repudiation and breach of the Long Side Loan Agreements.

49.    As a direct and proximate result of Long Side's breach of the respective Long Side Loan Agreements, NanoTech has suffered actual, incidental and consequential damages.

**WHEREFORE,** NanoTech respectfully requests this Honorable Court to enter judgment against Defendant for damages, together with costs, interest, attorneys' fees and such other relief as the Court may deem just and proper under the circumstances.

Composite Exhibit A

## COUNT II
## FRAUD IN THE INDUCEMENT
### (As to Long Side and Ben Kaplan)

50.     NanoTech realleges and incorporates the allegations contained in paragraphs 1 through 37 as if fully set forth herein.

51.     On or about June, 2010, August, 2010, April, 2011 and April, 2011 and prior to executing each Long Side Loan Agreement, Defendant Long Side and Defendant Ben Kaplan represented to NanoTech as an inducement to enter into the Long Side Loan Agreements, that NanoTech would have the exclusive right to convert the CPN1, CPN2, CPN3 and the CPN4 into shares of stock of NanoTech as either full or partial repayment of the underlying loans.

52.     The Defendants' false representation to the Plaintiff at the time each loan agreement was entered into constitutes a misrepresentation or false statement concerning a material fact of the transaction contemplated in each of the Long Side Loan Agreements.

53.     The Defendants knew that this misrepresentation was false at the time it was made because they never intended to honor or allow NanoTech to elect to convert the underlying Loan Agreements into shares of stock of NanoTech.

54.     The Defendants intended that its false representation induce NanoTech to enter into the subject Loan Agreements.

55.     NanoTech justifiably relied upon the false representation made by the Defendants in entering into the Loan Agreements to its detriment.

56.     NanoTech's justifiable reliance on the Defendants' misrepresentation has caused it to suffer damages.

**WHEREFORE**, NanoTech respectfully requests this Honorable Court to enter judgment against the Defendants for damages, together with costs, interest, and such other relief as the

9

Court may deem just and proper under the circumstances.

## COUNT III
### NEGLIGENT MISREPRESENTATION
### (As to Long Side and Ben Kaplan)

57.     NanoTech realleges and incorporates the allegations contained in paragraphs 1 through 37 as if fully set forth herein.

58.     On or about June, 2010, August, 2010, April, 2011 and April, 2011 and prior to executing each Long Side Loan Agreement, Defendant Long Side and Defendant Ben Kaplan represented to Plaintiff NanoTech, as an inducement to enter into the Long Side Loan Agreements, that NanoTech would have the exclusive right to convert the CPN1, CPN2, CPN3 and the CPN4 into shares of stock of NanoTech as either full or partial repayment of the underlying loans.

59.     The Defendants' representation to NanoTech was a representation of material fact believed to be true but which was in fact false.

60.     The Defendants acted negligently because they knew or should have known of the falsity of the representations to the Plaintiff.

61.     The Defendants intended to induce NanoTech to rely on the misrepresentation and consequently enter into the Long Side Loan Agreements.

62.     NanoTech justifiably relied upon the false representations made by the Defendants in entering into the Long Side Loan Agreements to its detriment.

63.     NanoTech's reliance on the Defendants' misrepresentation has caused it to suffer damages.

**WHEREFORE**, NanoTech respectfully request this Honorable Court to enter judgment against the Defendants for damages, together with costs, interest, and such other relief as the

Composite Exhibit A

Court may deem just and proper under the circumstances.

## COUNT IV
## FRAUDULENT MISREPRESENTATION
### (As to Long Side and Ben Kaplan)

64. NanoTech realleges and incorporates the allegations contained in paragraphs 1 through 37 as if fully set forth herein.

65. On or about June, 2010, August, 2010, April, 2011 and April, 2011 and at all material times thereafter, Defendant Long Side and Defendant Ben Kaplan represented to Plaintiff NanoTech that Plaintiff NanoTech would have the exclusive right to convert the CPN1, CPN2, CPN3 and the CPN4 into shares of stock of NanoTech as either full or partial repayment of the underlying loans.

66. The Defendants' representation to NanoTech was a representation of material fact that they knew was false at the time such representation was made to the Plaintiff.

67. The Defendants intended to induce NanoTech to rely on the misrepresentation to Plaintiff NanoTech's detriment.

68. NanoTech justifiably relied upon the false misrepresentations made by the Defendants to its detriment.

69. NanoTech's justifiable reliance on the Defendants' misrepresentation has caused it to suffer damages.

**WHEREFORE,** NanoTech respectfully requests this Honorable Court to enter judgment against the Defendant for damages, together with costs, interest, and such other relief as the Court may deem just and proper under the circumstances.

Composite Exhibit A

**COUNT V**
**USURY**
**(As to Long Side and Ben Kaplan)**

70.     NanoTech realleges and incorporates the allegations contained in paragraphs 1 through 37 as if fully set forth herein.

71.     This is an action pursuant to *Florida Statutes*, Chapter 687.

72.     Long Side, by an through its principal Ben Kaplan, lent NanoTech monies pursuant to the Long Side Loan Agreements as alleged in Paragraphs 1-37 above and as incorporated herein by reference.

73.     Pursuant to the terms of the Long Side Loan Agreements, there was an understanding between the parties that the money lent to NanoTech shall be returned to Long Side.

74.     A greater rate of interest that is allowed by law has been or is about to be paid to Long Side pursuant to the terms of the Long Side Loan Agreements.

75.     Long Side and Ben Kaplan with corrupt intent, willfully and knowingly intended take more than the legal rate of interest for the use of the money loaned to NanoTech pursuant to the Long Side Loan Agreements.

76.     As a direct and proximate result of the usury complained of herein, Plaintiff NanoTech has been damaged.

**WHEREFORE**, NanoTech respectfully requests this Honorable Court to enter judgment against Defendants for damages, together with costs, interest, attorneys' fees under Chapter 687 of the Florida Statutes and such other relief as the Court may deem just and proper under the circumstances.

12

Composite Exhibit A

## COUNT VI
## FRAUD
### (Against all Defendants)

77.     NanoTech realleges and incorporates by reference paragraphs 1 through 37 as if fully set forth herein.

78.     On August 14, 2012, the Defendants represented to Plaintiff NanoTech that Defendant R&T had a right to convert shares in Plaintiff Company pursuant to the CNS5 and CPN5 Agreements.

79.     Defendants affirmatively stated the foregoing misrepresentation.

80.     However, the foregoing statement constituted a misrepresentation of a material fact because Plaintiff did not enter into any agreement with Defendant R&T and the CNS5 and CPN5 were fabricated as alleged herein above and incorporated by reference notwithstanding the fact that Defendant R&T had no right of conversion whatsoever.

81.     The Defendants knew or should have known of the falsity of the representation because no agreement between NanoTech and Defendant R&T existed but was rather fabricated by Defendants for the reasons alleged in Paragraphs 23-35 above and incorporated herein by reference.

82.     Defendants forged, or prepared, approved, and accepted documents they knew contained forged signatures purporting to be signatures of Plaintiff.

83.     Defendants knew that Plaintiff did not execute the CPN5 and CNS5.

84.     All Defendants acted with the intent to defraud Plaintiff by and through the CNS5 and CPN5. Defendant R&T attempted to further defraud Plaintiff when it sued Plaintiff based on false claims related to the forged documents/agreements.

85.     Plaintiff has been damaged as a result of the fraud and forgeries identified herein.

Composite Exhibit A

86.     Defendants intended to induce Plaintiff to rely on the misrepresentations asserted herein and act on it. Plaintiff justifiably relied on same to its detriment.

87.     As a direct and proximate result of the Defendants' fraud, Plaintiff has been damaged.

WHEREFORE, Plaintiff NanoTech, respectfully requests judgment against Defendants for damages, prejudgment interest, costs and disbursements in the institution of this suit, and any other relief that this Court deems just, reasonable, and proper under the circumstances.

**COUNT VII**
**CONSPIRACY TO DEFRAUD**
**(Against all Defendants)**

88.     NanoTech realleges and incorporates by reference paragraphs 1 through 37 as if fully set forth herein.

89.     On August 14, 2012, the Defendants knowingly and willfully agreed to conspire amongst themselves to defraud Plaintiff by representing to Plaintiff NanoTech that Defendant R&T had a right to convert shares in Plaintiff Company pursuant to the fabricated CNS5 and CPN5 agreements among other things.

90.     Defendants each acted in concert, overtly and in furtherance of the conspiracy by fabricating, forging, preparing, approving, and accepting documents containing forged signatures purporting to be signatures of Plaintiff as further alleged in Paragraphs 23-35 above and incorporated herein by reference.

91.     The individual Defendants had a personal stake and direct benefit in committing the foregoing overt, unlawful and unauthorized act separate and distinct from the Defendant Companies' interest.

14

92.     As a direct and proximate result of the Defendants' conspiracy and orchestrated scheme to defraud Plaintiff NanoTech, Plaintiff has been damaged.

WHEREFORE, Plaintiff NanoTech, respectfully requests judgment against Defendants for damages, prejudgment interest, costs and disbursements in the institution of this suit, and any other relief that this Court deems just, reasonable, and proper under the circumstances.

## COUNT VIII
## FORGERY
### (Against Dan Kaplan and R&T)

93.     NanoTech realleges and incorporates by reference paragraphs 1 through 37 as if fully set forth herein.

94.     By virtue of the fabricated CPN5 and CNS5, Defendant D. Kaplan and Defendant R&T formed/created a writing which falsely purports to be the writing of Plaintiff.

95.     The CPN5 and CNS5 were made with the intent to injure or defraud Plaintiff.

96.     The CPN5 and CNS5 instruments were made maliciously in an attempt to establish, among other things, creditor status and circumvent conversion caps as alleged in Paragraphs 23-35 above and incorporated herein by reference.

97.     These writings were loan documents which clearly have legal efficacy.

98.     As a direct and proximate result of the Defendants' forgery, Plaintiff has been damaged.

WHEREFORE, Plaintiff NanoTech, respectfully requests judgment against Defendants for damages, prejudgment interest, costs and disbursements in the institution of this suit, and any other relief that this Court deems just, reasonable, and proper under the circumstances.

Composite Exhibit A

## COUNT IX
## ALTER EGO
### (As to B. Kaplan and Long Side)

99.   NanoTech realleges and incorporates the allegations contained in paragraphs 1 through 37 as if fully set forth herein.

100.   B. Kaplan controls and operates Defendant Long Side, exercises full control over its operations and, in fact, serves as B. Kaplan's alter ego.

101.   Long Side is a sham entity that was formed for an unlawful purpose and does not have separate legal existence from B. Kaplan.

102.   Long Side was organized and utilized by B. Kaplan as a sham to mislead and defraud third parties, such as NanoTech.

103.   B. Kaplan has utilized the corporate form, *to wit*, Long Side, fraudulently and for the improper purpose of perpetrating his usurious "loan sharking" scheme.

104.   Long Side is but a mere instrumentality of B. Kaplan who improperly used Long Side as a subterfuge to mislead and defraud third parties for his own personal benefit so as to blur the distinction between corporate and personal affairs.

105.   B. Kaplan's dominant and exclusive control over Long Side is to such an extent that its independent existence is in fact non-existent.

106.   B. Kaplan's fraudulent and improper use of Long Side has caused injury to NanoTech.

**WHEREFORE**, NanoTech respectfully requests this Honorable Court to enter judgment against Defendants for damages, together with costs, interest and such other relief as the Court may deem just and proper under the circumstances.

Composite Exhibit A

## COUNT X
## ALTER EGO
### (As to D. Kaplan and R&T)

107.    NanoTech realleges and incorporates the allegations contained in paragraphs 1 through 37 as if fully set forth herein.

108.    D. Kaplan controls and operates Defendant R&T and exercises full control over its operations and in fact serves as D. Kaplan's alter ego.

109.    R&T is a sham entity that was formed for an unlawful purpose and does not have separate legal existence from D. Kaplan.

110.    R&T was organized and utilized by D. Kaplan as a sham to mislead and defraud third parties, such as NanoTech.

111.    D. Kaplan has utilized the corporate form, *to wit*, R&T, fraudulently and for the improper purpose of perpetrating his usurious "loan sharking" scheme.

112.    R&T is but a mere instrumentality of D. Kaplan who improperly used R&T as a subterfuge to mislead and defraud third parties for his own personal benefit so as to blur the distinction between corporate and personal affairs.

113.    D. Kaplan's dominant and exclusive control over R&T is to such an extent that its independent existence is in fact non-existent.

114.    D. Kaplan's fraudulent and improper use of R&T has caused injury to NanoTech.

**WHEREFORE**, NanoTech respectfully requests this Honorable Court to enter judgment against Defendants for damages, together with costs, interest and such other relief as the Court may deem just and proper under the circumstances.

Composite Exhibit A

## COUNT XI
## FDUTPA
### (All Defendants)

115.    NanoTech realleges and incorporates the allegations contained in paragraphs 1 through 37 as if fully set forth herein.

116.    This is an action for damages for violation of the Florida Deceptive and Unfair Trade Practices Act (Florida Statutes §501.201, et seq.) (the "Act").

117.    The Act expressly states that one of its purposes is "to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.202(2).

118.    At all relevant times, Defendants were engaged in trade or commerce as defined in §501.203, Fla. Stat.

119.    At all relevant times, Plaintiff was a business enterprise under §501.203, Fla. Stat.

120.    On August 14, 2012, the Defendants knowingly and willfully agreed to conspire amongst themselves to defraud Plaintiff by representing to Plaintiff NanoTech that Defendant R&T had a right to convert shares in Plaintiff Company pursuant to the fabricated CNS5 and CPN5 agreements among other things.

121.    Defendants each acted in concert, overtly and in furtherance of the conspiracy by fabricating, forging, preparing, approving, and accepting documents containing forged signatures purporting to be signatures of Plaintiff as further alleged in Paragraphs 23-35 above and incorporated herein by reference.

122.    Defendants unlawful scheme was commercially immoral and otherwise utilized as

Composite Exhibit A

an unfair advantage over Plaintiff and obtained improperly in violation of law under the totality of the circumstances addressed herein.

123.    The manner in which such wrongful acts were committed by the Defendants were intentional, and the practices utilized by the Defendants are unfair, deceptive, and commercially immoral.

124.    The conduct of the Defendants was intentional, willful and in wanton disregard of Plaintiff's rights.

125.    Plaintiff has suffered significant damages as a result of Defendant's unlawful conduct.

WHEREFORE, Plaintiff NanoTech requests that this Court enter judgment in its favor for common law unfair competition and awarding damages, interest, costs, an award of attorney's fees and costs pursuant to §§501.211(2) and 501.2105, Fla. Stat., and such other relief as this Court deems just and proper.

## COUNT XII
## RESCISSION (IN THE ALTERNATIVE)
### (As to Long Side)

126.    NanoTech realleges and incorporates the allegations contained in paragraphs 1 through 37 as if fully set forth herein.

127.    <u>Character or relationship of parties</u>: Long Side and NanoTech have a commercial and/or business relationship.

128.    <u>Making of a Contract</u>: On or about June 23, 2010, August 12, 2010, April 1, 2011 and April 8, 2011, Long Side and NanoTech entered into the Long Side Loan Agreements.

129.    <u>Existence of fraud and usury as grounds for rescission or cancellation</u>: Prior to memorializing the parties' verbal agreement, as a material term of their agreement, Ben Kaplan

19

and Defendant Long Side represented to Plaintiff NanoTech that Plaintiff NanoTech would have the exclusive right to convert the CPN1, CPN2, CPN3 and the CPN4 into shares of stock of NanoTech as either full or partial payment of the underlying loans.

130.    The Defendants representation to NanoTech was a representation of material fact that they knew was false at the time such representation was made to NanoTech.

131.    The same was intended to induce NanoTech to rely on the misrepresentation and consequently enter into the Long Side Loan Agreements.

132.    NanoTech justifiably relied upon the false misrepresentations in entering into the subject Loan Agreements to its detriment.

133.    NanoTech's reliance on the misrepresentation has caused it to suffer damages.

134.    Furthermore, the Long Side Loan Agreements attempt to require NanoTech to pay a greater rate of interest that is allowed by law and is usurious pursuant to Florida law.

135.    NanoTech has rescinded the Long Side Loan Agreements and has notified Long Side of such rescission.

136.    NanoTech has made every attempt to repay the monies lent pursuant to the Loan Agreements but Long has refused to accept payment thereof under the false belief it has a right of conversion under the subject loan agreements and is therefore entitled to shares of stock in Plaintiff's Company.

137.    NanoTech has no adequate remedy at law.

**WHEREFORE**, NanoTech respectfully requests this Honorable Court to enter judgment against the Defendant, together with costs, interest and such other relief as the Court may deem just and proper under the circumstances.

Composite Exhibit A

## PUNITIVE DAMAGES

138.   NanoTech expressly reserves the right to assert punitive damages as discovery proceeds in this matter.

## JURY TRIAL

139.   NanoTech requests a trial by jury on all issues so triable.

Dated: June ___17ª___, 2014

Respectfully submitted,

By: __/s/ Daniel Zumpano___
      Daniel Zumpano, Esq.
      Fla. Bar. No. 0063485
      Ricardo A. Arce, Esq.
      Fla. Bar. No. 076201
      Zumpano Castro, LLC
      Attorneys for Plaintiff
      500 S. Dixie Hwy, Ste. 302
      Coral Gables, FL. 33146
      305.503.2990 (Tel)
      305.774.5908 (Fax)

Composite Exhibit A

# NANO TECH ENTERTAINMENT, INC.

### CONVERTIBLE NOTE
### SUBSCRIPTION AGREEMENT

**THIS SUBSCRIPTION AGREEMENT** (this "Agreement"), is dated as of June 22, 2010, by and between NanoTech Entertainment, Inc., a Nevada corporation (the "Company"), and the subscriber identified on the signature page hereto ("Subscriber").

**WHEREAS**, the Company and Subscriber are executing and delivering this Agreement in reliance upon an exemption from securities registration afforded by the provisions of Section 4(2), Section 4(6) and/or Regulation D ("Regulation D") as promulgated by the United States Securities and Exchange Commission (the "Commission") under the Securities Act of 1933, as amended (the "1933 Act"); and

**WHEREAS**, the parties desire that, upon the terms and subject to the conditions contained herein, the Subscriber shall lend to the Company $30,000 (the Principal Amount") as per the Disbursement Schedule set forth in Exhibit "A" under the terms and conditions outlined ("Principal Amount") in a Convertible Promissory Note from the Company ("Note"), the form of which is annexed hereto as Exhibit "B", convertible into shares of the Company's Common Stock, $0.001 par value (the "Common Stock") at a per share conversion price set forth in the Note ("Conversion Price") (collectively the "Offering"). The Convertible Promissory Note (the "Note") and the shares of Common Stock issuable upon conversion of the Note (the "Shares" or "Conversion Shares"), are collectively referred to herein as the "Securities."):

**NOW, THEREFORE**, in consideration of the mutual covenants and other agreements contained in this Agreement the Company and the Subscriber hereby agree as follows:

1. **Closing Date**. The "Closing Date" shall be the date that the Principle Amount is transmitted by wire transfer or otherwise credited to or for the benefit of the Company. Subject to the satisfaction or waiver of the terms and conditions of this Agreement, on the Closing Date, Subscriber shall lend to the Company which shall be evidenced by the Note in the aggregate Principal Amount of $30,000.

2. **Closing Deliverables**.
    a.    Subject to the satisfaction or waiver of the terms and conditions of this Agreement, on the Closing Date, the Subscriber and Company shall execute a Convertible Promissory Note which shall detail the terms and conditions for repayment as indicated thereon.

    b.    The Company shall provide the Subscriber with warrant to purchase that number of shares into which the Note is convertible into if the Note was converted on the day of the Closing. The exercise price shall be equal to closing price on the trading day immediately preceding the Closing Date.

1

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100015



EXHIBIT
A
Composite Exhibit

c.     Pursuant hereto the Company shall provide the Subscriber a "royalty" equal to 1.5% of the Company's gross sales up to an aggregate amount not to exceed 2.5 times the Principal Amount of the Note.

3. **Subscriber Representations and Warranties**.    Subscriber hereby represents and warrants to and agrees with the Company that:

(a) Organization and Standing of the Subscriber.    If Subscriber is an entity, such Subscriber is a corporation, partnership or other entity duly incorporated or organized, validly existing and in good standing under the laws of the State of Nevada.

(b) Authorization and Power.    Such Subscriber has the requisite power and authority to enter into and perform this Agreement and the other Transaction Documents (as defined herein) and to purchase the Note being sold to it hereunder. The execution, delivery and performance of this Agreement and the other Transaction Documents by such Subscriber and the consummation by it of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate or partnership action, and no further consent or authorization of such Subscriber or its Board of Directors, stockholders, partners, members, as the case may be, is required.  This Agreement and the other Transaction Documents have been duly authorized, executed and delivered by such Subscriber and constitutes, or shall constitute when executed and delivered, a valid and binding obligation of such Subscriber enforceable against such Subscriber in accordance with the terms thereof.

(c) No Conflicts.    The execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation by such Subscriber of the transactions contemplated hereby and thereby or relating hereto do not and will not (i) result in a violation of such Subscriber's charter documents or bylaws or other organizational documents or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of any agreement, indenture or instrument or obligation to which such Subscriber is a party or by which its properties or assets are bound, or result in a violation of any law, rule, or regulation, or any order, judgment or decree of any court or governmental agency applicable to such Subscriber or its properties (except for such conflicts, defaults and violations as would not, individually or in the aggregate, have a material adverse effect on such Subscriber).  Such Subscriber is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental agency in order for it to execute, deliver or perform any of its obligations under this Agreement and the other Transaction Documents or to purchase the Securities in accordance with the terms hereof, provided that for purposes of the representation made in this sentence, such Subscriber is assuming and relying upon the accuracy of the relevant representations and agreements of the Company herein.

(d) Information on Company.    Such Subscriber has been furnished with or has had access to the EDGAR Website of the Commission to the Company's Form 10-K filed on May 25, 2010 for the fiscal year ended June 30, 2009 and the financial statements included therein, Form 10-Q filed on May 25, 2010 for the quarter ended March 31, 2010, and for the quarter needed December 31, 2009 together with all other filings made with the Commission available at the

2

Composite Exhibit A

EDGAR website until five days before the Closing Date (hereinafter referred to collectively as the "Reports"). In addition, such Subscriber may have received in writing from the Company such other information concerning its operations, financial condition and other matters as such Subscriber has requested in writing, identified thereon as Other Written Information (such other information is collectively, the "Other Written Information"), and considered all factors such Subscriber deems material in deciding on the advisability of investing in the Securities. Such Subscriber has relied on the Reports and Other Written Information in making its investment decision.

(e) Information on Subscriber. Subscriber is, and will be at the time of the conversion of the Notes, an "accredited investor", as such term is defined in Regulation D promulgated by the Commission under the 1933 Act, is experienced in investments and business matters, has made investments of a speculative nature and has purchased securities of United States publicly-owned companies in private placements in the past and, with its representatives, has such knowledge and experience in financial, tax and other business matters as to enable such Subscriber to utilize the information made available by the Company to evaluate the merits and risks of and to make an informed investment decision with respect to the proposed purchase, which represents a speculative investment. Subscriber has the authority and is duly and legally qualified to purchase and own the Securities. Subscriber is able to bear the risk of such investment for an indefinite period and to afford a complete loss thereof. The information set forth on the signature page hereto regarding such Subscriber is accurate.

(f) Purchase of Note. On the Closing Date, Subscriber will purchase the Note as principal for its own account for investment only and not with a view toward, or for resale in connection with, the public sale or any distribution thereof.

(g) Compliance with Securities Act. Such Subscriber understands and agrees that the Securities have not been registered under the 1933 Act or any applicable state securities laws, by reason of their issuance in a transaction that does not require registration under the 1933 Act (based in part on the accuracy of the representations and warranties of the Subscriber contained herein), and that such Securities must be held indefinitely unless a subsequent disposition is registered under the 1933 Act or any applicable state securities laws or is exempt from such registration. In any event, and subject to compliance with applicable securities laws, the Subscriber may enter into lawful hedging transactions in the course of hedging the position they assume and the Subscriber may also enter into lawful short positions or other derivative transactions relating to the Securities, or interests in the Securities, and deliver the Securities, or interests in the Securities, to close out their short or other positions or otherwise settle other transactions, or loan or pledge the Securities, or interests in the Securities, to third parties who in turn may dispose of these Securities.

(h) Conversion Shares Legend. Unless or until subject to an effective registration statement to be filed on Form S-1, or other appropriate registration statement, registering the conversion shares, the Conversion Shares, shall bear the following or similar legend:

"THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, NOR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR

3

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100017

Composite Exhibit A

SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT.

(i) <u>Note Legend</u>.  The Note shall bear the following legend:

> "BOTH THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE [CONVERTIBLE -OR-EXERCISABLE] HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS.  THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT.

(j) <u>Communication of Offer</u>.  The offer to sell the Securities was directly communicated to such Subscriber by the Company.  At no time was such Subscriber presented with or solicited by any leaflet, newspaper or magazine article, radio or television advertisement, or any other form of general advertising or solicited or invited to attend a promotional meeting otherwise than in connection and concurrently with such communicated offer.

(k) <u>Restricted Securities</u>.  Such Subscriber understands that the Securities have not been registered under the 1933 Act and such Subscriber will not sell, offer to sell, assign, pledge, hypothecate or otherwise transfer any of the Securities unless pursuant to an effective registration statement under the 1933 Act, or unless an exemption from registration is available. Notwithstanding anything to the contrary contained in this Agreement, such Subscriber may transfer (without restriction and without the need for an opinion of counsel) the Securities to its Affiliates (as defined below) provided that each such Affiliate is an "accredited investor" under Regulation D and such Affiliate agrees to be bound by the terms and conditions of this Agreement. For the purposes of this Agreement, an "Affiliate" of any person or entity means any other person or entity directly or indirectly controlling, controlled by or under direct or indirect common control with such person or entity.  Affiliate includes each Subsidiary of the Company. For purposes of this definition, "control" means the power to direct the management and policies of such person or firm, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

(l) <u>No Governmental Review</u>.  Such Subscriber understands that no United States federal or state agency or any other governmental or state agency has passed on or made recommendations or endorsement of the Securities or the suitability of the investment in the Securities nor have such authorities passed upon or endorsed the merits of the offering of the Securities.

4

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100018

Composite Exhibit A

(m) Correctness of Representations.  Such Subscriber represents as to such Subscriber that the foregoing representations and warranties are true and correct as of the date hereof and, unless such Subscriber otherwise notifies the Company prior to the Closing Date shall be true and correct as of the Closing Date.

(n) Acknowledgement of Going Concern.  Such Subscriber recognizes and acknowledges that the Company is a "going concern" as disclosed in its Reports and Other Written Information and as reported by its auditor and may be unable to meet its financial obligations over the next twelve months.

(o) Survival.  The foregoing representations and warranties shall survive one (1) year from the Closing Date.

5. **Company Representations and Warranties**.  The Company represents and warrants to and agrees with each Subscriber that:

(a) Due Incorporation.  The Company is a corporation or other entity duly incorporated or organized, validly existing and in good standing under the laws of the State of Nevada and has the requisite corporate power to own its properties and to carry on its business as presently conducted.  The Company is duly qualified as a foreign corporation to do business and is in good standing in each jurisdiction where the nature of the business conducted or property owned by it makes such qualification necessary, other than those jurisdictions in which the failure to so qualify would not have a Material Adverse Effect.  For purposes of this Agreement, a "Material Adverse Effect" shall mean a material adverse effect on the financial condition, results of operations, prospects, properties or business of the Company and its Subsidiaries taken as a whole.  For purposes of this Agreement, "Subsidiary" means, with respect to any entity at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity of which more than 30% of (i) the outstanding capital stock having (in the absence of contingencies) ordinary voting power to elect a majority of the board of directors or other managing body of such entity, (ii) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such entity.  As of the Closing Date, all of the Company's Subsidiaries and the Company's ownership interest therein are set forth on Schedule 5(a).

(b) Outstanding Stock.  All issued and outstanding shares of capital stock and equity interests in the Company have been duly authorized and validly issued and are fully paid and non-assessable.

(c) Authority; Enforceability.  This Agreement, the Note and the Shares and any other agreements delivered together with this Agreement or in connection herewith (collectively "Transaction Documents") have been duly authorized, executed and delivered by the Company and/or Subsidiaries and are valid and binding agreements of the Company enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer,

5

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100019

Composite Exhibit A

reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights generally and to general principles of equity. The Company has full corporate power and authority necessary to enter into and deliver the Transaction Documents and to perform its obligations thereunder.

(d) Capitalization and Additional Issuances.   The authorized and outstanding capital stock of the Company and Subsidiaries on a fully diluted basis as of the date of this Agreement and the Closing Date (not including the Securities) are set forth on Schedule 5(d). Except as set forth on Schedule 5(d), there are no options, warrants, or rights to subscribe to, securities, rights, understandings or obligations convertible into or exchangeable for or giving any right to subscribe for any shares of capital stock or other equity interest of the Company or any of the Subsidiaries. The only officer, director, employee and consultant stock option or stock incentive plan or similar plan currently in effect or contemplated by the Company is described on Schedule 5(d).   There are no outstanding agreements or preemptive or similar rights affecting the Company's Common Stock.

(e) Consents.  No consent, approval, authorization or order of any court, governmental agency or body or arbitrator having jurisdiction over the Company, or any of its Affiliates, the OTC Bulletin Board (the "Bulletin Board") or the Company's shareholders is required for the execution by the Company of the Transaction Documents and compliance and performance by the Company of its obligations under the Transaction Documents, including, without limitation, the issuance and sale of the Securities.   The Transaction Documents and the Company's performance of its obligations thereunder have been unanimously approved by the Company's Board of Directors.   No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any governmental authority in the world, including without limitation, the United States, or elsewhere is required by the Company or any Affiliate of the Company in connection with the consummation of the transactions contemplated by this Agreement, except as would not otherwise have a Material Adverse Effect or the consummation of any of the other agreements, covenants or commitments of the Company or any Subsidiary contemplated by the other Transaction Documents. Any such qualifications and filings will, in the case of qualifications, be effective on the Closing and will, in the case of filings, be made within the time prescribed by law.

(f) No Violation or Conflict.   Assuming the representations and warranties of the Subscriber in Section 4 are true and correct, neither the issuance nor sale of the Securities nor the performance of the Company's obligations under this Agreement and all other agreements entered into by the Company relating thereto by the Company will:

(i) violate, conflict with, result in a breach of, or constitute a default (or an event which with the giving of notice or the lapse of time or both would be reasonably likely to constitute a default) under (A) the articles or certificate of incorporation, charter or bylaws of the Company, (B) to the Company's knowledge, any decree, judgment, order, law, treaty, rule, regulation or determination applicable to the Company of any court, governmental agency or body, or arbitrator having jurisdiction over the Company or over the properties or assets of the Company or any of its Affiliates, (C) the terms of any bond,

6

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100020

Composite Exhibit A

debenture, note or any other evidence of indebtedness, or any agreement, stock option or other similar plan, indenture, lease, mortgage, deed of trust or other instrument to which the Company or any of its Affiliates is a party, by which the Company or any of its Affiliates is bound, or to which any of the properties of the Company or any of its Affiliates is subject, or (D) the terms of any "lock-up" or similar provision of any underwriting or similar agreement to which the Company, or any of its Affiliates is a party except the violation, conflict, breach, or default of which would not have a Material Adverse Effect; or

(ii) result in the creation or imposition of any lien, charge or encumbrance upon the Securities or any of the assets of the Company or any of its Affiliates except in favor of Subscriber as described herein; or

(iii) result in the activation of any anti-dilution rights or a reset or re-pricing of any debt, equity or security instrument of any creditor or equity holder of the Company, or the holder of the right to receive any debt, equity or security instrument of the Company nor result in the acceleration of the due date of any obligation of the Company; or

(iv) result in the triggering of any piggy-back or other registration rights of any person or entity holding securities of the Company or having the right to receive securities of the Company.

(g) The Securities. The Securities upon issuance:

(i) are, or will be, free and clear of any security interests, liens, claims or other encumbrances, subject only to restrictions upon transfer under the 1933 Act and any applicable state securities laws;

(ii) have been, or will be, duly and validly authorized and on the dates of issuance of the Conversion Shares upon conversion of the Note, such Shares will be duly and validly issued, fully paid and non- assessable, and if registered pursuant to the 1933 Act and resold pursuant to an effective registration statement or exempt from registration will be free trading, unrestricted and unlegended;

(iii) will not have been issued or sold in violation of any preemptive or other similar rights of the holders of any securities of the Company or rights to acquire securities of the Company; and

(iv) will not subject the holders thereof to personal liability by reason of being such holders.

(h) Litigation. There is no pending or, to the best knowledge of the Company, threatened action, suit, proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over the Company, or any of its Affiliates that would affect the execution by the Company or the complete and timely

7

Composite Exhibit A

performance by the Company of its obligations under the Transaction Documents. Except as disclosed in the Reports, there is no pending or, to the best knowledge of the Company, basis for or threatened action, suit, proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over the Company, or any of its Affiliates which litigation if adversely determined would have a Material Adverse Effect.

(i) <u>No Market Manipulation</u>. The Company and its Affiliates have not taken, and will not take, directly or indirectly, any action designed to, or that might reasonably be expected to, cause or result in stabilization or manipulation of the price of the Common Stock to facilitate the sale or resale of the Securities or affect the price at which the Securities may be issued or resold.

(j) <u>Information Concerning Company</u>.   The Reports and Other Written Information contain all material information relating to the Company and its operations and financial condition as of their respective dates which information is required to be disclosed therein.   Since March 31, 2010, and except as modified in the Reports and Other Written Information or in the Schedules hereto, there has been no Material Adverse Effect relating to the Company's business, financial condition or affairs. The Reports and Other Written Information, including the financial statements included therein do not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, taken as a whole, not misleading in light of the circumstances and when made.

(k) <u>Defaults</u>.   The Company is not in material violation of its articles of incorporation or bylaws.   The Company is (i) not in default under or in violation of any other material agreement or instrument to which it is a party or by which it or any of its properties are bound or affected, which default or violation would have a Material Adverse Effect, (ii) not in default with respect to any order of any court, arbitrator or governmental body or subject to or party to any order of any court or governmental authority arising out of any action, suit or proceeding under any statute or other law respecting antitrust, monopoly, restraint of trade, unfair competition or similar matters which default would have a Material Adverse Effect, or (iii) not in violation of any statute, rule or regulation of any governmental authority which violation would have a Material Adverse Effect except as set forth in the note below.

(l) <u>No Integrated Offering</u>.   Neither the Company, nor any of its Affiliates, nor any person acting on its or their behalf, has directly or indirectly made any offers or sales of any security of the Company nor solicited any offers to buy any security of the Company under circumstances that would cause the offer of the Securities pursuant to this Agreement to be integrated with prior offerings by the Company for purposes of the 1933 Act or any applicable stockholder approval provisions, including, without limitation, under the rules and regulations of the Bulletin Board.   No prior offering will impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder.  Neither the Company nor any of its Affiliates will

8

Composite Exhibit A

take any action or steps that would cause the offer or issuance of the Securities to be integrated with other offerings which would impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder. The Company will not conduct any offering other than the transactions contemplated hereby that may be integrated with the offer or issuance of the Securities that would impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder.

(m) No General Solicitation.  Neither the Company, nor any of its Affiliates, nor to its knowledge, any person acting on its or their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D under the 1933 Act) in connection with the offer or sale of the Securities.

(n) No Undisclosed Liabilities.  The Company has no liabilities or obligations which are material, individually or in the aggregate, other than those incurred in the ordinary course of the Company businesses since March 31, 2009 (Form 10Q for third quarter then ended) and which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, except as disclosed in the Reports or on Schedule 5(n).

(o) No Undisclosed Events or Circumstances.  Since March 31, 2009, except as disclosed in the Reports, no event or circumstance has occurred or exists with respect to the Company or its businesses, properties, operations or financial condition, that, under applicable law, rule or regulation, requires public disclosure or announcement prior to the date hereof by the Company but which has not been so publicly announced or disclosed in the Reports.

(p) Dilution.  The Company's executive officers and directors understand the nature of the Securities being sold hereby and recognize that the issuance of the Securities will have a potential dilutive effect on the equity holdings of other holders of the Company's equity or rights to receive equity of the Company.  The board of directors of the Company has concluded, in its good faith business judgment that the issuance of the Securities is in the best interests of the Company.   The Company specifically acknowledges that its obligation to issue the Conversion Shares upon conversion of the Note is binding upon the Company and enforceable regardless of the dilution such issuance may have on the ownership interests of other shareholders of the Company or parties entitled to receive equity of the Company.

(q) No Disagreements with Accountants and Lawyers.  Other than the opinion regarding the Company's ability to continue as a "going concern," as disclosed in the Company's Reports, there are no material disagreements of any kind presently existing, or reasonably anticipated by the Company to arise between the Company and the accountants and lawyers previously and presently employed by the Company, including but not limited to disputes or conflicts over payment owed to such accountants and lawyers, nor have there been any such disagreements during the two years prior to the Closing Date.

9

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100023

Composite Exhibit A

(r) <u>Investment Company</u>.   Neither the Company nor any Affiliate of the Company is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(s) <u>Foreign Corrupt Practices</u>.  Neither the Company, nor to the knowledge of the Company, any agent or other person acting on behalf of the Company, has (i) directly or indirectly, used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to foreign or domestic political activity, (ii) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (iii) failed to disclose fully any contribution made by the Company (or made by any person acting on its behalf of which the Company is aware) which is in violation of law, or (iv) violated in any material respect any provision of the Foreign Corrupt Practices Act of 1977, as amended.

(t) <u>Reporting Company/Shell Company</u>.   The Company is a publicly-held company subject to reporting obligations pursuant to Section 13 of the Securities Exchange Act of 1934, as amended (the "1934 Act") and has a class of Common Stock registered pursuant to Section 12(g) of the 1934 Act.  Pursuant to the provisions of the 1934 Act, the Company has filed all reports and other materials required to be filed thereunder with the Commission during the preceding twelve months..

(u) <u>Listing</u>.  The Company's Common Stock is quoted on the OTCQB® under the symbol NTEK.   The Company has not received any oral or written notice that its Common Stock is not eligible nor will become ineligible for quotation on the Bulletin Board nor that its Common Stock does not meet all requirements for the continuation of such quotation.   The Company believes that it satisfies all the requirements for the continued quotation of its Common Stock on the Bulletin Board.

(v) <u>Transfer Agent</u>.   The Company's transfer agent is a participant in the Depository Trust Company Automated Securities Transfer Program. The name, address, telephone number, fax number, contact person and email address of the Company transfer agent is as follows: Stalt, Inc., 671 Oak Grove Avenue, Menlo Park, California 94025 – Telephone (650) 321-7111 Fax (650) 321-7113.

(w) Company Predecessor and Subsidiaries.  The Company makes each of the representations contained in Sections 5(a), (b), (c), (d), (e), (f), (h), (j), (k), (n), (o), (p), (q), (r) and (s) of this Agreement, as same relate or could be applicable to each Subsidiary.  All representations made by or relating to the Company of a historical or prospective nature and all undertakings described in Sections 9(g) through 9(l) shall relate, apply and refer to the Company and its predecessors and successors.   The Company represents that it owns all of the equity of the Subsidiaries and rights to receive equity of the Subsidiaries identified on Schedule 5(a), free and clear of all liens, encumbrances and claims, except as set forth on Schedule 5(a).  No person or entity other than the Company has the right to receive any equity interest in the Subsidiaries.  With

10

Composite Exhibit A

the exception of the pre-merger name, Aldar Group, Inc., the Company further represents that the Subsidiaries have not been known by any other name for the prior five (5) years.

(x)  Correctness of Representations.  The Company represents that the foregoing representations and warranties are true and correct as of the date hereof in all material respects, and, unless the Company otherwise notifies the Subscriber prior to the Closing Date, shall be true and correct in all material respects as of the Closing Date; provided, that, if such representation or warranty is made as of a different date, in which case such representation or warranty shall be true as of such date.

(y)  Survival.  The foregoing representations and warranties shall survive for a period of one (1) year after the Closing Date.

6.  **Regulation D Offering/Legal Opinion**.  The offer and issuance of the Securities to the Subscriber is being made pursuant to the exemption from the registration provisions of the 1933 Act afforded by Section 4(2) or Section 4(6) of the 1933 Act and/or Rule 506 of Regulation D promulgated thereunder.  The Company will provide, at the Company's expense, such other legal opinions, if any, as are reasonably necessary in each Subscriber's opinion for the issuance and resale of the Common Stock issuable upon conversion of the Notes pursuant to an effective registration statement, Rule 144 under the 1933 Act or an exemption from registration.

7.  **Conversion of Note**.

(a) Upon the conversion of a Note or part thereof (which conversion is defined fully in the Note attached as Exhibit "A") , the Company shall, at its own cost and expense, take all necessary action, including obtaining and delivering, an opinion of counsel to assure that the Company's transfer agent shall issue stock certificates in the name of Subscriber (or its permitted nominee) or such other persons as designated by Subscriber and in such denominations to be specified at conversion representing the number of shares of Common Stock issuable upon such conversion.  The Company warrants that no instructions other than these instructions have been or will be given to the transfer agent of the Company's Common Stock and that the certificates representing such shares shall contain no legend other than the legend set forth in Section 4(h). If and when Subscriber sells the Shares, assuming (i) a registration statement including such Shares for registration, filed with the Commission is effective and the prospectus, as supplemented or amended, contained therein is current and (ii) Subscriber or its agent confirms in writing to the transfer agent that Subscriber has complied with the prospectus delivery requirements, the Company will reissue the Shares without restrictive legend and the Shares will be free-trading, and freely transferable.   In the event that the Shares are sold in a manner that complies with an exemption from registration, the Company will promptly instruct its counsel to issue to the transfer agent an opinion permitting removal of the legend indefinitely, if pursuant to Rule 144(b)(1)(i) of the 1933 Act, or for 90 days if pursuant to the other provisions of Rule 144 of the 1933 Act, provided that Subscriber delivers all reasonably requested representations in support of such opinion.

(b) Subscriber will give notice of its decision to exercise its right to convert the Note, interest, or part thereof by telecopying, or otherwise delivering a completed Notice of

Conversion (a form of which is annexed as Exhibit A to the Note) to the Company via confirmed telecopier transmission or otherwise pursuant to Section 13(a) of this Agreement.  Subscriber will not be required to surrender the Note until the Note has been fully converted or satisfied.  Each date on which a Notice of Conversion is telecopied to the Company in accordance with the provisions hereof by 6 PM Eastern Time ("ET") (or if received by the Company after 6 PM ET, then the next business day) shall be deemed a "Conversion Date." The Company will itself or cause the Company's transfer agent to transmit the Company's Common Stock certificates representing the Conversion Shares issuable upon conversion of the Note to Subscriber via express courier for receipt by Subscriber within one (1) business day after the Conversion Date (such  day being the "Delivery Date").  In the event the Conversion Shares are electronically transferable, then delivery of the Shares must be made by electronic transfer provided request for such electronic transfer has been made by the Subscriber.  A Note representing the balance of the Note not so converted will be provided by the Company to Subscriber if requested by Subscriber, provided Subscriber delivers the original Note to the Company.

(c) The Company understands that a delay in the delivery of the Conversion Shares in the form required pursuant to Section 7.1 hereof could result in economic loss to the Subscriber.  As compensation to Subscriber for such loss, the Company agrees to pay (as liquidated damages and not as a penalty) to Subscriber for late issuance of Conversion Shares in the form required pursuant to Section 7.1 hereof upon conversion of the Note, the amount of $100 per business day after the Delivery Date for each $10,000 of Note principal amount and interest (and proportionately for other amounts) being converted of the corresponding Conversion Shares which are not timely delivered not to exceed a maximum of 15% of the principal amount outstanding on the Note.  The Company shall pay any payments incurred under this Section upon demand.

(d) Adjustments.    The Conversion Price and the amount of Shares issuable upon conversion of the Notes shall be equitably adjusted and as otherwise described in this Agreement and the Note.

(e) Redemption.    The Note shall be redeemable in whole or in part or callable by the Company at any time prior to conversion for the face value of the Note, plus 50%, or part thereof, paid to Subscriber.

8. **Covenants of the Company**.  The Company covenants and agrees with the Subscriber as follows:

(a) Stop Orders.  Subject to the prior notice requirement described in Section 8(n), the Company will advise the Subscriber, within twenty-four hours after it receives notice of issuance by the Commission, any state securities commission or any other regulatory authority of any stop order or of any order preventing or suspending any offering of any securities of the Company, or of the suspension of the qualification of the Common Stock of the Company for offering or sale in any jurisdiction, or the initiation of any proceeding for any such purpose.  The Company will not issue any stop transfer order or other order impeding the sale, resale or delivery of any of the Securities, except as may be required

12

Composite Exhibit A

by any applicable federal or state securities laws and unless contemporaneous notice of such instruction is given to the Subscriber.

(b) Listing/Quotation. The Company shall promptly secure the quotation or listing of the Conversion Shares upon each national securities exchange, or automated quotation system on which the Company's Common Stock is quoted or listed and upon which such Conversion Shares are or become eligible for quotation or listing (subject to official notice of issuance). The Company will maintain the quotation or listing of its Common Stock and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of as applicable. The Company will provide Subscriber with copies of all notices it receives notifying the Company of the threatened and actual delisting of the Common Stock.

(c) Market Regulations. If required, the Company shall notify the Commission, the Principal Market and applicable state authorities, in accordance with their requirements, of the transactions contemplated by this Agreement, and shall take all other necessary action and proceedings as may be required and permitted by applicable law, rule and regulation, for the legal and valid issuance of the Securities to the Subscriber and promptly provide copies thereof to the Subscriber.

(d) Filing Requirements. From the date of this Agreement and until the last to occur of (i) two (2) years after the Closing Date, (ii) until all the Shares have been resold or transferred by the Subscriber pursuant to a registration statement or pursuant to Rule 144(b)(1)(i), or (iii) the Note is no longer outstanding (the date of such latest occurrence being the "End Date"), the Company will (A) cause its Common Stock to continue to be registered under Section 12(b) or 12(g) of the 1934 Act, (B) comply in all respects with its reporting and filing obligations under the 1934 Act, (C) voluntarily comply with all reporting requirements that are applicable to an issuer with a class of shares registered pursuant to Section 12(g) of the 1934 Act, if the Company is not subject to such reporting requirements, and (D) comply with all requirements related to any registration statement filed pursuant to this Agreement. The Company will use its best efforts not to take any action or file any document (whether or not permitted by the 1933 Act or the 1934 Act or the rules thereunder) to terminate or suspend such registration or to terminate or suspend its reporting and filing obligations under said acts until the End Date. Until the End Date, the Company will continue the listing or quotation of the Common Stock on a Principal Market and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Principal Market. The Company agrees to timely file a Form D with respect to the Securities if required under Regulation D and to provide a copy thereof to each Subscriber promptly after such filing.

(e) Use of Proceeds. The proceeds of the Offering will be employed by the Company for expenses of the Offering, the filing of a registration statement pursuant to the 1933 Act, and general working capital. Except as described on Schedule 8(e), the Purchase Price may not and will not be used for accrued and unpaid officer and director salaries, payment of financing related debt, redemption of outstanding notes or equity instruments of the Company nor non-trade obligations outstanding on a Closing Date.

13

For so long as any Note is outstanding, the Company will not prepay any financing related debt obligations, except equipment payments or in the event such payments are made in the ordinary course of business, nor redeem any equity instruments of the Company without the prior consent of the Subscriber.

(f) Reservation.   Prior to the Closing, the Company undertakes to reserve on behalf of Subscriber from its authorized but unissued Common Stock, a sufficient number of shares of Common Stock necessary to allow Subscriber to be able to convert the entire Note.   Failure to have sufficient shares reserved pursuant to this Section 9(f) at any time shall be a material default of the Company's obligations under this Agreement and an Event of Default under the Note.  If at any time the Note is outstanding the Company has insufficient Common Stock reserved on behalf of the Subscriber in an amount less than the amount necessary for full conversion of the outstanding Note principal and interest at the conversion price that would be in effect on every such date ("Minimum Required Reservation"), the Company will promptly reserve the Minimum Required Reservation, or if there are insufficient authorized and available shares of Common Stock to do so, the Company will take all action necessary to increase its authorized capital to be able to fully satisfy its reservation requirements hereunder, including the filing of a preliminary proxy with the Commission not later than fifteen days after the first day the Company has less than the Minimum Required Reservation. The Company agrees to provide notice to the Subscriber not later than five days after the date the Company has less than the Minimum Required Reservation reserved on behalf of the Subscriber.

(g) DTC Program.   At all times that Notes are outstanding, the Company will employ as the transfer agent for the Common Stock, and Conversion Shares a participant in the Depository Trust Company Automated Securities Transfer Program.

(h) Taxes.   From the date of this Agreement and until the End Date, the Company will promptly pay and discharge, or cause to be paid and discharged, when due and payable, all lawful taxes, assessments and governmental charges or levies imposed upon the income, profits, property or business of the Company; provided, however, that any such tax, assessment, charge or levy need not be paid if the validity thereof shall currently be contested in good faith by appropriate proceedings and if the Company shall have set aside on its books adequate reserves with respect thereto, and provided, further, that the Company will pay all such taxes, assessments, charges or levies forthwith upon the commencement of proceedings to foreclose any lien which may have attached as security therefore.

(i) Insurance. As reasonably necessary as determined by the Company, from the date of this Agreement and until the End Date, the Company will keep its assets which are of an insurable character insured by financially sound and reputable insurers against loss or damage by fire, explosion and other risks customarily insured against by companies in the Company's line of business and location, in amounts and to the extent and in the manner customary for companies in similar businesses similarly situated and located and to the extent available on commercially reasonable terms.

14

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100028

Composite Exhibit A

(j) Books and Records.  From the date of this Agreement and until the End Date, the Company will keep true records and books of account in which full, true and correct entries will be made of all dealings or transactions in relation to its business and affairs in accordance with generally accepted accounting principles applied on a consistent basis.

(k) Governmental Authorities.  From the date of this Agreement and until the End Date, the Company shall duly observe and conform in all material respects to all valid requirements of governmental authorities relating to the conduct of its business or to its properties or assets.

(l) Intellectual Property.  From the date of this Agreement and until the End Date, the Company shall maintain in full force and effect its corporate existence, rights and franchises and all licenses and other rights to use intellectual property owned or possessed by it and reasonably deemed to be necessary to the conduct of its business, unless it is sold for value.  Schedule 9(l) hereto identifies all of the intellectual property owned by the Company and Subsidiaries.

(m) Properties.  From the date of this Agreement and until the End Date, the Company will keep its properties in good repair, working order and condition, reasonable wear and tear excepted, and from time to time make all necessary and proper repairs, renewals, replacements, additions and improvements thereto; and the Company will at all times comply with each provision of all leases and claims to which it is a party or under which it occupies or has rights to property if the breach of such provision could reasonably be expected to have a Material Adverse Effect.  The Company will not abandon any of its assets except for those assets which have negligible or marginal value or for which it is prudent to do so under the circumstances.

(n) Negative Covenants.  So long as a Note is outstanding, without the consent of the Subscriber, the Company will not and will not permit any of its Subsidiaries to directly or indirectly:

(i) create, incur, assume or suffer to exist any pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, security title, mortgage, security deed or deed of trust, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction) (each, a "Lien") upon any of its property, whether now owned or hereafter acquired except for: (A) the Excepted Issuances (as defined in Section 12 hereof), and (B) (a) Liens imposed by law for taxes that are not yet due or are being contested in good faith and for which adequate reserves have been established in accordance with generally accepted accounting principles; (b) carriers', warehousemen's, mechanics', material men's, repairmen's and other like

15

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100029

Composite Exhibit A

Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or that are being contested in good faith and by appropriate proceedings; (c) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (d) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business; (e) Liens created with respect to the financing of the purchase of new property in the ordinary course of the Company's business up to the amount of the purchase price of such property; and (f) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property (each of (a) through (f), a "Permitted Lien").

(ii) amend its certificate of incorporation, bylaws or its charter documents so as to materially and adversely affect any rights of the Subscriber (an increase in the amount of authorized shares and an increase in the number of directors will not be deemed adverse to the rights of the Subscriber);

(iii) repay, repurchase or offer to repay, repurchase or otherwise acquire or make any dividend or distribution in respect of any of its Common Stock, preferred stock, or other equity securities other than to the extent permitted or required under the Transaction Documents.

(iv) engage in any transactions with any officer, director, employee or any Affiliate of the Company, including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner, in each case in excess of $25,000 other than (i) for payment of salary, or fees for services rendered, (ii) reimbursement for expenses incurred on behalf of the Company, and (iii) for other employee benefits, including stock option agreements under any stock option plan of the Company; or

(v) prepay or redeem any financing related debt or past due obligations or securities outstanding as of the Closing Date, or past due obligations (except with respect to vendor obligations, any such obligations which in management's good faith, reasonable judgment must be repaid to avoid disruption of the Company's businesses. The Company agrees to provide Subscriber not less than ten (10) days notice prior to becoming obligated to or effectuating a Permitted Lien or Excepted Issuance.

16

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100030

Composite Exhibit A

(s) Seniority.   Except for Permitted Liens, until the Note is fully satisfied or converted, without the consent of the Subscriber, the Company shall not grant nor allow any security interest to be taken in the assets of the Company or any Subsidiary or any Subsidiary's assets; nor issue any debt, equity or other instrument which would give the holder thereof directly or indirectly, a right in any assets of the Company or any Subsidiary or any right to payment equal to or superior to any right of the Subscriber as a holder of the Note in or to such assets or payment, nor issue or incur any debt not in the ordinary course of business.

(t) Notices.   For so long as the Subscriber holds any Securities, the Company will maintain a United States address and United States fax number for notice purposes under the Transaction Documents.

(v) Blackout.   The Company undertakes and covenants that without the consent of the Subscriber, until the end of the Exclusion Period, the Company will not enter into any acquisition, merger, exchange or sale or other transaction or fail to take any action that could have the effect of delaying the effectiveness of any pending registration statement beyond the effective date, or causing an already effective registration statement to no longer be effective or current for a period of forty-five or more days in the aggregate during any three hundred and sixty-five day period.

## 9. Covenants of the Company Regarding Indemnification.

(a) The Company agrees to indemnify, hold harmless, reimburse and defend the Subscriber, the Subscriber's officers, directors, agents, Affiliates, members, managers, control persons, and principal shareholders, against any claim, cost, expense, liability, obligation, loss or damage (including reasonable legal fees) of any nature, incurred by or imposed upon the Subscriber or any such person which results, arises out of or is based upon (i) any material misrepresentation by Company or breach of any representation or warranty by Company in this Agreement or in any Exhibits or Schedules attached hereto in any Transaction Document, or (ii) after any applicable notice and/or cure periods, any breach or default in performance by the Company of any material covenant or undertaking to be performed by the Company hereunder, or any other material agreement entered into by the Company and Subscriber relating hereto.

(b) In no event shall the liability of the Subscriber or permitted successor hereunder or under any Transaction Document or other agreement delivered in connection herewith be greater in amount than the dollar amount of the net proceeds actually received by such Subscriber or successor upon the sale of Registrable Securities (as defined herein).

10. **Registration Rights**. The Company anticipates filing a Form S-1 Registration Statement pursuant to the Securities Act of 1933, as amended, with the Securities and Exchange Commission (the "SEC") no later than five (5) days after execution of this Agreement (the "Registration Statement"). Pursuant to this Registration Statement, Subscriber will be classified as a "Selling Shareholder" and the Securities as defined in this Agreement will be fully registered.

17

Composite Exhibit A

11. <u>Miscellaneous</u>.

(a) Notices.  All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice.  Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be as follows:

If to the Company, to:   NanoTech Entertainment, Inc.
                         2050 Gateway Plaza, Suite 100-122
                         San Jose, CA  95110
                         Attention:  Robert DeKett
                         Telephone:  (408)-642-1559

If to the Investor (s):
                         Long Side Ventures LLC
                         1800 S. Ocean Dr., PH2
                         Hallandale Beach, FL 33009
                         Attention: Ben Kaplan (Managing Member)
                         Telephone:  _____
                         Facsimile:   _____

With a copy to:          Jonathan D. Leinwand, P.A.
                         17501 Biscayne Blvd., Suite 430
                         Aventura, FL 33160
                         Telephone (954) 903-7856
                         Fax: (954) 252-4265

(b) <u>Entire Agreement; Assignment</u>.  This Agreement and other documents delivered in connection herewith represent the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by both parties.  Neither the Company nor the Subscriber has relied on any representations not contained or referred to in

18

Composite Exhibit A

this Agreement and the documents delivered herewith.   No right or obligation of the Company shall be assigned without prior notice to and the written consent of the Subscriber.

(c) Counterparts/Execution.  This Agreement may be executed in any number of counterparts and by the different signatories hereto on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute but one and the same instrument.  This Agreement may be executed by facsimile transmission, PDF, electronic signature or other similar electronic means with the same force and effect as if such signature page were an original thereof.

(d) Law Governing this Agreement.  This Agreement shall be governed by and construed in accordance with the laws of the State of Florida without regard to principles of conflicts of laws.  Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of Florida or in the federal courts located in the State of Florida and county of Broward.  The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens.  The parties executing this Agreement and other agreements referred to herein or delivered in connection herewith on behalf of the Company agree to submit to the in personam jurisdiction of such courts and hereby irrevocably waive trial by jury.  The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs.  In the event that any provision of this Agreement or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law.  Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement.  Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement or any other Transaction Document by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.   Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

(e) Specific Enforcement, Consent to Jurisdiction.   The Company and Subscriber acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the parties shall be entitled to seek an injunction or injunctions to prevent or cure breaches of the provisions of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which any of them may be entitled by law or equity.  Subject to Section 13(d) hereof, the Company hereby irrevocably waives, and agrees not to assert in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction in Nevada of such court, that the suit, action or proceeding is brought in an inconvenient forum or that the venue of the suit, action or proceeding is improper.  Nothing in this Section shall affect or limit any right to serve process in any other manner permitted by law.

19

(f) <u>Maximum Payments</u>.  Nothing contained herein or in any document referred to herein or delivered in connection herewith shall be deemed to establish or require the payment of a rate of interest or other charges in excess of the maximum permitted by applicable law.  In the event that the rate of interest or dividends required to be paid or other charges hereunder exceed the maximum permitted by such law, any payments in excess of such maximum shall be credited against amounts owed by the Company to the Subscriber and thus refunded to the Company.

(g) <u>Calendar Days</u>.   All references to "days" in the Transaction Documents shall mean calendar days unless otherwise stated.  The terms "business days" and "trading days" shall mean days that the Nevada Stock Exchange is open for trading for three or more hours.  Time periods shall be determined as if the relevant action, calculation or time period were occurring in Nevada City.  Any deadline that falls on a non-business day in any of the Transaction Documents shall be automatically extended to the next business day and interest, if any, shall be calculated and payable through such extended period.

(h) <u>Captions: Certain Definitions</u>.  The captions of the various sections and paragraphs of this Agreement have been inserted only for the purposes of convenience; such captions are not a part of this Agreement and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions of this Agreement.  As used in this Agreement the term "person" shall mean and include an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated organization and a government or any department or agency thereof.

(j) <u>Severability</u>.  In the event that any term or provision of this Agreement shall be finally determined to be superseded, invalid, illegal or otherwise unenforceable pursuant to applicable law by an authority having jurisdiction and venue, that determination shall not impair or otherwise affect the validity, legality or enforceability: (i) by or before that authority of the remaining terms and provisions of this Agreement, which shall be enforced as if the unenforceable term or provision were deleted, or (ii) by or before any other authority of any of the terms and provisions of this Agreement.

(k) <u>Successor Laws</u>.  References in the Transaction Documents to laws, rules, regulations and forms shall also include successors to and functionally equivalent replacements of such laws, rules, regulations and forms.  A successor rule to Rule 144(b)(1)(i) shall include any rule that would be available to a non-Affiliate of the Company for the sale of Common Stock not subject to volume restrictions and after a six month holding period.

20

Composite Exhibit A

## SIGNATURE PAGE TO SUBSCRIPTION

Please acknowledge your acceptance of the foregoing Subscription Agreement by signing and returning a copy to the undersigned whereupon it shall become a binding agreement between us.

NANOTECH ENTERTAINMENT, INC., a Nevada corporation

By: _____

Name: Robert DeKett
Title: CEO

Dated: June 23, 2010

LONG SIDE VENTURES LLC

By: _____
Name: Ben Kaplan
Title: Managing Member

Dated: June ____, 2010

21

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100035

Composite Exhibit A

Exhibit B

DISBURSEMENT SCHEDULE AND USE OF PROCEEDS

Closing Disbursements

| Closing | Recipient | Amount |
|---|---|---|
| Closing | NanoTech Entertainment | $25,000 |
| Closing | Jonathan D. Leinwand PA (Investor Legal Fees) | $5,000 |
| **Total Loan Amount** | | **$30,000** |

The Company and the Investor agree that the above referenced amounts are the agreed upon disbursements and use of proceeds for the sums invested.

NANOTECH ENTERTAINMENT INC.                    LONG SIDE VENTURES LLC

_____                _____

Robert DeKett, CEO                             Ben Kaplan, Managing Member

Date_____June 23, 2010_____              Date_____

22

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100036

Composite Exhibit A

NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT.  NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

Principal Amount: $30,000
Issue Date: June 23, 2010

## CONVERTIBLE PROMISSORY NOTE

FOR VALUE RECEIVED,  NanoTech Entertainment, Inc., a Nevada corporation (hereinafter called "Borrower"), hereby promises to pay to Long Side Ventures LLC whose address is 1800 S. Ocean Dr. PH2, Hallandale Beach, FL 33009 (the "Holder") on order, without demand, the sum of THIRTY THOUSAND DOLLARS ($30,000) ("Principal Amount") on June 23, 2012 (the "Maturity Date"), if not sooner paid.

This Note has been entered into pursuant to the terms of a subscription agreement between the Borrower and the Holder dated at or about the date hereof (the "Subscription Agreement"), and shall be governed by the terms of such Subscription Agreement. Unless otherwise separately defined herein, all capitalized terms used in this Note shall have the same meaning as is set forth in the Subscription Agreement.

## ARTICLE I
## GENERAL PROVISIONS

1.1 Payment Grace Period.  The Borrower shall have a five (5) day grace period to pay any monetary amounts due under this Note, after which grace period a default interest rate of fifteen percent (15%) per annum shall apply.

1.2 Conversion Privileges.  The Conversion Privileges set forth in Article II shall remain in full force and effect immediately from the date hereof and until the Note is paid in full regardless of the occurrence of an Event of Default.  The Note shall be payable in full on the Maturity Date, unless previously converted into Common Stock in accordance with Article II hereof.

1.3 Security Interest – The Borrower has caused 3,000,000 (THREE MILLION) to be deposited with Jonathan D. Leinwand, P.A. as collateral for the obligations of the Company pursuant to this note.

Composite Exhibit A

## ARTICLE II
## CONVERSION RIGHTS

The Borrower shall have the right to convert the principal and any interest due under this Note into Shares of the Borrower's Common Stock, $.001 par value per share ("Common Stock") as set forth below.

2.1. Conversion into the Borrower's Common Stock.

(a) The Borrower shall have the right from and after the date of the issuance of this Note and then at any time until this Note is fully paid, to convert any outstanding and unpaid principal portion of this Note (in whole or in part), and accrued interest, at the election of the Borrower (the date of giving of such notice of conversion being a "Conversion Date") into fully paid and nonassessable shares of Common Stock as such stock exists on the date of issuance of this Note, or any shares of capital stock of Borrower into which such Common Stock shall hereafter be changed or reclassified, at the Conversion Price as defined in Section 2.1(b) hereof, determined as provided herein. Upon delivery to the Holder of a completed Notice of Conversion, a form of which is annexed hereto as Exhibit A, Borrower shall issue and deliver to the Holder within one (1) business day after the Conversion Date (such day being the "Delivery Date") that number of shares of Common Stock for the portion of the Note converted in accordance with the foregoing. Such shares are to be delivered via DWAC, if eligible, or otherwise shall deliver the certificate via overnight mail to the address provided by the Holder. The number of shares of Common Stock to be issued upon each conversion of this Note shall be determined by dividing that portion of the outstanding principal amount of the Note and accrued but unpaid interest calculated at 15% per annum, if any, to be converted, by the Conversion Price.

(b) Subject to adjustment as provided in Section 2.1(c) hereof, the conversion price per share shall be at a rate of 30% of the average the lowest intraday trading prices during the 15 trading days prior to conversion

(c) The Conversion Price and number and kind of shares or other securities to be issued upon conversion determined pursuant to Section 2.1(a), shall be subject to adjustment from time to time upon the happening of certain events while this conversion right remains outstanding, as follows:

(i). Merger, Sale of Assets, etc.  If (A) the Borrower effects any merger or consolidation of the Borrower with or into another entity, (B) the Borrower effects any sale of all or substantially all of its assets in one or a series of related transactions, (C) any tender offer or exchange offer (whether by the Borrower or another entity) is completed pursuant to which holders of Common Stock are permitted to tender or exchange their shares for other securities, cash or property, (D) the Borrower consummates a stock purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with one or more persons or entities whereby such other persons or entities acquire more than the 50% of the outstanding shares of Common Stock (not including any shares of Common Stock held by such other persons or entities making or party to, or associated or

affiliated with the other persons or entities making or party to, such stock purchase agreement or other business combination), (E) any "person" or "group" (as these terms are used for purposes of Sections 13(d) and 14(d) of the 1934 Act) is or shall become the "beneficial owner" (as defined in Rule 13d-3 under the 1934 Act), directly or indirectly, of 50% of the aggregate Common Stock of the Borrower, or (F) the Borrower effects any reclassification of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property (in any such case, a "Fundamental Transaction"), this Note, as to the unpaid principal portion thereof and accrued interest thereon, shall thereafter be deemed to evidence the right to convert into such number and kind of shares or other securities and property as would have been issuable or distributable on account of such Fundamental Transaction, upon or with respect to the securities subject to the conversion right immediately prior to such Fundamental Transaction. The foregoing provision shall similarly apply to successive Fundamental Transactions of a similar nature by any such successor or purchaser. Without limiting the generality of the foregoing, the anti-dilution provisions of this Section shall apply to such securities of such successor or purchaser after any such Fundamental Transaction.

(ii). Reclassification, etc. If the Borrower at any time shall, by reclassification or otherwise, change the Common Stock into the same or a different number of securities of any class or classes that may be issued or outstanding, this Note, as to the unpaid principal portion thereof and accrued interest thereon, shall thereafter be deemed to evidence the right to purchase an adjusted number of such securities and kind of securities as would have been issuable as the result of such change with respect to the Common Stock immediately prior to such reclassification or other change.

(d) During the period the conversion right exists, Borrower will reserve from its authorized and unissued Common Stock a sufficient number of shares of Common Stock so as to effect conversion of this Note. Borrower represents that upon issuance, such shares will be duly and validly issued, fully paid and non-assessable. Borrower agrees that its issuance of this Note shall constitute full authority to its officers, agents, and transfer agents who are charged with the duty of executing and issuing stock certificates to execute and issue the necessary certificates for shares of Common Stock upon the conversion of this Note.

2.2 Method of Conversion. This Note may be converted by the Borrower in whole or in part as described in Section 2.1(a) and the Subscription Agreement. Upon partial conversion of this Note, a new Note containing the same date and provisions of this Note shall, at the request of the Holder, be issued by the Borrower to the Holder for the principal balance of this Note and interest which shall not have been converted or paid.

2.3. Maximum Conversion. (a)      Notwithstanding anything to the contrary contained herein, the number of Conversion Shares that may be acquired by the Subscriber upon conversion of the Notes (or otherwise in respect hereof) shall be limited to the extent necessary to ensure that, following such conversion (or other issuance), the total number of shares of Common Stock then beneficially owned by such Subscriber and its affiliates and any other persons whose beneficial ownership of Common Stock would be aggregated with the

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100039

Composite Exhibit A

Subscriber's for purposes of Section 13(d) of the 1934 Act, does not exceed 4.999% of the total number of issued and outstanding shares of Common Stock (including for such purpose the shares of Common Stock issuable upon such conversion). For such purposes, beneficial ownership shall be determined in accordance with Section 13(d) of the 1934 Act and the rules and regulations promulgated thereunder. By written notice to the Company, a Subscriber may waive the provisions of this Section 2.3(a) as to itself but any such waiver will not be effective until the 61st day after delivery thereof and such waiver shall have no effect on any other Subscriber.

(b)     Notwithstanding anything to the contrary contained herein, the number of Conversion Shares that may be acquired by the Subscriber upon conversion of the Notes (or otherwise in respect hereof) shall be limited to the extent necessary to ensure that, following such conversion (or other issuance), the total number of shares of Common Stock then beneficially owned by such Subscriber and its affiliates and any other persons whose beneficial ownership of Common Stock would be aggregated with the Subscriber's for purposes of Section 13(d) of the 1934 Act, does not exceed 9.999% of the total number of issued and outstanding shares of Common Stock (including for such purpose the shares of Common Stock issuable upon such conversion). For such purposes, beneficial ownership shall be determined in accordance with Section 13(d) of the 1934 Act and the rules and regulations promulgated thereunder. This provision may not be waived.

2.4. Optional Redemption of Principal Amount. Provided an Event of Default or an event which with the passage of time or the giving of notice could become an Event of Default has not occurred, whether or not such Event of Default has been cured, the Borrower will have the option of prepaying the outstanding Principal Amount of this Note ("Optional Redemption"), in whole or in part, by paying to the Holder a sum of money equal the Principal amount plus an additional 50% thereof, together with accrued but unpaid interest thereon and any and all other sums due, accrued or payable to the Holder arising under this Note or any Transaction Document through the Redemption Payment Date as defined below (the "Redemption Amount"). Borrower's election to exercise its right to prepay must be by notice in writing ("Notice of Redemption"). The Notice of Redemption shall specify the date for such Optional Redemption (the "Redemption Payment Date"), which date shall be at least thirty (30) business days after the date of the Notice of Redemption (the "Redemption Period"). A Notice of Redemption shall not be effective with respect to any portion of the Principal Amount for which the Holder has previously delivered an election to convert, or subject to the previous sentence, for conversions initiated or made by the Holder during the Redemption Period. On the Redemption Payment Date, the Redemption Amount, less any portion of the Redemption Amount against which the Holder has permissibly exercised its conversion rights, shall be paid in good funds to the Holder. In the event the Borrower fails to pay the Redemption Amount on the Redemption Payment Date as set forth herein, then (i) such Notice of Redemption will be null and void, (ii) Borrower will have no right to deliver another Notice of Redemption, and (iii) Borrower's failure may be deemed by Holder to be a non-curable Event of Default. A Notice of Redemption may not be given nor may the Borrower effectuate a Redemption without the consent of the Holder, if at any time during the Redemption Period an Event of Default, or an event which with the passage of time or giving of notice could become an Event of Default (whether or not such Event of Default

has been cured), has occurred. During the Optional Redemption Period, the Company must abide by all of its obligations to the Note Holder.

## ARTICLE III
## EVENT OF DEFAULT

The occurrence of any of the following events of default ("Event of Default") shall, at the option of the Holder hereof, make all sums of principal and interest then remaining unpaid hereon and all other amounts payable hereunder immediately due and payable, upon demand, without presentment, or grace period, all of which hereby are expressly waived, except as set forth below:

3.1 Failure to Pay Principal or Interest. The Borrower fails to pay the principal, interest or other sum due under this Note when due.

3.2 Breach of Covenant. The Borrower breaches any material covenant or other term or condition of the Subscription Agreement or this Note in any material respect and such breach, if subject to cure, continues for a period of thirty (30) days after written notice to the Borrower from the Holder.

3.3 Breach of Representations and Warranties. Any material representation or warranty of the Borrower made herein, in the Subscription Agreement or any Transaction Document shall be false or misleading in any material respect as of the date made and the Closing Date.

3.4 Liquidation. Any dissolution, liquidation or winding up of Borrower or any substantial portion of its business.

3.5 Cessation of Operations. Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they come due.

3.6 Maintenance of Assets. The failure by Borrower to maintain any material intellectual property rights, personal, real property or other assets which are necessary to conduct its business (whether now or in the future).

3.7 Receiver or Trustee. The Borrower or any Subsidiary of Borrower shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business; or such a receiver or trustee shall otherwise be appointed.

3.8 Judgments. Any money judgment, writ or similar final process shall be entered or filed against Borrower or any of its property or other assets for more than $100,000.

3.9 Bankruptcy. Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings or relief under any bankruptcy law or any law, or the issuance of any notice in

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100041

Composite Exhibit A

relation to such event, for the relief of debtors shall be instituted by or against the Borrower or any Subsidiary of Borrower.

3.10 <u>Non-Payment</u>.   A default by the Borrower under any one or more obligations in an aggregate monetary amount in excess of $100,000 for more than twenty days after the due date, unless the Borrower is contesting the validity of such obligation in good faith and has segregated cash funds equal to not less than one-half of the contested amount.

3.11 <u>Stop Trade</u>.   An SEC or judicial stop trade order or Principal Market trading suspension that lasts for five (5) or more consecutive trading days.

3.12 <u>Failure to Deliver Common Stock or Replacement Note</u>.   Borrower's failure to timely deliver Common Stock to the Holder pursuant to and in the form required by this Note and Sections 7 and 11 of the Subscription Agreement, or, if required, a replacement Note.

3.13 <u>Reservation Default</u>.   Failure by the Borrower to have reserved for issuance upon conversion of the Note or upon exercise of the Warrants issued in connection with the Subscription Agreement, the number of shares of Common Stock as required in the Subscription Agreement, this Note and the Warrants, and such failure continues for a period of thirty (30) days.

3.14 <u>Financial Statement Restatement</u>.   The restatement of any financial statements filed by the Borrower with the Securities and Exchange Commission for any date or period from two years prior to the Issue Date of this Note and until this Note is no longer outstanding, if the result of such restatement would, by comparison to the un-restated financial statements, have constituted a Material Adverse Effect.

3.15 <u>Event Described in Subscription Agreement</u>.   The occurrence of an Event of Default as described in the Subscription Agreement that, if susceptible to cure, is not cured during any designated cure period.

3.16 <u>Executive Officers Breach of Duties</u>.   Any of Borrower's named executive officers or directors is convicted of a violation of securities laws, or a settlement in excess of $250,000 is reached by any such officer or director relating to a violation of securities laws, breach of fiduciary duties or self-dealing.

## ARTICLE IV
## MISCELLANEOUS

4.1 <u>Failure or Indulgence Not Waiver</u>.   No failure or delay on the part of the Holder hereof in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.   All rights and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100042

Composite Exhibit A

4.2 <u>Notices</u>.   All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the first business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.  The addresses for such communications shall be:

If to the Company, to:           NanoTech Entertainment, Inc.
                                 2050 Gateway Plaza, Suite 100-122
                                 San Jose, CA  95110
                                 Attention:   Robert DeKett
                                 Telephone:  (408)-642-1559

If to the Investor (s):          Long Side Ventures LLC
                                 1800 S. Ocean Dr. PH2
                                 Hallandale Beach, FL 33009
                                 Attention:  Ben Kaplan (Portfolio Manager)
                                 Telephone:  _____
                                 Facsimile:   _____

                                 With a copy to:
                                 Joanthan D. Leinwand, Esq.
                                 17501 Biscayne Blvd., Suite 430
                                 Aventura, FL 33160
                                 Tel. 954-903-7856
                                 Fax. 954-252-4265

4.3 <u>Amendment Provision</u>.  The term "Note" and all reference thereto, as used throughout this instrument, shall mean this instrument as originally executed, or if later amended or supplemented, then as so amended or supplemented.

4.4 <u>Assignability</u>.  This Note shall be binding upon the Borrower and its successors and assigns, and shall inure to the benefit of the Holder and its successors and assigns.

4.5 <u>Cost of Collection</u>.  If default is made in the payment of this Note, Borrower shall pay the Holder hereof reasonable costs of collection, including reasonable attorneys' fees.

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100043

Composite Exhibit A

4.6 Governing Law. This Note shall be governed by and construed in accordance with the laws of the State of Florida without regard to conflicts of laws principles that would result in the application of the substantive laws of another jurisdiction. Any action brought by either party against the other concerning the transactions contemplated by this Agreement must be brought only in the civil or state courts of Florida or in the federal courts located in the State and county of Broward. Both parties and the individual signing this Agreement on behalf of the Borrower agree to submit to the jurisdiction of such courts. The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or unenforceability of any other provision of this Note. Nothing contained herein shall be deemed or operate to preclude the Holder from bringing suit or taking other legal action against the Borrower in any other jurisdiction to collect on the Borrower's obligations to Holder, to realize on any collateral or any other security for such obligations, or to enforce a judgment or other decision in favor of the Holder. This Note shall be deemed an unconditional obligation of Borrower for the payment of money and, without limitation to any other remedies of Holder, may be enforced against Borrower by summary proceeding pursuant to Florida Civil Procedure Laws and Rules.

4.7 Maximum Payments. Nothing contained herein shall be deemed to establish or require the payment of a rate of interest or other charges in excess of the maximum rate permitted by applicable law. In the event that the rate of interest required to be paid or other charges hereunder exceed the maximum rate permitted by applicable law, any payments in excess of such maximum rate shall be credited against amounts owed by the Borrower to the Holder and thus refunded to the Borrower.

4.8 Non-Business Days. Whenever any payment or any action to be made shall be due on a Saturday, Sunday or a public holiday under the laws of the State of Florida, such payment may be due or action shall be required on the next succeeding business day and, for such payment, such next succeeding day shall be included in the calculation of the amount of accrued interest payable on such date.

4.9 Redemption. This Note may be redeemed or called in full or in part with or without the consent of the Holder.

4.10 Shareholder Status. The Holder shall not have rights as a shareholder of the Borrower with respect to unconverted portions of this Note. However, the Holder will have the rights of a shareholder of the Borrower with respect to the Shares of Common Stock to be received after delivery by the Holder of a Conversion Notice to the Borrower.

[Balance of this Page Intentionally Left Blank]

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100044

Composite Exhibit A

IN WITNESS WHEREOF, Borrower has caused this Note to be signed in its name by an authorized officer as of the 23rd day of June 2010.

NANOTECH ENTERTAINMENT, INC., a Nevada corporation

By: _____
Name: Robert DeKett
Title: CEO

Dated: June 23, 2010

**LONG SIDE VENTURES LLC**

By:_____
Name: Ben Kaplan
Title: Managing Member

Dated: June ___, 2010

# NANO TECH ENTERTAINMENT, INC.

## CONVERTIBLE NOTE
## SUBSCRIPTION AGREEMENT

**THIS SUBSCRIPTION AGREEMENT** (this "Agreement"), is dated as of August 12, 2010, by and between NanoTech Entertainment, Inc., a Nevada corporation (the "Company"), and the subscriber identified on the signature page hereto ("Subscriber").

**WHEREAS**, the Company and Subscriber are executing and delivering this Agreement in reliance upon an exemption from securities registration afforded by the provisions of Section 4(2), Section 4(6) and/or Regulation D ("Regulation D") as promulgated by the United States Securities and Exchange Commission (the "Commission") under the Securities Act of 1933, as amended (the "1933 Act"); and

**WHEREAS**, the parties desire that, upon the terms and subject to the conditions contained herein, the Subscriber shall lend to the Company $26,000 (the Principal Amount) as per the Disbursement Schedule set forth in Exhibit "A" under the terms and conditions outlined ("Principal Amount") in a Convertible Promissory Note from the Company ("Note"), the form of which is annexed hereto as Exhibit "B", convertible into shares of the Company's Common Stock, $0.001 par value (the "Common Stock") at a per share conversion price set forth in the Note ("Conversion Price") (collectively the "Offering"). The Convertible Promissory Note (the "Note") and the shares of Common Stock issuable upon conversion of the Note (the "Shares" or "Conversion Shares"), are collectively referred to herein as the "Securities."):

**NOW, THEREFORE**, in consideration of the mutual covenants and other agreements contained in this Agreement the Company and the Subscriber hereby agree as follows:

1. **Closing Date**. The "Closing Date" shall be the date that the Principle Amount is transmitted by wire transfer or otherwise credited to or for the benefit of the Company. Subject to the satisfaction or waiver of the terms and conditions of this Agreement, on the Closing Date, Subscriber shall lend to the Company which shall be evidenced by the Note in the aggregate Principal Amount of $26,000.

2. **Closing Deliverables**.
   a.    Subject to the satisfaction or waiver of the terms and conditions of this Agreement, on the Closing Date, the Subscriber and Company shall execute a Convertible Promissory Note which shall detail the terms and conditions for repayment as indicated thereon.

   b.    The Company shall provide the Subscriber with warrant to purchase that number of shares into which the Note is convertible into if the Note was converted on the day of the Closing. The exercise price shall be equal to closing price on the trading day immediately preceding the Closing Date.

   c.    Pursuant hereto the Company shall provide the Subscriber a "royalty" equal to 1.5% of the Company's gross sales up to an aggregate amount not to exceed 2.5 times



1

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100046



**EXHIBIT**
**B**
Composite Exhibit A

the Principal Amount of the Note. As the Subscriber may lend money to the Company from time-to-time the Royalty percentage shall not increase but the loan amounts shall aggregate.

3. **Subscriber Representations and Warranties.** Subscriber hereby represents and warrants to and agrees with the Company that:

(a) Organization and Standing of the Subscriber. If Subscriber is an entity, such Subscriber is a corporation, partnership or other entity duly incorporated or organized, validly existing and in good standing under the laws of the State of Nevada.

(b) Authorization and Power. Such Subscriber has the requisite power and authority to enter into and perform this Agreement and the other Transaction Documents (as defined herein) and to purchase the Note being sold to it hereunder. The execution, delivery and performance of this Agreement and the other Transaction Documents by such Subscriber and the consummation by it of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate or partnership action, and no further consent or authorization of such Subscriber or its Board of Directors, stockholders, partners, members, as the case may be, is required. This Agreement and the other Transaction Documents have been duly authorized, executed and delivered by such Subscriber and constitutes, or shall constitute when executed and delivered, a valid and binding obligation of such Subscriber enforceable against such Subscriber in accordance with the terms thereof.

(c) No Conflicts. The execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation by such Subscriber of the transactions contemplated hereby and thereby or relating hereto do not and will not (i) result in a violation of such Subscriber's charter documents or bylaws or other organizational documents or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of any agreement, indenture or instrument or obligation to which such Subscriber is a party or by which its properties or assets are bound, or result in a violation of any law, rule, or regulation, or any order, judgment or decree of any court or governmental agency applicable to such Subscriber or its properties (except for such conflicts, defaults and violations as would not, individually or in the aggregate, have a material adverse effect on such Subscriber). Such Subscriber is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental agency in order for it to execute, deliver or perform any of its obligations under this Agreement and the other Transaction Documents or to purchase the Securities in accordance with the terms hereof, provided that for purposes of the representation made in this sentence, such Subscriber is assuming and relying upon the accuracy of the relevant representations and agreements of the Company herein.

(d) Information on Company. Such Subscriber has been furnished with or has had access to the EDGAR Website of the Commission to the Company's Form 10-K filed on May 25, 2010 for the fiscal year ended June 30, 2009 and the financial statements included therein, Form 10-Q filed on May 25, 2010 for the quarter ended March 31, 2010, and for the quarter ended December 31, 2009 together with all other filings made with the Commission available at the EDGAR website until five days before the Closing Date (hereinafter referred to collectively as



2

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100047

Composite Exhibit A

the "Reports").  In addition, such Subscriber may have received in writing from the Company such other information concerning its operations, financial condition and other matters as such Subscriber has requested in writing, identified thereon as Other Written Information (such other information is collectively, the "Other Written Information"), and considered all factors such Subscriber deems material in deciding on the advisability of investing in the Securities.  Such Subscriber has relied on the Reports and Other Written Information in making its investment decision.

(e) Information on Subscriber.  Subscriber is, and will be at the time of the conversion of the Notes, an "accredited investor", as such term is defined in Regulation D promulgated by the Commission under the 1933 Act, is experienced in investments and business matters, has made investments of a speculative nature and has purchased securities of United States publicly-owned companies in private placements in the past and, with its representatives, has such knowledge and experience in financial, tax and other business matters as to enable such Subscriber to utilize the information made available by the Company to evaluate the merits and risks of and to make an informed investment decision with respect to the proposed purchase, which represents a speculative investment.  Subscriber has the authority and is duly and legally qualified to purchase and own the Securities.  Subscriber is able to bear the risk of such investment for an indefinite period and to afford a complete loss thereof.  The information set forth on the signature page hereto regarding such Subscriber is accurate.

(f) Purchase of Note.  On the Closing Date, Subscriber will purchase the Note as principal for its own account for investment only and not with a view toward, or for resale in connection with, the public sale or any distribution thereof.

(g) Compliance with Securities Act.  Such Subscriber understands and agrees that the Securities have not been registered under the 1933 Act or any applicable state securities laws, by reason of their issuance in a transaction that does not require registration under the 1933 Act (based in part on the accuracy of the representations and warranties of the Subscriber contained herein), and that such Securities must be held indefinitely unless a subsequent disposition is registered under the 1933 Act or any applicable state securities laws or is exempt from such registration.  In any event, and subject to compliance with applicable securities laws, the Subscriber may enter into lawful hedging transactions in the course of hedging the position they assume and the Subscriber may also enter into lawful short positions or other derivative transactions relating to the Securities, or interests in the Securities, and deliver the Securities, or interests in the Securities, to close out their short or other positions or otherwise settle other transactions, or loan or pledge the Securities, or interests in the Securities, to third parties who in turn may dispose of these Securities.

(h) Conversion Shares Legend.  Unless or until subject to an effective registration statement to be filed on Form S-1, or other appropriate registration statement, registering the conversion shares, or there is an exemption from registration available, the Conversion Shares shall bear the following or similar legend:

"THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, NOR APPLICABLE STATE SECURITIES LAWS.  THE SECURITIES MAY NOT BE OFFERED FOR



3

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
J00048

Composite Exhibit A

SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT.

(i) Note Legend.  The Note shall bear the following legend:

"BOTH THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE [CONVERTIBLE -OR-EXERCISABLE] HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT."

(j) Communication of Offer.  The offer to sell the Securities was directly communicated to such Subscriber by the Company.  At no time was such Subscriber presented with or solicited by any leaflet, newspaper or magazine article, radio or television advertisement, or any other form of general advertising or solicited or invited to attend a promotional meeting otherwise than in connection and concurrently with such communicated offer.

(k) Restricted Securities.  Such Subscriber understands that the Securities have not been registered under the 1933 Act and such Subscriber will not sell, offer to sell, assign, pledge, hypothecate or otherwise transfer any of the Securities unless pursuant to an effective registration statement under the 1933 Act, or unless an exemption from registration is available. Notwithstanding anything to the contrary contained in this Agreement, such Subscriber may transfer (without restriction and without the need for an opinion of counsel) the Securities to its Affiliates (as defined below) provided that each such Affiliate is an "accredited investor" under Regulation D and such Affiliate agrees to be bound by the terms and conditions of this Agreement. For the purposes of this Agreement, an "Affiliate" of any person or entity means any other person or entity directly or indirectly controlling, controlled by or under direct or indirect common control with such person or entity. Affiliate includes each Subsidiary of the Company. For purposes of this definition, "control" means the power to direct the management and policies of such person or firm, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

(l) No Governmental Review.  Such Subscriber understands that no United States federal or state agency or any other governmental or state agency has passed on or made recommendations or endorsement of the Securities or the suitability of the investment in the Securities nor have such authorities passed upon or endorsed the merits of the offering of the Securities.

4

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100049

Composite Exhibit A

(m) <u>Correctness of Representations</u>.  Such Subscriber represents as to such Subscriber that the foregoing representations and warranties are true and correct as of the date hereof and, unless such Subscriber otherwise notifies the Company prior to the Closing Date shall be true and correct as of the Closing Date.

(n) <u>Acknowledgement of Going Concern</u>.  Such Subscriber recognizes and acknowledges that the Company is a "going concern" as disclosed in its Reports and Other Written Information and as reported by its auditor and may be unable to meet its financial obligations over the next twelve months.

(o) <u>Survival</u>.  The foregoing representations and warranties shall survive one (1) year from the Closing Date.

5.  <u>Company Representations and Warranties</u>.  The Company represents and warrants to and agrees with each Subscriber that:

(a) <u>Due Incorporation</u>.  The Company is a corporation or other entity duly incorporated or organized, validly existing and in good standing under the laws of the State of Nevada and has the requisite corporate power to own its properties and to carry on its business as presently conducted.  The Company is duly qualified as a foreign corporation to do business and is in good standing in each jurisdiction where the nature of the business conducted or property owned by it makes such qualification necessary, other than those jurisdictions in which the failure to so qualify would not have a Material Adverse Effect.  For purposes of this Agreement, a "Material Adverse Effect" shall mean a material adverse effect on the financial condition, results of operations, prospects, properties or business of the Company and its Subsidiaries taken as a whole.  For purposes of this Agreement, "Subsidiary" means, with respect to any entity at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity of which more than 30% of (i) the outstanding capital stock having (in the absence of contingencies) ordinary voting power to elect a majority of the board of directors or other managing body of such entity, (ii) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such entity.  As of the Closing Date, all of the Company's Subsidiaries and the Company's ownership interest therein are set forth on Schedule 5(a).

(b) Outstanding Stock.  All issued and outstanding shares of capital stock and equity interests in the Company have been duly authorized and validly issued and are fully paid and non-assessable.

(c) Authority; Enforceability.  This Agreement, the Note and the Shares and any other agreements delivered together with this Agreement or in connection herewith (collectively "Transaction Documents") have been duly authorized, executed and delivered by the Company and/or Subsidiaries and are valid and binding agreements of the Company enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer,

 5

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100050

Composite Exhibit A

reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights generally and to general principles of equity. The Company has full corporate power and authority necessary to enter into and deliver the Transaction Documents and to perform its obligations thereunder.

(d) Capitalization and Additional Issuances. The authorized and outstanding capital stock of the Company and Subsidiaries on a fully diluted basis as of the date of this Agreement and the Closing Date (not including the Securities) are set forth on Schedule 5(d). Except as set forth on Schedule 5(d), there are no options, warrants, or rights to subscribe to, securities, rights, understandings or obligations convertible into or exchangeable for or giving any right to subscribe for any shares of capital stock or other equity interest of the Company or any of the Subsidiaries. The only officer, director, employee and consultant stock option or stock incentive plan or similar plan currently in effect or contemplated by the Company is described on Schedule 5(d). There are no outstanding agreements or preemptive or similar rights affecting the Company's Common Stock.

(e) Consents. No consent, approval, authorization or order of any court, governmental agency or body or arbitrator having jurisdiction over the Company, or any of its Affiliates, the OTC Bulletin Board (the "Bulletin Board") or the Company's shareholders is required for the execution by the Company of the Transaction Documents and compliance and performance by the Company of its obligations under the Transaction Documents, including, without limitation, the issuance and sale of the Securities. The Transaction Documents and the Company's performance of its obligations thereunder have been unanimously approved by the Company's Board of Directors. No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any governmental authority in the world, including without limitation, the United States, or elsewhere is required by the Company or any Affiliate of the Company in connection with the consummation of the transactions contemplated by this Agreement, except as would not otherwise have a Material Adverse Effect or the consummation of any of the other agreements, covenants or commitments of the Company or any Subsidiary contemplated by the other Transaction Documents. Any such qualifications and filings will, in the case of qualifications, be effective on the Closing and will, in the case of filings, be made within the time prescribed by law.

(f) No Violation or Conflict. Assuming the representations and warranties of the Subscriber in Section 4 are true and correct, neither the issuance nor sale of the Securities nor the performance of the Company's obligations under this Agreement and all other agreements entered into by the Company relating thereto by the Company will:

(i) violate, conflict with, result in a breach of, or constitute a default (or an event which with the giving of notice or the lapse of time or both would be reasonably likely to constitute a default) under (A) the articles or certificate of incorporation, charter or bylaws of the Company, (B) to the Company's knowledge, any decree, judgment, order, law, treaty, rule, regulation or determination applicable to the Company of any court, governmental agency or body, or arbitrator having jurisdiction over the Company or over the properties or assets of the Company or any of its Affiliates, (C) the terms of any bond,

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100051

Composite Exhibit A

debenture, note or any other evidence of indebtedness, or any agreement, stock option or other similar plan, indenture, lease, mortgage, deed of trust or other instrument to which the Company or any of its Affiliates is a party, by which the Company or any of its Affiliates is bound, or to which any of the properties of the Company or any of its Affiliates is subject, or (D) the terms of any "lock-up" or similar provision of any underwriting or similar agreement to which the Company, or any of its Affiliates is a party except the violation, conflict, breach, or default of which would not have a Material Adverse Effect; or

(ii) result in the creation or imposition of any lien, charge or encumbrance upon the Securities or any of the assets of the Company or any of its Affiliates except in favor of Subscriber as described herein; or

(iii) result in the activation of any anti-dilution rights or a reset or re-pricing of any debt, equity or security instrument of any creditor or equity holder of the Company, or the holder of the right to receive any debt, equity or security instrument of the Company nor result in the acceleration of the due date of any obligation of the Company; or

(iv) result in the triggering of any piggy-back or other registration rights of any person or entity holding securities of the Company or having the right to receive securities of the Company.

(g) The Securities. The Securities upon issuance:

(i) are, or will be, free and clear of any security interests, liens, claims or other encumbrances, subject only to restrictions upon transfer under the 1933 Act and any applicable state securities laws;

(ii) have been, or will be, duly and validly authorized and on the dates of issuance of the Conversion Shares upon conversion of the Note, such Shares will be duly and validly issued, fully paid and non-assessable, and if registered pursuant to the 1933 Act and resold pursuant to an effective registration statement or exempt from registration will be free trading, unrestricted and unlegended;

(iii) will not have been issued or sold in violation of any preemptive or other similar rights of the holders of any securities of the Company or rights to acquire securities of the Company; and

(iv) will not subject the holders thereof to personal liability by reason of being such holders.

(h) Litigation. There is no pending or, to the best knowledge of the Company, threatened action, suit, proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over the Company, or any of its Affiliates that would affect the execution by the Company or the complete and timely

7

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
J00052

Composite Exhibit A

performance by the Company of its obligations under the Transaction Documents. Except as disclosed in the Reports, there is no pending or, to the best knowledge of the Company, basis for or threatened action, suit, proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over the Company, or any of its Affiliates which litigation if adversely determined would have a Material Adverse Effect.

(i) No Market Manipulation. The Company and its Affiliates have not taken, and will not take, directly or indirectly, any action designed to, or that might reasonably be expected to, cause or result in stabilization or manipulation of the price of the Common Stock to facilitate the sale or resale of the Securities or affect the price at which the Securities may be issued or resold.

(j) Information Concerning Company. The Reports and Other Written Information contain all material information relating to the Company and its operations and financial condition as of their respective dates which information is required to be disclosed therein. Since March 31, 2010, and except as modified in the Reports and Other Written Information or in the Schedules hereto, there has been no Material Adverse Effect relating to the Company's business, financial condition or affairs. The Reports and Other Written Information, including the financial statements included therein do not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, taken as a whole, not misleading in light of the circumstances and when made.

(k) Defaults. The Company is not in material violation of its articles of incorporation or bylaws. The Company is (i) not in default under or in violation of any other material agreement or instrument to which it is a party or by which it or any of its properties are bound or affected, which default or violation would have a Material Adverse Effect, (ii) not in default with respect to any order of any court, arbitrator or governmental body or subject to or party to any order of any court or governmental authority arising out of any action, suit or proceeding under any statute or other law respecting antitrust, monopoly, restraint of trade, unfair competition or similar matters which default would have a Material Adverse Effect, or (iii) not in violation of any statute, rule or regulation of any governmental authority which violation would have a Material Adverse Effect except as set forth in the note below.

(l) No Integrated Offering. Neither the Company, nor any of its Affiliates, nor any person acting on its or their behalf, has directly or indirectly made any offers or sales of any security of the Company nor solicited any offers to buy any security of the Company under circumstances that would cause the offer of the Securities pursuant to this Agreement to be integrated with prior offerings by the Company for purposes of the 1933 Act or any applicable stockholder approval provisions, including, without limitation, under the rules and regulations of the Bulletin Board. No prior offering will impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder. Neither the Company nor any of its Affiliates will

8

take any action or steps that would cause the offer or issuance of the Securities to be integrated with other offerings which would impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder. The Company will not conduct any offering other than the transactions contemplated hereby that may be integrated with the offer or issuance of the Securities that would impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder.

(m) <u>No General Solicitation</u>. Neither the Company, nor any of its Affiliates, nor to its knowledge, any person acting on its or their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D under the 1933 Act) in connection with the offer or sale of the Securities.

(n) <u>No Undisclosed Liabilities</u>. The Company has no liabilities or obligations which are material, individually or in the aggregate, other than those incurred in the ordinary course of the Company businesses since March 31, 2009 (Form 10Q for third quarter then ended) and which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, except as disclosed in the Reports or on Schedule 5(n).

(o) <u>No Undisclosed Events or Circumstances</u>. Since March 31, 2009, except as disclosed in the Reports, no event or circumstance has occurred or exists with respect to the Company or its businesses, properties, operations or financial condition, that, under applicable law, rule or regulation, requires public disclosure or announcement prior to the date hereof by the Company but which has not been so publicly announced or disclosed in the Reports.

(p) <u>Dilution</u>. The Company's executive officers and directors understand the nature of the Securities being sold hereby and recognize that the issuance of the Securities will have a potential dilutive effect on the equity holdings of other holders of the Company's equity or rights to receive equity of the Company. The board of directors of the Company has concluded, in its good faith business judgment that the issuance of the Securities is in the best interests of the Company. The Company specifically acknowledges that its obligation to issue the Conversion Shares upon conversion of the Note is binding upon the Company and enforceable regardless of the dilution such issuance may have on the ownership interests of other shareholders of the Company or parties entitled to receive equity of the Company.

(q) <u>No Disagreements with Accountants and Lawyers</u>. Other than the opinion regarding the Company's ability to continue as a "going concern," as disclosed in the Company's Reports, there are no material disagreements of any kind presently existing, or reasonably anticipated by the Company to arise between the Company and the accountants and lawyers previously and presently employed by the Company, including but not limited to disputes or conflicts over payment owed to such accountants and lawyers, nor have there been any such disagreements during the two years prior to the Closing Date.



9

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100054

Composite Exhibit A

(r) <u>Investment Company</u>.   Neither the Company nor any Affiliate of the Company is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(s) <u>Foreign Corrupt Practices</u>.  Neither the Company, nor to the knowledge of the Company, any agent or other person acting on behalf of the Company, has (i) directly or indirectly, used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to foreign or domestic political activity, (ii) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (iii) failed to disclose fully any contribution made by the Company (or made by any person acting on its behalf of which the Company is aware) which is in violation of law, or (iv) violated in any material respect any provision of the Foreign Corrupt Practices Act of 1977, as amended.

(t) <u>Reporting Company/Shell Company</u>.   The Company is a publicly-held company subject to reporting obligations pursuant to Section 13 of the Securities Exchange Act of 1934, as amended (the "1934 Act") and has a class of Common Stock registered pursuant to Section 12(g) of the 1934 Act.  Pursuant to the provisions of the 1934 Act, the Company has filed all reports and other materials required to be filed thereunder with the Commission during the preceding twelve months.

(u) <u>Listing</u>.  The Company's Common Stock is quoted on the OTCBB® under the symbol NTEK.   The Company has not received any oral or written notice that its Common Stock is not eligible nor will become ineligible for quotation on the Bulletin Board nor that its Common Stock does not meet all requirements for the continuation of such quotation.  The Company believes that it satisfies all the requirements for the continued quotation of its Common Stock on the Bulletin Board.

(v) <u>Transfer Agent</u>.   The Company's transfer agent is a participant in the Depository Trust Company Automated Securities Transfer Program. The name, address, telephone number, fax number, contact person and email address of the Company transfer agent is as follows: Stalt, Inc., 671 Oak Grove Avenue, Menlo Park, California 94025 – Telephone (650) 321-7111 Fax (650) 321-7113.

(w) Company Predecessor and Subsidiaries.  The Company makes each of the representations contained in Sections 5(a), (b), (c), (d), (e), (f), (h), (j), (k), (n), (o), (p), (q), (r) and (s) of this Agreement, as same relate or could be applicable to each Subsidiary.  All representations made by or relating to the Company of a historical or prospective nature and all undertakings described in Sections 9(g) through 9(l) shall relate, apply and refer to the Company and its predecessors and successors.  The Company represents that it owns all of the equity of the Subsidiaries and rights to receive equity of the Subsidiaries identified on Schedule 5(a), free and clear of all liens, encumbrances and claims, except as set forth on Schedule 5(a).  No person or entity other than the Company has the right to receive any equity interest in the Subsidiaries.  With 

10

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100055

Composite Exhibit A

the exception of the pre-merger name, Aldar Group, Inc., the Company further represents that the Subsidiaries have not been known by any other name for the prior five (5) years.

(x)  Correctness of Representations.  The Company represents that the foregoing representations and warranties are true and correct as of the date hereof in all material respects, and, unless the Company otherwise notifies the Subscriber prior to the Closing Date, shall be true and correct in all material respects as of the Closing Date; provided, that, if such representation or warranty is made as of a different date, in which case such representation or warranty shall be true as of such date.

(y)  Survival.  The foregoing representations and warranties shall survive for a period of one (1) year after the Closing Date.

6.  **Regulation D Offering/Legal Opinion**.  The offer and issuance of the Securities to the Subscriber is being made pursuant to the exemption from the registration provisions of the 1933 Act afforded by Section 4(2) or Section 4(6) of the 1933 Act and/or Rule 506 of Regulation D promulgated thereunder.  The Company will provide, at the Company's expense, such other legal opinions, if any, as are reasonably necessary in each Subscriber's opinion for the issuance and resale of the Common Stock issuable upon conversion of the Notes pursuant to an effective registration statement, Rule 144 under the 1933 Act or an exemption from registration.

7.  **Conversion of Note**.

(a)  Upon the conversion of a Note or part thereof (which conversion is defined fully in the Note attached as Exhibit "A") , the Company shall, at its own cost and expense, take all necessary action, including obtaining and delivering, an opinion of counsel to assure that the Company's transfer agent shall issue stock certificates in the name of Subscriber (or its permitted nominee) or such other persons as designated by Subscriber and in such denominations to be specified at conversion representing the number of shares of Common Stock issuable upon such conversion.  The Company warrants that no instructions other than these instructions have been or will be given to the transfer agent of the Company's Common Stock and that the certificates representing such shares shall contain no legend other than the legend set forth in Section 4(h). If and when Subscriber sells the Shares, assuming (i) a registration statement including such Shares for registration, filed with the Commission is effective and the prospectus, as supplemented or amended, contained therein is current and (ii) Subscriber or its agent confirms in writing to the transfer agent that Subscriber has complied with the prospectus delivery requirements, the Company will reissue the Shares without restrictive legend and the Shares will be free-trading, and freely transferable.   In the event that the Shares are sold in a manner that complies with an exemption from registration, the Company will promptly instruct its counsel to issue to the transfer agent an opinion permitting removal of the legend indefinitely, if pursuant to Rule 144(b)(1)(i) of the 1933 Act, or for 90 days if pursuant to the other provisions of Rule 144 of the 1933 Act, provided that Subscriber delivers all reasonably requested representations in support of such opinion.

(b)  Subscriber will give notice of its decision to exercise its right to convert the Note, interest, or part thereof by telecopying, or otherwise delivering a completed Notice of 

11

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100056

Composite Exhibit A

Conversion (a form of which is annexed as Exhibit A to the Note) to the Company via confirmed telecopier transmission or otherwise pursuant to Section 13(a) of this Agreement. Subscriber will not be required to surrender the Note until the Note has been fully converted or satisfied. Each date on which a Notice of Conversion is telecopied to the Company in accordance with the provisions hereof by 6 PM Eastern Time ("ET") (or if received by the Company after 6 PM ET, then the next business day) shall be deemed a "Conversion Date." The Company will itself or cause the Company's transfer agent to transmit the Company's Common Stock certificates representing the Conversion Shares issuable upon conversion of the Note to Subscriber via express courier for receipt by Subscriber within one (1) business day after the Conversion Date (such day being the "Delivery Date"). In the event the Conversion Shares are electronically transferable, then delivery of the Shares must be made by electronic transfer provided request for such electronic transfer has been made by the Subscriber. A Note representing the balance of the Note not so converted will be provided by the Company to Subscriber if requested by Subscriber, provided Subscriber delivers the original Note to the Company.

(c) The Company understands that a delay in the delivery of the Conversion Shares in the form required pursuant to Section 7.1 hereof could result in economic loss to the Subscriber. As compensation to Subscriber for such loss, the Company agrees to pay (as liquidated damages and not as a penalty) to Subscriber for late issuance of Conversion Shares in the form required pursuant to Section 7.1 hereof upon Conversion of the Note, the amount of $100 per business day after the Delivery Date for each $10,000 of Note principal amount and interest (and proportionately for other amounts) being converted of the corresponding Conversion Shares which are not timely delivered not to exceed a maximum of 15% of the principal amount outstanding on the Note. The Company shall pay any payments incurred under this Section upon demand.

(d) Adjustments. The Conversion Price and the amount of Shares issuable upon conversion of the Notes shall be equitably adjusted and as otherwise described in this Agreement and the Note.

(e) Redemption. The Note shall be redeemable in whole or in part or callable by the Company at any time prior to conversion for the face value of the Note, plus 50%, or part thereof, paid to Subscriber.

8. **Covenants of the Company**. The Company covenants and agrees with the Subscriber as follows:

(a) Stop Orders. Subject to the prior notice requirement described in Section 8(n), the Company will advise the Subscriber, within twenty-four hours after it receives notice of issuance by the Commission, any state securities commission or any other regulatory authority of any stop order or of any order preventing or suspending any offering of any securities of the Company, or of the suspension of the qualification of the Common Stock of the Company for offering or sale in any jurisdiction, or the initiation of any proceeding for any such purpose. The Company will not issue any stop transfer order or other order impeding the sale, resale or delivery of any of the Securities, except as may be required

12

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100057

Composite Exhibit A

by any applicable federal or state securities laws and unless contemporaneous notice of such instruction is given to the Subscriber.

(b) <u>Listing/Quotation</u>.   The Company shall promptly secure the quotation or listing of the Conversion Shares upon each national securities exchange, or automated quotation system on which the Company's Common Stock is quoted or listed and upon which such Conversion Shares are or become eligible for quotation or listing (subject to official notice of issuance).  The Company will maintain the quotation or listing of its Common Stock and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of as applicable. The Company will provide Subscriber with copies of all notices it receives notifying the Company of the threatened and actual delisting of the Common Stock.

(c) <u>Market Regulations</u>.  If required, the Company shall notify the Commission, the Principal Market and applicable state authorities, in accordance with their requirements, of the transactions contemplated by this Agreement, and shall take all other necessary action and proceedings as may be required and permitted by applicable law, rule and regulation, for the legal and valid issuance of the Securities to the Subscriber and promptly provide copies thereof to the Subscriber.

(d) <u>Filing Requirements</u>.  From the date of this Agreement and until the last to occur of (i) two (2) years after the Closing Date, (ii) until all the Shares have been resold or transferred by the Subscriber pursuant to a registration statement or pursuant to Rule 144(b)(1)(i), or (iii) the Note is no longer outstanding (the date of such latest occurrence being the "End Date"), the Company will (A) cause its Common Stock to continue to be registered under Section 12(b) or 12(g) of the 1934 Act, (B) comply in all respects with its reporting and filing obligations under the 1934 Act, (C) voluntarily comply with all reporting requirements that are applicable to an issuer with a class of shares registered pursuant to Section 12(g) of the 1934 Act, if the Company is not subject to such reporting requirements, and (D) comply with all requirements related to any registration statement filed pursuant to this Agreement.  The Company will use its best efforts not to take any action or file any document (whether or not permitted by the 1933 Act or the 1934 Act or the rules thereunder) to terminate or suspend such registration or to terminate or suspend its reporting and filing obligations under said acts until the End Date.  Until the End Date, the Company will continue the listing or quotation of the Common Stock on a Principal Market and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Principal Market.  The Company agrees to timely file a Form D with respect to the Securities if required under Regulation D and to provide a copy thereof to each Subscriber promptly after such filing.

(e) <u>Use of Proceeds</u>.   The proceeds of the Offering will be employed by the Company for expenses of the Offering, the filing of a registration statement pursuant to the 1933 Act, and general working capital.   Except as described on Schedule 8(e), the Purchase Price may not and will not be used for accrued and unpaid officer and director salaries, payment of financing related debt, redemption of outstanding notes or equity instruments of the Company nor non-trade obligations outstanding on a Closing Date,

13

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100058

Composite Exhibit A

For so long as any Note is outstanding, the Company will not prepay any financing related debt obligations, except equipment payments or in the event such payments are made in the ordinary course of business, nor redeem any equity instruments of the Company without the prior consent of the Subscriber.

(f) Reservation.  Prior to the Closing, the Company undertakes to reserve on behalf of Subscriber from its authorized but unissued Common Stock, a sufficient number of shares of Common Stock necessary to allow Subscriber to be able to convert the entire Note.  Failure to have sufficient shares reserved pursuant to this Section 9(f) at any time shall be a material default of the Company's obligations under this Agreement and an Event of Default under the Note.  If at any time the Note is outstanding the Company has insufficient Common Stock reserved on behalf of the Subscriber in an amount less than the amount necessary for full conversion of the outstanding Note principal and interest at the conversion price that would be in effect on every such date ("Minimum Required Reservation"), the Company will promptly reserve the Minimum Required Reservation, or if there are insufficient authorized and available shares of Common Stock to do so, the Company will take all action necessary to increase its authorized capital to be able to fully satisfy its reservation requirements hereunder, including the filing of a preliminary proxy with the Commission not later than fifteen days after the first day the Company has less than the Minimum Required Reservation. The Company agrees to provide notice to the Subscriber not later than five days after the date the Company has less than the Minimum Required Reservation reserved on behalf of the Subscriber.

(g) DTC Program.  At all times that Notes are outstanding, the Company will employ as the transfer agent for the Common Stock, and Conversion Shares a participant in the Depository Trust Company Automated Securities Transfer Program.

(h) Taxes.  From the date of this Agreement and until the End Date, the Company will promptly pay and discharge, or cause to be paid and discharged, when due and payable, all lawful taxes, assessments and governmental charges or levies imposed upon the income, profits, property or business of the Company; provided, however, that any such tax, assessment, charge or levy need not be paid if the validity thereof shall currently be contested in good faith by appropriate proceedings and if the Company shall have set aside on its books adequate reserves with respect thereto, and provided, further, that the Company will pay all such taxes, assessments, charges or levies forthwith upon the commencement of proceedings to foreclose any lien which may have attached as security therefore.

(i) Insurance.  As reasonably necessary as determined by the Company, from the date of this Agreement and until the End Date, the Company will keep its assets which are of an insurable character insured by financially sound and reputable insurers against loss or damage by fire, explosion and other risks customarily insured against by companies in the Company's line of business and location, in amounts and to the extent and in the manner customary for companies in similar businesses similarly situated and located and to the extent available on commercially reasonable terms.

14

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100059

Composite Exhibit A

(j) Books and Records. From the date of this Agreement and until the End Date, the Company will keep true records and books of account in which full, true and correct entries will be made of all dealings or transactions in relation to its business and affairs in accordance with generally accepted accounting principles applied on a consistent basis.

(k) Governmental Authorities. From the date of this Agreement and until the End Date, the Company shall duly observe and conform in all material respects to all valid requirements of governmental authorities relating to the conduct of its business or to its properties or assets.

(l) Intellectual Property. From the date of this Agreement and until the End Date, the Company shall maintain in full force and effect its corporate existence, rights and franchises and all licenses and other rights to use intellectual property owned or possessed by it and reasonably deemed to be necessary to the conduct of its business, unless it is sold for value. Schedule 9(l) hereto identifies all of the intellectual property owned by the Company and Subsidiaries.

(m) Properties. From the date of this Agreement and until the End Date, the Company will keep its properties in good repair, working order and condition, reasonable wear and tear excepted, and from time to time make all necessary and proper repairs, renewals, replacements, additions and improvements thereto; and the Company will at all times comply with each provision of all leases and claims to which it is a party or under which it occupies or has rights to property if the breach of such provision could reasonably be expected to have a Material Adverse Effect. The Company will not abandon any of its assets except for those assets which have negligible or marginal value or for which it is prudent to do so under the circumstances.

(n) Negative Covenants. So long as a Note is outstanding, without the consent of the Subscriber, the Company will not and will not permit any of its Subsidiaries to directly or indirectly:

(i) create, incur, assume or suffer to exist any pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, security title, mortgage, security deed or deed of trust, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction) (each, a "Lien") upon any of its property, whether now owned or hereafter acquired except for: (A) the Excepted Issuances (as defined in Section 12 hereof), and (B) (a) Liens imposed by law for taxes that are not yet due or are being contested in good faith and for which adequate reserves have been established in accordance with generally accepted accounting principles; (b) carriers', warehousemen's, mechanics', material men's, repairmen's and other like

15

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100060

Composite Exhibit A

Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or that are being contested in good faith and by appropriate proceedings; (c) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (d) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business; (e) Liens created with respect to the financing of the purchase of new property in the ordinary course of the Company's business up to the amount of the purchase price of such property; and (f) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property (each of (a) through (f), a "Permitted Lien").

(ii) amend its certificate of incorporation, bylaws or its charter documents so as to materially and adversely affect any rights of the Subscriber (an increase in the amount of authorized shares and an increase in the number of directors will not be deemed adverse to the rights of the Subscriber);

(iii) repay, repurchase or offer to repay, repurchase or otherwise acquire or make any dividend or distribution in respect of any of its Common Stock, preferred stock, or other equity securities other than to the extent permitted or required under the Transaction Documents.

(iv) engage in any transactions with any officer, director, employee or any Affiliate of the Company, including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner, in each case in excess of $25,000 other than (i) for payment of salary, or fees for services rendered, (ii) reimbursement for expenses incurred on behalf of the Company, and (iii) for other employee benefits, including stock option agreements under any stock option plan of the Company; or

(v) prepay or redeem any financing related debt or past due obligations or securities outstanding as of the Closing Date, or past due obligations (except with respect to vendor obligations, any such obligations which in management's good faith, reasonable judgment must be repaid to avoid disruption of the Company's businesses. The Company agrees to provide Subscriber not less than ten (10) days notice prior to becoming obligated to or effectuating a Permitted Lien or Excepted Issuance.

16

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100061

Composite Exhibit A

(s) Seniority.   Except for Permitted Liens, until the Note is fully satisfied or converted, without the consent of the Subscriber, the Company shall not grant nor allow any security interest to be taken in the assets of the Company or any Subsidiary or any Subsidiary's assets; nor issue any debt, equity or other instrument which would give the holder thereof directly or indirectly, a right in any assets of the Company or any Subsidiary or any right to payment equal to or superior to any right of the Subscriber as a holder of the Note in or to such assets or payment, nor issue or incur any debt not in the ordinary course of business.

(t) Notices.  For so long as the Subscriber holds any Securities, the Company will maintain a United States address and United States fax number for notice purposes under the Transaction Documents.

(v) Blackout.  The Company undertakes and covenants that without the consent of the Subscriber, until the end of the Exclusion Period, the Company will not enter into any acquisition, merger, exchange or sale or other transaction or fail to take any action that could have the effect of delaying the effectiveness of any pending registration statement beyond the effective date, or causing an already effective registration statement to no longer be effective or current for a period of forty-five or more days in the aggregate during any three hundred and sixty-five day period.

## 9. Covenants of the Company Regarding Indemnification.

(a) The Company agrees to indemnify, hold harmless, reimburse and defend the Subscriber, the Subscriber's officers, directors, agents, Affiliates, members, managers, control persons, and principal shareholders, against any claim, cost, expense, liability, obligation, loss or damage (including reasonable legal fees) of any nature, incurred by or imposed upon the Subscriber or any such person which results, arises out of or is based upon (i) any material misrepresentation by Company or breach of any representation or warranty by Company in this Agreement or in any Exhibits or Schedules attached hereto in any Transaction Document, or (ii) after any applicable notice and/or cure periods, any breach or default in performance by the Company of any material covenant or undertaking to be performed by the Company hereunder, or any other material agreement entered into by the Company and Subscriber relating hereto.

(b) In no event shall the liability of the Subscriber or permitted successor hereunder or under any Transaction Document or other agreement delivered in connection herewith be greater in amount than the dollar amount of the net proceeds actually received by such Subscriber or successor upon the sale of Registrable Securities (as defined herein).

10. **Registration Rights**. The Company anticipates filing a Form S-1 Registration Statement pursuant to the Securities Act of 1933, as amended, with the Securities and Exchange Commission (the "SEC") no later than five (5) days after execution of this Agreement (the "Registration Statement"). Pursuant to this Registration Statement, Subscriber will be classified as a "Selling Shareholder" and the Securities as defined in this Agreement will be fully registered.

17

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100062

Composite Exhibit A

11. Miscellaneous.

(a) Notices. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be as follows:

If to the Company, to:       NanoTech Entertainment, Inc.
                             c/o Southwest Business Services, LLC
                             9360 W. Flamingo Road, #110-158
                             Las Vegas, NV 89147-6646
                             Attention: Robert DeKett
                             Telephone: (408)-642-1559


If to the Investor (s):

                             Long Side Ventures LLC
                             1800 S. Ocean Dr., PH2
                             Hallandale Beach, FL 33009
                             Attention: Ben Kaplan (Managing Member)
                             Telephone: (954) 691-0333
                             Facsimile: _____

With a copy to:              Jonathan D. Leinwand, P.A.
                             17501 Biscayne Blvd., Suite 430
                             Aventura, FL 33160
                             Telephone (954) 903-7856
                             Fax: (954) 252-4265

(b) Entire Agreement: Assignment. This Agreement and other documents delivered in connection herewith represent the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by both parties. Neither the Company nor the Subscriber has relied on any representations not contained or referred to in

18

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100063

Composite Exhibit A

this Agreement and the documents delivered herewith.  No right or obligation of the Company shall be assigned without prior notice to and the written consent of the Subscriber.

(c)  Counterparts/Execution.  This Agreement may be executed in any number of counterparts and by the different signatories hereto on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute but one and the same instrument.  This Agreement may be executed by facsimile transmission, PDF, electronic signature or other similar electronic means with the same force and effect as if such signature page were an original thereof.

(d)  Law Governing this Agreement.  This Agreement shall be governed by and construed in accordance with the laws of the State of Florida without regard to principles of conflicts of laws.  Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of Florida or in the federal courts located in the State of Florida and county of Broward.  The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens.  The parties executing this Agreement and other agreements referred to herein or delivered in connection herewith on behalf of the Company agree to submit to the in personam jurisdiction of such courts and hereby irrevocably waive trial by jury.  The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs.  In the event that any provision of this Agreement or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law.  Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement.  Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement or any other Transaction Document by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

(e)  Specific Enforcement, Consent to Jurisdiction.  The Company and Subscriber acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the parties shall be entitled to seek an injunction or injunctions to prevent or cure breaches of the provisions of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which any of them may be entitled by law or equity.  Subject to Section 13(d) hereof, the Company hereby irrevocably waives, and agrees not to assert in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction in Nevada of such court, that the suit, action or proceeding is brought in an inconvenient forum or that the venue of the suit, action or proceeding is improper.  Nothing in this Section shall affect or limit any right to serve process in any other manner permitted by law.

19

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100064

Composite Exhibit A

(f) <u>Maximum Payments</u>.  Nothing contained herein or in any document referred to herein or delivered in connection herewith shall be deemed to establish or require the payment of a rate of interest or other charges in excess of the maximum permitted by applicable law. In the event that the rate of interest or dividends required to be paid or other charges hereunder exceed the maximum permitted by such law, any payments in excess of such maximum shall be credited against amounts owed by the Company to the Subscriber and thus refunded to the Company.

(g) <u>Calendar Days</u>.    All references to "days" in the Transaction Documents shall mean calendar days unless otherwise stated. The terms "business days" and "trading days" shall mean days that the Nevada Stock Exchange is open for trading for three or more hours.  Time periods shall be determined as if the relevant action, calculation or time period were occurring in Nevada City.  Any deadline that falls on a non-business day in any of the Transaction Documents shall be automatically extended to the next business day and interest, if any, shall be calculated and payable through such extended period.

(h) <u>Captions: Certain Definitions</u>.  The captions of the various sections and paragraphs of this Agreement have been inserted only for the purposes of convenience; such captions are not a part of this Agreement and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions of this Agreement.  As used in this Agreement the term "person" shall mean and include an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated organization and a government or any department or agency thereof.

(j) <u>Severability</u>.  In the event that any term or provision of this Agreement shall be finally determined to be superseded, invalid, illegal or otherwise unenforceable pursuant to applicable law by an authority having jurisdiction and venue, that determination shall not impair or otherwise affect the validity, legality or enforceability: (i) by or before that authority of the remaining terms and provisions of this Agreement, which shall be enforced as if the unenforceable term or provision were deleted, or (ii) by or before any other authority of any of the terms and provisions of this Agreement.

(k) <u>Successor Laws</u>.  References in the Transaction Documents to laws, rules, regulations and forms shall also include successors to and functionally equivalent replacements of such laws, rules, regulations and forms.  A successor rule to Rule 144(b)(1)(i) shall include any rule that would be available to a non-Affiliate of the Company for the sale of Common Stock not subject to volume restrictions and after a six month holding period.



20

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100065

Composite Exhibit A

## SIGNATURE PAGE TO SUBSCRIPTION

Please acknowledge your acceptance of the foregoing Subscription Agreement by signing and returning a copy to the undersigned whereupon it shall become a binding agreement between us.

**NANOTECH ENTERTAINMENT, INC.,** a Nevada corporation

By: _____
Name: Robert Dekett
Title: President

Dated: August 12, 2010

**LONG SIDE VENTURES LLC**

By: _____
Name: Ben Kaplan
Title: Managing Member    July 16

Dated: August ___, 2010

21

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100066

Composite Exhibit A

ExhibitB

DISBURSEMENTSCHEDULEANDUSEOFPROCEEDS

ClosingDisbursements

| Closing | Recipient | Amount |
|---------|-----------|--------|
| Closing | NanoTechEntertainment | $25,000 |
| Closing | JonathanD.LeinwandPA (InvestorLegalFees) | $1,000 |
| TotalLoanAmount | | $26,000 |

TheCompanyandtheInvestoragreethattheabovereferencedamountsaretheagreedupon disbursementsanduseofproceedsforthesumsinvested.

NANOTECHENTERTAINMENTINC.

RobertDeKett,President

Date:August12,2010

LONGSIDEVENTURESLLC

BenKaplan,ManagingMember

Date  July/16

22

Composite Exhibit A

NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

Principal Amount: $26,000

Issue Date: August 12, 2010

## CONVERTIBLE PROMISSORY NOTE

FOR VALUE RECEIVED,  NanoTech Entertainment, Inc., a Nevada corporation (hereinafter called "Borrower"), hereby promises to pay to Long Side Ventures LLC whose address is 1800 S. Ocean Dr. PH2, Hallandale Beach, FL 33009 (the "Holder") on order, without demand, the sum of TWENTY-SIX DOLLARS ($26,000) ("Principal Amount") on August 12, 2012 (the "Maturity Date"), if not sooner paid.

This Note has been entered into pursuant to the terms of a subscription agreement between the Borrower and the Holder dated at or about the date hereof (the "Subscription Agreement"), and shall be governed by the terms of such Subscription Agreement. Unless otherwise separately defined herein, all capitalized terms used in this Note shall have the same meaning as is set forth in the Subscription Agreement.

## ARTICLE I
## GENERAL PROVISIONS

1.1 Payment Grace Period.  The Borrower shall have a five (5) day grace period to pay any monetary amounts due under this Note, after which grace period a default interest rate of fifteen percent (15%) per annum shall apply.

1.2 Conversion Privileges.  The Conversion Privileges set forth in Article II shall remain in full force and effect immediately from the date hereof and until the Note is paid in full regardless of the occurrence of an Event of Default.  The Note shall be payable in full on the Maturity Date, unless previously converted into Common Stock in accordance with Article II hereof.

1.3 Security Interest – The Borrower has caused 3,000,000 (THREE MILLION) to be deposited with Jonathan D. Leinwand, P.A. as collateral for the obligations of the Company pursuant to this note.

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100068

Composite Exhibit A

## ARTICLE II
## CONVERSION RIGHTS

The Borrower shall have the right to convert the principal and any interest due under this Note into Shares of the Borrower's Common Stock, $.001 par value per share ("Common Stock") as set forth below.

2.1. Conversion into the Borrower's Common Stock.

(a) The Borrower shall have the right from and after the date of the issuance of this Note and then at any time until this Note is fully paid, to convert any outstanding and unpaid principal portion of this Note (in whole or in part), and accrued interest, at the election of the Borrower (the date of giving of such notice of conversion being a "Conversion Date") into fully paid and nonassessable shares of Common Stock as such stock exists on the date of issuance of this Note, or any shares of capital stock of Borrower into which such Common Stock shall hereafter be changed or reclassified, at the Conversion Price as defined in Section 2.1(b) hereof, determined as provided herein. Upon delivery to the Holder of a completed Notice of Conversion, a form of which is annexed hereto as Exhibit A, Borrower shall issue and deliver to the Holder within one (1) business day after the Conversion Date (such day being the "Delivery Date") that number of shares of Common Stock for the portion of the Note converted in accordance with the foregoing. Such shares are to be delivered via DWAC, if eligible, or otherwise shall deliver the certificate via overnight mail to the address provided by the Holder. The number of shares of Common Stock to be issued upon each conversion of this Note shall be determined by dividing that portion of the outstanding principal amount of the Note and accrued but unpaid interest calculated at 15% per annum, if any, to be converted, by the Conversion Price.

(b) Subject to adjustment as provided in Section 2.1(c) hereof, the conversion price per share shall be at a rate of 30% of the average the lowest intraday trading price during the 15 trading days prior to conversion

(c) The Conversion Price and number and kind of shares or other securities to be issued upon conversion determined pursuant to Section 2.1(a), shall be subject to adjustment from time to time upon the happening of certain events while this conversion right remains outstanding, as follows:

(i). Merger, Sale of Assets, etc. If (A) the Borrower effects any merger or consolidation of the Borrower with or into another entity, (B) the Borrower effects any sale of all or substantially all of its assets in one or a series of related transactions, (C) any tender offer or exchange offer (whether by the Borrower or another entity) is completed pursuant to which holders of Common Stock are permitted to tender or exchange their shares for other securities, cash or property, (D) the Borrower consummates a stock purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with one or more persons or entities whereby such other persons or entities acquire more than the 50% of the outstanding shares of Common Stock (not including any shares of Common Stock held by such other persons or entities making or party to, or associated or

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100069

Composite Exhibit A

affiliated with the other persons or entities making or party to, such stock purchase agreement or other business combination), (E) any "person" or "group" (as these terms are used for purposes of Sections 13(d) and 14(d) of the 1934 Act) is or shall become the "beneficial owner" (as defined in Rule 13d-3 under the 1934 Act), directly or indirectly, of 50% of the aggregate Common Stock of the Borrower, or (F) the Borrower effects any reclassification of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property (in any such case, a "Fundamental Transaction"), this Note, as to the unpaid principal portion thereof and accrued interest thereon, shall thereafter be deemed to evidence the right to convert into such number and kind of shares or other securities and property as would have been issuable or distributable on account of such Fundamental Transaction, upon or with respect to the securities subject to the conversion right immediately prior to such Fundamental Transaction. The foregoing provision shall similarly apply to successive Fundamental Transactions of a similar nature by any such successor or purchaser. Without limiting the generality of the foregoing, the anti-dilution provisions of this Section shall apply to such securities of such successor or purchaser after any such Fundamental Transaction.

(ii). Reclassification, etc. If the Borrower at any time shall, by reclassification or otherwise, change the Common Stock into the same or a different number of securities of any class or classes that may be issued or outstanding, this Note, as to the unpaid principal portion thereof and accrued interest thereon, shall thereafter be deemed to evidence the right to purchase an adjusted number of such securities and kind of securities as would have been issuable as the result of such change with respect to the Common Stock immediately prior to such reclassification or other change.

(d) During the period the conversion right exists, Borrower will reserve from its authorized and unissued Common Stock a sufficient number of shares of Common Stock so as to effect conversion of this Note. Borrower represents that upon issuance, such shares will be duly and validly issued, fully paid and non-assessable. Borrower agrees that its issuance of this Note shall constitute full authority to its officers, agents, and transfer agents who are charged with the duty of executing and issuing stock certificates to execute and issue the necessary certificates for shares of Common Stock upon the conversion of this Note.

2.2 Method of Conversion. This Note may be converted by the Borrower in whole or in part as described in Section 2.1(a) and the Subscription Agreement. Upon partial conversion of this Note, a new Note containing the same date and provisions of this Note shall, at the request of the Holder, be issued by the Borrower to the Holder for the principal balance of this Note and interest which shall not have been converted or paid.

2.3. Maximum Conversion. (a)      Notwithstanding anything to the contrary contained herein, the number of Conversion Shares that may be acquired by the Subscriber upon conversion of the Notes (or otherwise in respect hereof) shall be limited to the extent necessary to ensure that, following such conversion (or other issuance), the total number of shares of Common Stock then beneficially owned by such Subscriber and its affiliates and any other persons whose beneficial ownership of Common Stock would be aggregated with the

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100070

Composite Exhibit A

Subscriber's for purposes of Section 13(d) of the 1934 Act, does not exceed 4.999% of the total number of issued and oustanding shares of Common Stock (including for such purpose the shares of Common Stock issuable upon such conversion). For such purposes, beneficial ownership shall be determined in accordance with Section 13(d) of the 1934 Act and the rules and regulations promulgated thereunder. By written notice to the Company, a Subscriber may waive the provisions of this Section 2.3(a) as to itself but any such waiver will not be effective until the 61st day after delivery thereof and such waiver shall have no effect on any other Subscriber.

(b)    Notwithstanding anything to the contrary contained herein, the number of Conversion Shares that may be acquired by the Subscriber upon conversion of the Notes (or otherwise in respect hereof) shall be limited to the extent necessary to ensure that, following such conversion (or other issuance), the total number of shares of Common Stock then beneficially owned by such Subscriber and its affiliates and any other persons whose beneficial ownership of Common Stock would be aggregated with the Subscriber's for purposes of Section 13(d) of the 1934 Act, does not exceed 9.999% of the total number of issued and outstanding shares of Common Stock (including for such purpose the shares of Common Stock issuable upon such conversion). For such purposes, beneficial ownership shall be determined in accordance with Section 13(d) of the 1934 Act and the rules and regulations promulgated thereunder. This provision may not be waived.

2.4. <u>Optional Redemption of Principal Amount</u>.   Provided an Event of Default or an event which with the passage of time or the giving of notice could become an Event of Default has not occurred, whether or not such Event of Default has been cured, the Borrower will have the option of prepaying the outstanding Principal Amount of this Note ("Optional Redemption"), in whole or in part, by paying to the Holder a sum of money equal the Principal amount plus an additional 50% thereof, together with accrued but unpaid interest thereon and any and all other sums due, accrued or payable to the Holder arising under this Note or any Transaction Document through the Redemption Payment Date as defined below (the "Redemption Amount"). Borrower's election to exercise its right to prepay must be by notice in writing ("Notice of Redemption"). The Notice of Redemption shall specify the date for such Optional Redemption (the "Redemption Payment Date"), which date shall be at least thirty (30) business days after the date of the Notice of Redemption (the "Redemption Period"). A Notice of Redemption shall not be effective with respect to any portion of the Principal Amount for which the Holder has previously delivered an election to convert, or subject to the previous sentence, for conversions initiated or made by the Holder during the Redemption Period. On the Redemption Payment Date, the Redemption Amount, less any portion of the Redemption Amount against which the Holder has permissibly exercised its conversion rights, shall be paid in good funds to the Holder. In the event the Borrower fails to pay the Redemption Amount on the Redemption Payment Date as set forth herein, then (i) such Notice of Redemption will be null and void, (ii) Borrower will have no right to deliver another Notice of Redemption, and (iii) Borrower's failure may be deemed by Holder to be a non-curable Event of Default. A Notice of Redemption may not be given nor may the Borrower effectuate a Redemption without the consent of the Holder, if at any time during the Redemption Period an Event of Default, or an event which with the passage of time or giving of notice could become an Event of Default (whether or not such Event of Default

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100071

Composite Exhibit A

has been cured), has occurred.  During the Optional Redemption Period, the Company must abide by all of its obligations to the Note Holder.

## ARTICLE III
### EVENT OF DEFAULT

The occurrence of any of the following events of default ("Event of Default") shall, at the option of the Holder hereof, make all sums of principal and interest then remaining unpaid hereon and all other amounts payable hereunder immediately due and payable, upon demand, without presentment, or grace period, all of which hereby are expressly waived, except as set forth below:

3.1 Failure to Pay Principal or Interest.  The Borrower fails to pay the principal, interest or other sum due under this Note when due.

3.2 Breach of Covenant.  The Borrower breaches any material covenant or other term or condition of the Subscription Agreement or this Note in any material respect and such breach, if subject to cure, continues for a period of thirty (30) days after written notice to the Borrower from the Holder.

3.3 Breach of Representations and Warranties.  Any material representation or warranty of the Borrower made herein, in the Subscription Agreement or any Transaction Document shall be false or misleading in any material respect as of the date made and the Closing Date.

3.4 Liquidation.   Any dissolution, liquidation or winding up of Borrower or any substantial portion of its business.

3.5 Cessation of Operations.   Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they come due.

3.6 Maintenance of Assets.   The failure by Borrower to maintain any material intellectual property rights, personal, real property or other assets which are necessary to conduct its business (whether now or in the future).

3.7 Receiver or Trustee.  The Borrower or any Subsidiary of Borrower shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business; or such a receiver or trustee shall otherwise be appointed.

3.8 Judgments.  Any money judgment, writ or similar final process shall be entered or filed against Borrower or any of its property or other assets for more than $100,000.

3.9 Bankruptcy.  Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings or relief under any bankruptcy law or any law, or the issuance of any notice in

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100072

Composite Exhibit A

relation to such event, for the relief of debtors shall be instituted by or against the Borrower or any Subsidiary of Borrower.

3.10 <u>Non-Payment</u>.   A default by the Borrower under any one or more obligations in an aggregate monetary amount in excess of $100,000 for more than twenty days after the due date, unless the Borrower is contesting the validity of such obligation in good faith and has segregated cash funds equal to not less than one-half of the contested amount.

3.11 <u>Stop Trade</u>.   An SEC or judicial stop trade order or Principal Market trading suspension that lasts for five (5) or more consecutive trading days.

3.12 <u>Failure to Deliver Common Stock or Replacement Note</u>.   Borrower's failure to timely deliver Common Stock to the Holder pursuant to and in the form required by this Note and Sections 7 and 11 of the Subscription Agreement, or, if required, a replacement Note.

3.13 <u>Reservation Default</u>.   Failure by the Borrower to have reserved for issuance upon conversion of the Note or upon exercise of the Warrants issued in connection with the Subscription Agreement, the number of shares of Common Stock as required in the Subscription Agreement, this Note and the Warrants, and such failure continues for a period of thirty (30) days.

3.14 <u>Financial Statement Restatement</u>.   The restatement of any financial statements filed by the Borrower with the Securities and Exchange Commission for any date or period from two years prior to the Issue Date of this Note and until this Note is no longer outstanding, if the result of such restatement would, by comparison to the un-restated financial statements, have constituted a Material Adverse Effect.

3.15 <u>Event Described in Subscription Agreement</u>.   The occurrence of an Event of Default as described in the Subscription Agreement that, if susceptible to cure, is not cured during any designated cure period.

3.16 <u>Executive Officers Breach of Duties</u>.   Any of Borrower's named executive officers or directors is convicted of a violation of securities laws, or a settlement in excess of $250,000 is reached by any such officer or director relating to a violation of securities laws, breach of fiduciary duties or self-dealing.

## ARTICLE IV
## MISCELLANEOUS

4.1 <u>Failure or Indulgence Not Waiver</u>.   No failure or delay on the part of the Holder hereof in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.   All rights and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100073

Composite Exhibit A

4.2 <u>Notices</u>.   All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice.   Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the first business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.   The addresses for such communications shall be:

If to the Company, to:      NanoTech Entertainment, Inc.
                            c/o Southwest Business Services, LLC
                            9360 W. Flamingo Road, #110-158
                            Las Vegas, NV  89147-6646
                            Attention:   Robert DeKett
                            Telephone:   (408)-642-1559

If to the Investor (s):     Long Side Ventures LLC
                            1800 S. Ocean Dr. PH2
                            Hallandale Beach, FL 33009
                            Attention:  Ben Kaplan (Portfolio Manager)
                            Telephone:  (954) 691-0333
                            Facsimile:   _____

                            With a copy to:
                            Joanthan D. Leinwand, Esq.
                            17501 Biscayne Blvd., Suite 430
                            Aventura, FL 33160
                            Tel. 954-903-7856
                            Fax. 954-252-4265

4.3 <u>Amendment Provision</u>.  The term "Note" and all reference thereto, as used throughout this instrument, shall mean this instrument as originally executed, or if later amended or supplemented, then as so amended or supplemented.

4.4 <u>Assignability</u>.  This Note shall be binding upon the Borrower and its successors and assigns, and shall inure to the benefit of the Holder and its successors and assigns.

4.5 <u>Cost of Collection</u>.  If default is made in the payment of this Note, Borrower shall pay the Holder hereof reasonable costs of collection, including reasonable attorneys' fees.

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100074

Composite Exhibit A

4.6 <u>Governing Law</u>. This Note shall be governed by and construed in accordance with the laws of the State of Florida without regard to conflicts of laws principles that would result in the application of the substantive laws of another jurisdiction. Any action brought by either party against the other concerning the transactions contemplated by this Agreement must be brought only in the civil or state courts of Florida or in the federal courts located in the State and county of Broward. Both parties and the individual signing this Agreement on behalf of the Borrower agree to submit to the jurisdiction of such courts. The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or unenforceability of any other provision of this Note. Nothing contained herein shall be deemed or operate to preclude the Holder from bringing suit or taking other legal action against the Borrower in any other jurisdiction to collect on the Borrower's obligations to Holder, to realize on any collateral or any other security for such obligations, or to enforce a judgment or other decision in favor of the Holder. This Note shall be deemed an unconditional obligation of Borrower for the payment of money and, without limitation to any other remedies of Holder, may be enforced against Borrower by summary proceeding pursuant to Florida Civil Procedure Laws and Rules.

4.7 <u>Maximum Payments</u>. Nothing contained herein shall be deemed to establish or require the payment of a rate of interest or other charges in excess of the maximum rate permitted by applicable law. In the event that the rate of interest required to be paid or other charges hereunder exceed the maximum rate permitted by applicable law, any payments in excess of such maximum rate shall be credited against amounts owed by the Borrower to the Holder and thus refunded to the Borrower.

4.8 <u>Non-Business Days</u>. Whenever any payment or any action to be made shall be due on a Saturday, Sunday or a public holiday under the laws of the State of Florida, such payment may be due or action shall be required on the next succeeding business day and, for such payment, such next succeeding day shall be included in the calculation of the amount of accrued interest payable on such date.

4.9 <u>Redemption</u>. This Note may be redeemed or called in full or in part with or without the consent of the Holder.

4.10 <u>Shareholder Status</u>. The Holder shall not have rights as a shareholder of the Borrower with respect to unconverted portions of this Note. However, the Holder will have the rights of a shareholder of the Borrower with respect to the Shares of Common Stock to be received after delivery by the Holder of a Conversion Notice to the Borrower.

[Balance of this Page Intentionally Left Blank]

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100075

Composite Exhibit A

IN WITNESS WHEREOF, Borrower has caused this Note to be signed in its name by an authorized officer as of the 12 day of August, 2010.

**NANOTECH ENTERTAINMENT, INC.,** a Nevada corporation

By: _____
Name: Robert Dekett
Title: President

Dated: August 12, 2010

Long Side Ventures LLC v. NanoTech Entertainment, Inc., et al.
Case No. 13-03103
100076

Composite Exhibit A

# NANOTECH ENTERTAINMENT, INC.

## CONVERTIBLE NOTE
## SUBSCRIPTION AGREEMENT

**THIS SUBSCRIPTION AGREEMENT** (this "Agreement"), is dated as of April 1, 2011, by and between NanoTech Entertainment, Inc., a Nevada corporation (the "Company"), and the subscriber identified on the signature page hereto ("Subscriber").

**WHEREAS**, the Company and Subscriber are executing and delivering this Agreement in reliance upon an exemption from securities registration afforded by the provisions of Section 4(2), Section 4(6) and/or Regulation D ("Regulation D") as promulgated by the United States Securities and Exchange Commission (the "Commission") under the Securities Act of 1933, as amended (the "1933 Act"); and

**WHEREAS**, the parties desire that, upon the terms and subject to the conditions contained herein, the Subscriber shall lend to the Company $55,000 (the Principal Amount) as per the Disbursement Schedule set forth in Exhibit "A" under the terms and conditions outlined ("Principal Amount") in a Convertible Promissory Note from the Company ("Note"), the form of which is annexed hereto as Exhibit "B", convertible into shares of the Company's Common Stock, $0.001 par value (the "Common Stock") at a per share conversion price set forth in the Note ("Conversion Price") (collectively the "Offering"). The Convertible Promissory Note (the "Note") and the shares of Common Stock issuable upon conversion of the Note (the "Shares" or "Conversion Shares"), are collectively referred to herein as the "Securities."):

**NOW, THEREFORE**, in consideration of the mutual covenants and other agreements contained in this Agreement the Company and the Subscriber hereby agree as follows:

1. **Closing Date**.  The "Closing Date" shall be the date that the Principle Amount is transmitted by wire transfer or otherwise credited to or for the benefit of the Company. Subject to the satisfaction or waiver of the terms and conditions of this Agreement, on the Closing Date, Subscriber shall lend to the Company which shall be evidenced by the Note in the aggregate Principal Amount of $55,000.

2. **Closing Deliverables**.
   a.     Subject to the satisfaction or waiver of the terms and conditions of this Agreement, on the Closing Date, the Subscriber and Company shall execute a Convertible Promissory Note which shall detail the terms and conditions for repayment as indicated thereon.

   b.     The Company shall provide the Subscriber with warrant to purchase that number of shares into which the Note is convertible into if the Note was converted on the day of the Closing. The exercise price shall be equal to closing price on the trading day immediately preceding the Closing Date.



1

c.      Pursuant hereto the Company shall provide the Subscriber a "royalty" equal to 1.5% of the Company's gross sales up to an aggregate amount not to exceed 2.5 times the Principal Amount of the Note.

d.      The Company shall issue 3,000,000 shares to be held in escrow, by the Escrow Agent, as security for the repayment of the loan. The Escrow Agreement is attached hereto as Exhibit C.

e.      The Company shall enter into a Security Agreement as attached hereto as Exhibit D.

3. **Subscriber Representations and Warranties**.   Subscriber hereby represents and warrants to and agrees with the Company that:

(a) Organization and Standing of the Subscriber.    If Subscriber is an entity, such Subscriber is a corporation, partnership or other entity duly incorporated or organized, validly existing and in good standing under the laws of the State of Nevada.

(b) Authorization and Power.   Such Subscriber has the requisite power and authority to enter into and perform this Agreement and the other Transaction Documents (as defined herein) and to purchase the Note being sold to it hereunder.  The execution, delivery and performance of this Agreement and the other Transaction Documents by such Subscriber and the consummation by it of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate or partnership action, and no further consent or authorization of such Subscriber or its Board of Directors, stockholders, partners, members, as the case may be, is required.  This Agreement and the other Transaction Documents have been duly authorized, executed and delivered by such Subscriber and constitutes, or shall constitute when executed and delivered, a valid and binding obligation of such Subscriber enforceable against such Subscriber in accordance with the terms thereof.

(c) No Conflicts.   The execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation by such Subscriber of the transactions contemplated hereby and thereby or relating hereto do not and will not (i) result in a violation of such Subscriber's charter documents or bylaws or other organizational documents or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of any agreement, indenture or instrument or obligation to which such Subscriber is a party or by which its properties or assets are bound, or result in a violation of any law, rule, or regulation, or any order, judgment or decree of any court or governmental agency applicable to such Subscriber or its properties (except for such conflicts, defaults and violations as would not, individually or in the aggregate, have a material adverse effect on such Subscriber).  Such Subscriber is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental agency in order for it to execute, deliver or perform any of its obligations under this Agreement and the other Transaction Documents or to purchase the Securities in accordance with the terms hereof, provided that for purposes of the

2

representation made in this sentence, such Subscriber is assuming and relying upon the accuracy of the relevant representations and agreements of the Company herein.

(d) Information on Company.   Such Subscriber has been furnished with or has had access to the EDGAR Website of the Commission to the Company's Form 10-K filed on May 25, 2010 for the fiscal year ended June 30, 2009 and the financial statements included therein, Form 10-Q filed on May 25, 2010 for the quarter ended March 31, 2010, and for the quarter ended December 31, 2009 together with all other filings made with the Commission available at the EDGAR website until five days before the Closing Date (hereinafter referred to collectively as the "Reports").   In addition, such Subscriber may have received in writing from the Company such other information concerning its operations, financial condition and other matters as such Subscriber has requested in writing, identified thereon as Other Written Information (such other information is collectively, the "Other Written Information"), and considered all factors such Subscriber deems material in deciding on the advisability of investing in the Securities.   Such Subscriber has relied on the Reports and Other Written Information in making its investment decision.

(e) Information on Subscriber.   Subscriber is, and will be at the time of the conversion of the Notes, an "accredited investor", as such term is defined in Regulation D promulgated by the Commission under the 1933 Act, is experienced in investments and business matters, has made investments of a speculative nature and has purchased securities of United States publicly-owned companies in private placements in the past and, with its representatives, has such knowledge and experience in financial, tax and other business matters as to enable such Subscriber to utilize the information made available by the Company to evaluate the merits and risks of and to make an informed investment decision with respect to the proposed purchase, which represents a speculative investment.   Subscriber has the authority and is duly and legally qualified to purchase and own the Securities.   Subscriber is able to bear the risk of such investment for an indefinite period and to afford a complete loss thereof.   The information set forth on the signature page hereto regarding such Subscriber is accurate.

(f) Purchase of Note.   On the Closing Date, Subscriber will purchase the Note as principal for its own account for investment only and not with a view toward, or for resale in connection with, the public sale or any distribution thereof.

(g) Compliance with Securities Act.   Such Subscriber understands and agrees that the Securities have not been registered under the 1933 Act or any applicable state securities laws, by reason of their issuance in a transaction that does not require registration under the 1933 Act (based in part on the accuracy of the representations and warranties of the Subscriber contained herein), and that such Securities must be held indefinitely unless a subsequent disposition is registered under the 1933 Act or any applicable state securities laws or is exempt from such registration.   In any event, and subject to compliance with applicable securities laws, the Subscriber may enter into lawful hedging transactions in the course of hedging the position they assume and the Subscriber may also enter into lawful short positions or other derivative transactions relating to the Securities, or interests in the Securities, and deliver the Securities, or interests in the Securities, to close out their short or other positions or otherwise settle other

transactions, or loan or pledge the Securities, or interests in the Securities, to third parties who in turn may dispose of these Securities.

(h) <u>Conversion Shares Legend</u>.   Unless or until subject to an effective registration statement to be filed on Form S-1, or other appropriate registration statement, registering the conversion shares, the Conversion Shares, shall bear the following or similar legend:

> **"THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, NOR APPLICABLE STATE SECURITIES LAWS.  THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT.**

(i) <u>Note Legend</u>.  The Note shall bear the following legend:

> **"BOTH THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE [CONVERTIBLE -OR-EXERCISABLE] HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS.  THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT.**

(j) <u>Communication of Offer</u>.  The offer to sell the Securities was directly communicated to such Subscriber by the Company.  At no time was such Subscriber presented with or solicited by any leaflet, newspaper or magazine article, radio or television advertisement, or any other form of general advertising or solicited or invited to attend a promotional meeting otherwise than in connection and concurrently with such communicated offer.

(k) <u>Restricted Securities</u>.   Such Subscriber understands that the Securities have not been registered under the 1933 Act and such Subscriber will not sell, offer to sell, assign, pledge, hypothecate or otherwise transfer any of the Securities unless pursuant to an effective registration statement under the 1933 Act, or unless an exemption from registration is available. Notwithstanding anything to the contrary contained in this Agreement, such Subscriber may transfer (without restriction and without the need for an opinion of counsel) the Securities to its Affiliates (as defined below) provided that each such Affiliate is an "accredited investor" under Regulation D and such Affiliate agrees to be bound by the terms and conditions of this Agreement. For the purposes of this Agreement, an "Affiliate" of any person or entity means any other person or entity directly or indirectly controlling, controlled by or under direct or indirect common control with such person or entity.  Affiliate includes each Subsidiary of the Company. For purposes of this definition, "control" means the power to direct the management and policies

of such person or firm, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

(l) No Governmental Review.   Such Subscriber understands that no United States federal or state agency or any other governmental or state agency has passed on or made recommendations or endorsement of the Securities or the suitability of the investment in the Securities nor have such authorities passed upon or endorsed the merits of the offering of the Securities.

(m) Correctness of Representations.   Such Subscriber represents as to such Subscriber that the foregoing representations and warranties are true and correct as of the date hereof and, unless such Subscriber otherwise notifies the Company prior to the Closing Date shall be true and correct as of the Closing Date.

(n) Acknowledgement of Going Concern.   Such Subscriber recognizes and acknowledges that the Company is a "going concern" as disclosed in its Reports and Other Written Information and as reported by its auditor and may be unable to meet its financial obligations over the next twelve months.

(o) Survival.   The foregoing representations and warranties shall survive one (1) year from the Closing Date.

5. **Company Representations and Warranties**.  The Company represents and warrants to and agrees with each Subscriber that:

(a) Due Incorporation.  The Company is a corporation or other entity duly incorporated or organized, validly existing and in good standing under the laws of the State of Nevada and has the requisite corporate power to own its properties and to carry on its business as presently conducted.  The Company is duly qualified as a foreign corporation to do business and is in good standing in each jurisdiction where the nature of the business conducted or property owned by it makes such qualification necessary, other than those jurisdictions in which the failure to so qualify would not have a Material Adverse Effect.  For purposes of this Agreement, a "Material Adverse Effect" shall mean a material adverse effect on the financial condition, results of operations, prospects, properties or business of the Company and its Subsidiaries taken as a whole.  For purposes of this Agreement, "Subsidiary" means, with respect to any entity at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity of which more than 30% of (i) the outstanding capital stock having (in the absence of contingencies) ordinary voting power to elect a majority of the board of directors or other managing body of such entity, (ii) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such entity.  As of the Closing Date, all of the Company's Subsidiaries and the Company's ownership interest therein are set forth on Schedule 5(a).

(b) Outstanding Stock.  All issued and outstanding shares of capital stock and equity interests in the Company have been duly authorized and validly issued and are fully paid and non-assessable.

(c) Authority; Enforceability.  This Agreement, the Note and the Shares and any other agreements delivered together with this Agreement or in connection herewith (collectively "Transaction Documents") have been duly authorized, executed and delivered by the Company and/or Subsidiaries and are valid and binding agreements of the Company enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights generally and to general principles of equity.  The Company has full corporate power and authority necessary to enter into and deliver the Transaction Documents and to perform its obligations thereunder.

(d) Capitalization and Additional Issuances.   The authorized and outstanding capital stock of the Company and Subsidiaries on a fully diluted basis as of the date of this Agreement and the Closing Date (not including the Securities) are set forth on Schedule 5(d).  Except as set forth on Schedule 5(d), there are no options, warrants, or rights to subscribe to, securities, rights, understandings or obligations convertible into or exchangeable for or giving any right to subscribe for any shares of capital stock or other equity interest of the Company or any of the Subsidiaries.  The only officer, director, employee and consultant stock option or stock incentive plan or similar plan currently in effect or contemplated by the Company is described on Schedule 5(d).   There are no outstanding agreements or preemptive or similar rights affecting the Company's Common Stock.

(e) Consents.  No consent, approval, authorization or order of any court, governmental agency or body or arbitrator having jurisdiction over the Company, or any of its Affiliates, the OTC Markets or OTC Bulletin Board (the "Bulletin Board") or the Company's shareholders is required for the execution by the Company of the Transaction Documents and compliance and performance by the Company of its obligations under the Transaction Documents, including, without limitation, the issuance and sale of the Securities.  The Transaction Documents and the Company's performance of its obligations thereunder have been unanimously approved by the Company's Board of Directors.  No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any governmental authority in the world, including without limitation, the United States, or elsewhere is required by the Company or any Affiliate of the Company in connection with the consummation of the transactions contemplated by this Agreement, except as would not otherwise have a Material Adverse Effect or the consummation of any of the other agreements, covenants or commitments of the Company or any Subsidiary contemplated by the other Transaction Documents. Any such qualifications and filings will, in the case of qualifications, be effective on the Closing and will, in the case of filings, be made within the time prescribed by law.

(f) No Violation or Conflict.  Assuming the representations and warranties of the Subscriber in Section 4 are true and correct, neither the issuance nor sale of the Securities nor the performance of the Company's obligations under this Agreement and all other agreements entered into by the Company relating thereto by the Company will:

(i) violate, conflict with, result in a breach of, or constitute a default (or an event which with the giving of notice or the lapse of time or both would be reasonably likely to constitute a default) under (A) the articles or certificate of incorporation, charter or bylaws of the Company, (B) to the Company's knowledge, any decree, judgment, order, law, treaty, rule, regulation or determination applicable to the Company of any court, governmental agency or body, or arbitrator having jurisdiction over the Company or over the properties or assets of the Company or any of its Affiliates, (C) the terms of any bond, debenture, note or any other evidence of indebtedness, or any agreement, stock option or other similar plan, indenture, lease, mortgage, deed of trust or other instrument to which the Company or any of its Affiliates is a party, by which the Company or any of its Affiliates is bound, or to which any of the properties of the Company or any of its Affiliates is subject, or (D) the terms of any "lock-up" or similar provision of any underwriting or similar agreement to which the Company, or any of its Affiliates is a party except the violation, conflict, breach, or default of which would not have a Material Adverse Effect; or

(ii) result in the creation or imposition of any lien, charge or encumbrance upon the Securities or any of the assets of the Company or any of its Affiliates except in favor of Subscriber as described herein; or

(iii) result in the activation of any anti-dilution rights or a reset or re-pricing of any debt, equity or security instrument of any creditor or equity holder of the Company, or the holder of the right to receive any debt, equity or security instrument of the Company nor result in the acceleration of the due date of any obligation of the Company; or

(iv) result in the triggering of any piggy-back or other registration rights of any person or entity holding securities of the Company or having the right to receive securities of the Company.

(g) The Securities.  The Securities upon issuance:

(i) are, or will be, free and clear of any security interests, liens, claims or other encumbrances, subject only to restrictions upon transfer under the 1933 Act and any applicable state securities laws;

(ii) have been, or will be, duly and validly authorized and on the dates of issuance of the Conversion Shares upon conversion of the Note, such Shares will be duly and validly issued, fully paid and non- assessable, and if registered pursuant to the 1933 Act and resold pursuant to an effective registration statement or exempt from registration will be free trading, unrestricted and unlegended;

(iii) will not have been issued or sold in violation of any preemptive or other similar rights of the holders of any securities of the Company or rights to acquire securities of the Company; and

(iv) will not subject the holders thereof to personal liability by reason of being such holders.

(h) <u>Litigation</u>.   There is no pending or, to the best knowledge of the Company, threatened action, suit, proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over the Company, or any of its Affiliates that would affect the execution by the Company or the complete and timely performance by the Company of its obligations under the Transaction Documents. Except as disclosed in the Reports, there is no pending or, to the best knowledge of the Company, basis for or threatened action, suit, proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over the Company, or any of its Affiliates which litigation if adversely determined would have a Material Adverse Effect.

(i) <u>No Market Manipulation</u>.   The Company and its Affiliates have not taken, and will not take, directly or indirectly, any action designed to, or that might reasonably be expected to, cause or result in stabilization or manipulation of the price of the Common Stock to facilitate the sale or resale of the Securities or affect the price at which the Securities may be issued or resold.

(j) <u>Information Concerning Company</u>.   The Reports and Other Written Information contain all material information relating to the Company and its operations and financial condition as of their respective dates which information is required to be disclosed therein.   Since March 31, 2010, and except as modified in the Reports and Other Written Information or in the Schedules hereto, there has been no Material Adverse Effect relating to the Company's business, financial condition or affairs. The Reports and Other Written Information, including the financial statements included therein do not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, taken as a whole, not misleading in light of the circumstances and when made.

(k) <u>Defaults</u>.   The Company is not in material violation of its articles of incorporation or bylaws.   The Company is (i) not in default under or in violation of any other material agreement or instrument to which it is a party or by which it or any of its properties are bound or affected, which default or violation would have a Material Adverse Effect, (ii) not in default with respect to any order of any court, arbitrator or governmental body or subject to or party to any order of any court or governmental authority arising out of any action, suit or proceeding under any statute or other law respecting antitrust, monopoly, restraint of trade, unfair competition or similar matters which default would have a Material Adverse Effect, or (iii) not in violation of any statute, rule or regulation of any governmental authority which violation would have a Material Adverse Effect except as set forth in the note below.

(l) <u>No Integrated Offering</u>.   Neither the Company, nor any of its Affiliates, nor any person acting on its or their behalf, has directly or indirectly made any offers or sales of any security of the Company nor solicited any offers to buy any security of the Company under circumstances that would cause the offer of the Securities pursuant to this Agreement to be integrated with prior offerings by the Company for purposes of the 1933 Act or any applicable stockholder approval provisions, including, without limitation, under the rules and regulations of the Bulletin Board.  No prior offering will impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder.  Neither the Company nor any of its Affiliates will take any action or steps that would cause the offer or issuance of the Securities to be integrated with other offerings which would impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder.  The Company will not conduct any offering other than the transactions contemplated hereby that may be integrated with the offer or issuance of the Securities that would impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder.

(m) <u>No General Solicitation</u>.   Neither the Company, nor any of its Affiliates, nor to its knowledge, any person acting on its or their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D under the 1933 Act) in connection with the offer or sale of the Securities.

(n) <u>No Undisclosed Liabilities</u>.   The Company has no liabilities or obligations which are material, individually or in the aggregate, other than those incurred in the ordinary course of the Company businesses since March 31, 2009 (Form 10Q for third quarter then ended) and which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, except as disclosed in the Reports or on Schedule 5(n).

(o) <u>No Undisclosed Events or Circumstances</u>.   Since March 31, 2009, except as disclosed in the Reports, no event or circumstance has occurred or exists with respect to the Company or its businesses, properties, operations or financial condition, that, under applicable law, rule or regulation, requires public disclosure or announcement prior to the date hereof by the Company but which has not been so publicly announced or disclosed in the Reports.

(p) <u>Dilution</u>.   The Company's executive officers and directors understand the nature of the Securities being sold hereby and recognize that the issuance of the Securities will have a potential dilutive effect on the equity holdings of other holders of the Company's equity or rights to receive equity of the Company.  The board of directors of the Company has concluded, in its good faith business judgment that the issuance of the Securities is in the best interests of the Company.   The Company specifically acknowledges that its obligation to issue the Conversion Shares upon conversion of the Note is binding upon the Company and enforceable regardless of the dilution such

issuance may have on the ownership interests of other shareholders of the Company or parties entitled to receive equity of the Company.

(q) <u>No Disagreements with Accountants and Lawyers</u>.  Other than the opinion regarding the Company's ability to continue as a "going concern," as disclosed in the Company's Reports, there are no material disagreements of any kind presently existing, or reasonably anticipated by the Company to arise between the Company and the accountants and lawyers previously and presently employed by the Company, including but not limited to disputes or conflicts over payment owed to such accountants and lawyers, nor have there been any such disagreements during the two years prior to the Closing Date.

(r) <u>Investment Company</u>.    Neither the Company nor any Affiliate of the Company is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(s) <u>Foreign Corrupt Practices</u>.  Neither the Company, nor to the knowledge of the Company, any agent or other person acting on behalf of the Company, has (i) directly or indirectly, used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to foreign or domestic political activity, (ii) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (iii) failed to disclose fully any contribution made by the Company (or made by any person acting on its behalf of which the Company is aware) which is in violation of law, or (iv) violated in any material respect any provision of the Foreign Corrupt Practices Act of 1977, as amended.

(t) <u>Reporting Company/Shell Company</u>.    The Company is a publicly-held company subject to reporting obligations pursuant to Section 13 of the Securities Exchange Act of 1934, as amended (the "1934 Act") and has a class of Common Stock registered pursuant to Section 12(g) of the 1934 Act.  Pursuant to the provisions of the 1934 Act, the Company has <u>not</u> filed all reports and other materials required to be filed thereunder with the Commission during the preceding twelve months. The company is not now nor has ever been a "shell" as defined in Rule 12b-2 of the Exchange Act.

(u) <u>Listing</u>.  The Company's Common Stock is quoted on the OTC Markets (formerly known as the Pink Sheets) under the symbol NTEK.

(v) <u>Transfer Agent</u>.    The Company's transfer agent is a participant in the Depository Trust Company Automated Securities Transfer Program. The name, address, telephone number, fax number, contact person and email address of the Company transfer agent is as follows: Stalt, Inc., 671 Oak Grove Avenue, Menlo Park, California 94025 – Telephone (650) 321-7111 Fax (650) 321-7113.

(w) Company Predecessor and Subsidiaries.  The Company makes each of the representations contained in Sections 5(a), (b), (c), (d), (e), (f), (h), (j), (k), (n), (o), (p), (q), (r) and (s) of this Agreement, as same relate or could be applicable to each

Subsidiary.  All representations made by or relating to the Company of a historical or prospective nature and all undertakings described in Sections 9(g) through 9(l) shall relate, apply and refer to the Company and its predecessors and successors.  The Company represents that it owns all of the equity of the Subsidiaries and rights to receive equity of the Subsidiaries identified on Schedule 5(a), free and clear of all liens, encumbrances and claims, except as set forth on Schedule 5(a).  No person or entity other than the Company has the right to receive any equity interest in the Subsidiaries.  With the exception of the pre-merger name, Aldar Group, Inc., the Company further represents that the Subsidiaries have not been known by any other name for the prior five (5) years.

(x)  Correctness of Representations.  The Company represents that the foregoing representations and warranties are true and correct as of the date hereof in all material respects, and, unless the Company otherwise notifies the Subscriber prior to the Closing Date, shall be true and correct in all material respects as of the Closing Date; provided, that, if such representation or warranty is made as of a different date, in which case such representation or warranty shall be true as of such date.

(y)  Survival.  The foregoing representations and warranties shall survive for a period of one (1) year after the Closing Date.

6.  **Regulation D Offering/Legal Opinion**.  The offer and issuance of the Securities to the Subscriber is being made pursuant to the exemption from the registration provisions of the 1933 Act afforded by Section 4(2) or Section 4(6) of the 1933 Act and/or Rule 506 of Regulation D promulgated thereunder.  The Company will provide, at the Company's expense, such other legal opinions, if any, as are reasonably necessary in each Subscriber's opinion for the issuance and resale of the Common Stock issuable upon conversion of the Notes pursuant to an effective registration statement, Rule 144 under the 1933 Act or an exemption from registration.

7.  **Conversion of Note**.

(a) Upon the conversion of a Note or part thereof (which conversion is defined fully in the Note attached as Exhibit "A") , the Company shall, at its own cost and expense, take all necessary action, including obtaining and delivering, an opinion of counsel to assure that the Company's transfer agent shall issue stock certificates in the name of Subscriber (or its permitted nominee) or such other persons as designated by Subscriber and in such denominations to be specified at conversion representing the number of shares of Common Stock issuable upon such conversion.  The Company warrants that no instructions other than these instructions have been or will be given to the transfer agent of the Company's Common Stock and that the certificates representing such shares shall contain no legend other than the legend set forth in Section 4(h).  If and when Subscriber sells the Shares, assuming (i) a registration statement including such Shares for registration, filed with the Commission is effective and the prospectus, as supplemented or amended, contained therein is current and (ii) Subscriber or its agent confirms in writing to the transfer agent that Subscriber has complied with the prospectus delivery requirements, the Company will reissue the Shares without restrictive legend and the Shares will be free-trading, and freely transferable.  In the event that the Shares are sold in a manner that complies with an exemption from registration, the Company will promptly instruct its counsel to

issue to the transfer agent an opinion permitting removal of the legend indefinitely, if pursuant to Rule 144(b)(1)(i) of the 1933 Act, or for 90 days if pursuant to the other provisions of Rule 144 of the 1933 Act, provided that Subscriber delivers all reasonably requested representations in support of such opinion.

(b) Subscriber will give notice of its decision to exercise its right to convert the Note, interest, or part thereof by telecopying, or otherwise delivering a completed Notice of Conversion (a form of which is annexed as Exhibit A to the Note) to the Company via confirmed telecopier transmission or otherwise pursuant to Section 13(a) of this Agreement. Subscriber will not be required to surrender the Note until the Note has been fully converted or satisfied. Each date on which a Notice of Conversion is telecopied to the Company in accordance with the provisions hereof by 6 PM Eastern Time ("ET") (or if received by the Company after 6 PM ET, then the next business day) shall be deemed a "Conversion Date." The Company will itself or cause the Company's transfer agent to transmit the Company's Common Stock certificates representing the Conversion Shares issuable upon conversion of the Note to Subscriber via express courier for receipt by Subscriber within one (1) business day after the Conversion Date (such day being the "Delivery Date"). In the event the Conversion Shares are electronically transferable, then delivery of the Shares must be made by electronic transfer provided request for such electronic transfer has been made by the Subscriber. A Note representing the balance of the Note not so converted will be provided by the Company to Subscriber if requested by Subscriber, provided Subscriber delivers the original Note to the Company.

(c) The Company understands that a delay in the delivery of the Conversion Shares in the form required pursuant to Section 7.1 hereof could result in economic loss to the Subscriber. As compensation to Subscriber for such loss, the Company agrees to pay (as liquidated damages and not as a penalty) to Subscriber for late issuance of Conversion Shares in the form required pursuant to Section 7.1 hereof upon Conversion of the Note, the amount of $100 per business day after the Delivery Date for each $10,000 of Note principal amount and interest (and proportionately for other amounts) being converted of the corresponding Conversion Shares which are not timely delivered not to exceed a maximum of 15% of the principal amount outstanding on the Note. The Company shall pay any payments incurred under this Section upon demand.

(d) <u>Adjustments</u>.    The Conversion Price and the amount of Shares issuable upon conversion of the Notes shall be equitably adjusted and as otherwise described in this Agreement and the Note.

(e) <u>Redemption</u>.    The Note shall be redeemable in whole or in part or callable by the Company at any time prior to conversion for the face value of the Note, plus 50%, or part thereof, paid to Subscriber.

8. **Covenants of the Company**.  The Company covenants and agrees with the Subscriber as follows:

(a) <u>Stop Orders</u>.  Subject to the prior notice requirement described in Section 8(n), the Company will advise the Subscriber, within twenty-four hours after it receives notice

of issuance by the Commission, any state securities commission or any other regulatory authority of any stop order or of any order preventing or suspending any offering of any securities of the Company, or of the suspension of the qualification of the Common Stock of the Company for offering or sale in any jurisdiction, or the initiation of any proceeding for any such purpose. The Company will not issue any stop transfer order or other order impeding the sale, resale or delivery of any of the Securities, except as may be required by any applicable federal or state securities laws and unless contemporaneous notice of such instruction is given to the Subscriber.

(b) Listing/Quotation. The Company shall promptly secure the quotation or listing of the Conversion Shares upon each national securities exchange, or automated quotation system on which the Company's Common Stock is quoted or listed and upon which such Conversion Shares are or become eligible for quotation or listing (subject to official notice of issuance). The Company will maintain the quotation or listing of its Common Stock and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of as applicable. The Company will provide Subscriber with copies of all notices it receives notifying the Company of the threatened and actual delisting of the Common Stock.

(c) Market Regulations. If required, the Company shall notify the Commission, the Principal Market and applicable state authorities, in accordance with their requirements, of the transactions contemplated by this Agreement, and shall take all other necessary action and proceedings as may be required and permitted by applicable law, rule and regulation, for the legal and valid issuance of the Securities to the Subscriber and promptly provide copies thereof to the Subscriber.

(d) Filing Requirements. From the date of this Agreement and until the last to occur of (i) two (2) years after the Closing Date, (ii) until all the Shares have been resold or transferred by the Subscriber pursuant to a registration statement or pursuant to Rule 144(b)(1)(i), or (iii) the Note is no longer outstanding (the date of such latest occurrence being the "End Date"), the Company will (A) cause its Common Stock to continue to be registered under Section 12(b) or 12(g) of the 1934 Act, (B) comply in all respects with its reporting and filing obligations under the 1934 Act, (C) voluntarily comply with all reporting requirements that are applicable to an issuer with a class of shares registered pursuant to Section 12(g) of the 1934 Act, if the Company is not subject to such reporting requirements, and (D) comply with all requirements related to any registration statement filed pursuant to this Agreement. The Company will use its best efforts not to take any action or file any document (whether or not permitted by the 1933 Act or the 1934 Act or the rules thereunder) to terminate or suspend such registration or to terminate or suspend its reporting and filing obligations under said acts until the End Date. Until the End Date, the Company will continue the listing or quotation of the Common Stock on a Principal Market and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Principal Market. The Company agrees to timely file a Form D with respect to the Securities if required under Regulation D and to provide a copy thereof to each Subscriber promptly after such filing.

(e) Use of Proceeds. The proceeds of the Offering will be employed by the Company for expenses of the Offering, the filing of a registration statement pursuant to the 1933 Act, and general working capital. Except as described on Schedule 8(e), the Purchase Price may not and will not be used for accrued and unpaid officer and director salaries, payment of financing related debt, redemption of outstanding notes or equity instruments of the Company nor non-trade obligations outstanding on a Closing Date. For so long as any Note is outstanding, the Company will not prepay any financing related debt obligations, except equipment payments or in the event such payments are made in the ordinary course of business, nor redeem any equity instruments of the Company without the prior consent of the Subscriber.

(f) Reservation. Prior to the Closing, the Company undertakes to reserve on behalf of Subscriber from its authorized but unissued Common Stock, a sufficient number of shares of Common Stock necessary to allow Subscriber to be able to convert the entire Note. Failure to have sufficient shares reserved pursuant to this Section 9(f) at any time shall be a material default of the Company's obligations under this Agreement and an Event of Default under the Note. If at any time the Note is outstanding the Company has insufficient Common Stock reserved on behalf of the Subscriber in an amount less than the amount necessary for full conversion of the outstanding Note principal and interest at the conversion price that would be in effect on every such date ("Minimum Required Reservation"), the Company will promptly reserve the Minimum Required Reservation, or if there are insufficient authorized and available shares of Common Stock to do so, the Company will take all action necessary to increase its authorized capital to be able to fully satisfy its reservation requirements hereunder, including the filing of a preliminary proxy with the Commission not later than fifteen days after the first day the Company has less than the Minimum Required Reservation. The Company agrees to provide notice to the Subscriber not later than five days after the date the Company has less than the Minimum Required Reservation reserved on behalf of the Subscriber.

(g) DTC Program. At all times that Notes are outstanding, the Company will employ as the transfer agent for the Common Stock, and Conversion Shares a participant in the Depository Trust Company Automated Securities Transfer Program.

(h) Taxes. From the date of this Agreement and until the End Date, the Company will promptly pay and discharge, or cause to be paid and discharged, when due and payable, all lawful taxes, assessments and governmental charges or levies imposed upon the income, profits, property or business of the Company; provided, however, that any such tax, assessment, charge or levy need not be paid if the validity thereof shall currently be contested in good faith by appropriate proceedings and if the Company shall have set aside on its books adequate reserves with respect thereto, and provided, further, that the Company will pay all such taxes, assessments, charges or levies forthwith upon the commencement of proceedings to foreclose any lien which may have attached as security therefore.

(i) Insurance.  As reasonably necessary as determined by the Company, from the date of this Agreement and until the End Date, the Company will keep its assets which are of an insurable character insured by financially sound and reputable insurers against loss or damage by fire, explosion and other risks customarily insured against by companies in the Company's line of business and location, in amounts and to the extent and in the manner customary for companies in similar businesses similarly situated and located and to the extent available on commercially reasonable terms.

(j) Books and Records.  From the date of this Agreement and until the End Date, the Company will keep true records and books of account in which full, true and correct entries will be made of all dealings or transactions in relation to its business and affairs in accordance with generally accepted accounting principles applied on a consistent basis.

(k) Governmental Authorities.   From the date of this Agreement and until the End Date, the Company shall duly observe and conform in all material respects to all valid requirements of governmental authorities relating to the conduct of its business or to its properties or assets.

(l) Intellectual Property.  From the date of this Agreement and until the End Date, the Company shall maintain in full force and effect its corporate existence, rights and franchises and all licenses and other rights to use intellectual property owned or possessed by it and reasonably deemed to be necessary to the conduct of its business, unless it is sold for value.  Schedule 9(l) hereto identifies all of the intellectual property owned by the Company and Subsidiaries.

(m) Properties.  From the date of this Agreement and until the End Date, the Company will keep its properties in good repair, working order and condition, reasonable wear and tear excepted, and from time to time make all necessary and proper repairs, renewals, replacements, additions and improvements thereto; and the Company will at all times comply with each provision of all leases and claims to which it is a party or under which it occupies or has rights to property if the breach of such provision could reasonably be expected to have a Material Adverse Effect.  The Company will not abandon any of its assets except for those assets which have negligible or marginal value or for which it is prudent to do so under the circumstances.

(n) Negative Covenants.  So long as a Note is outstanding, without the consent of the Subscriber, the Company will not and will not permit any of its Subsidiaries to directly or indirectly:

(i) create, incur, assume or suffer to exist any pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, security title, mortgage, security deed or deed of trust, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement

perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction) (each, a "Lien") upon any of its property, whether now owned or hereafter acquired except for: (A) the Excepted Issuances (as defined in Section 12 hereof), and (B) (a) Liens imposed by law for taxes that are not yet due or are being contested in good faith and for which adequate reserves have been established in accordance with generally accepted accounting principles; (b) carriers', warehousemen's, mechanics', material men's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or that are being contested in good faith and by appropriate proceedings; (c) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (d) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business; (e) Liens created with respect to the financing of the purchase of new property in the ordinary course of the Company's business up to the amount of the purchase price of such property; and (f) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property (each of (a) through (f), a "Permitted Lien").

(ii) amend its certificate of incorporation, bylaws or its charter documents so as to materially and adversely affect any rights of the Subscriber (an increase in the amount of authorized shares and an increase in the number of directors will not be deemed adverse to the rights of the Subscriber);

(iii) repay, repurchase or offer to repay, repurchase or otherwise acquire or make any dividend or distribution in respect of any of its Common Stock, preferred stock, or other equity securities other than to the extent permitted or required under the Transaction Documents.

(iv) engage in any transactions with any officer, director, employee or any Affiliate of the Company, including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner, in each case in excess of $25,000 other than (i) for payment of salary, or fees for services rendered, (ii) reimbursement for expenses incurred on behalf of the Company, and (iii) for other employee benefits, including stock option agreements under any stock option plan of the Company; or

(v) prepay or redeem any financing related debt or past due obligations or securities outstanding as of the Closing Date, or past due obligations (except with respect to vendor obligations, any such obligations which in management's good faith, reasonable judgment must be repaid to avoid disruption of the Company's businesses.  The Company agrees to provide Subscriber not less than ten (10) days notice prior to becoming obligated to or effectuating a Permitted Lien or Excepted Issuance.

(s) Seniority.   Except for Permitted Liens, until the Note is fully satisfied or converted, without the consent of the Subscriber, the Company shall not grant nor allow any security interest to be taken in the assets of the Company or any Subsidiary or any Subsidiary's assets; nor issue any debt, equity or other instrument which would give the holder thereof directly or indirectly, a right in any assets of the Company or any Subsidiary or any right to payment equal to or superior to any right of the Subscriber as a holder of the Note in or to such assets or payment, nor issue or incur any debt not in the ordinary course of business.

(t) Notices.   For so long as the Subscriber holds any Securities, the Company will maintain a United States address and United States fax number for notice purposes under the Transaction Documents.

(v) Blackout.   The Company undertakes and covenants that without the consent of the Subscriber, until the end of the Exclusion Period, the Company will not enter into any acquisition, merger, exchange or sale or other transaction or fail to take any action that could have the effect of delaying the effectiveness of any pending registration statement beyond the effective date, or causing an already effective registration statement to no longer be effective or current for a period of forty-five or more days in the aggregate during any three hundred and sixty-five day period.

## 9. <u>Covenants of the Company Regarding Indemnification</u>.

(a) The Company agrees to indemnify, hold harmless, reimburse and defend the Subscriber, the Subscriber's officers, directors, agents, Affiliates, members, managers, control persons, and principal shareholders, against any claim, cost, expense, liability, obligation, loss or damage (including reasonable legal fees) of any nature, incurred by or imposed upon the Subscriber or any such person which results, arises out of or is based upon (i) any material misrepresentation by Company or breach of any representation or warranty by Company in this Agreement or in any Exhibits or Schedules attached hereto in any Transaction Document, or (ii) after any applicable notice and/or cure periods, any breach or default in performance by the Company of any material covenant or undertaking to be performed by the Company hereunder, or any other material agreement entered into by the Company and Subscriber relating hereto.

(b) In no event shall the liability of the Subscriber or permitted successor hereunder or under any Transaction Document or other agreement delivered in connection herewith be greater in amount than the dollar amount of the net proceeds actually received by such Subscriber or successor upon the sale of Registrable Securities (as defined herein).

10. **Registration Rights**. The Company anticipates filing a Form S-1 Registration Statement pursuant to the Securities Act of 1933, as amended, with the Securities and Exchange Commission (the "SEC") no later one (1) year after execution of this Agreement (the "Registration Statement"). Pursuant to this Registration Statement, Subscriber will be classified as a "Selling Shareholder" and the Securities as defined in this Agreement will be fully registered.

11. **Miscellaneous**.

(a) Notices.   All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice.  Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be as follows:

If to the Company, to:      NanoTech Entertainment, Inc.
                            3883 Raymert Drive, Suite 3
                            Las Vegas, NV  89121
                            Attention:   David R. Foley
                            Telephone:  (702) 518-7410


If to the Investor (s):

                            Long Side Ventures LLC
                            1800 S. Ocean Dr., PH2
                            Hallandale Beach, FL 33009
                            Attention:  Ben Kaplan (Managing Member)
                            Telephone:  _____
                            Facsimile:  _____

With a copy to:             Jonathan D. Leinwand, P.A.
                             20801 Biscayne Blvd., Suite 403
                             Aventura, FL 33180

Composite Exhibit A

Telephone (954) 903-7856
Fax:  (954) 252-4265

(b) <u>Entire Agreement; Assignment</u>.  This Agreement and other documents delivered in connection herewith represent the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by both parties.  Neither the Company nor the Subscriber has relied on any representations not contained or referred to in this Agreement and the documents delivered herewith.   No right or obligation of the Company shall be assigned without prior notice to and the written consent of the Subscriber.

(c) <u>Counterparts/Execution</u>.   This Agreement may be executed in any number of counterparts and by the different signatories hereto on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute but one and the same instrument.  This Agreement may be executed by facsimile transmission, PDF, electronic signature or other similar electronic means with the same force and effect as if such signature page were an original thereof.

(d) <u>Law Governing this Agreement</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Florida without regard to principles of conflicts of laws.  Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of Florida or in the federal courts located in the State of Florida and county of Broward.   The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens.  The parties executing this Agreement and other agreements referred to herein or delivered in connection herewith on behalf of the Company agree to submit to the in personam jurisdiction of such courts and hereby irrevocably waive trial by jury.  The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs.  In the event that any provision of this Agreement or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law.  Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement.  Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement or any other Transaction Document by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.   Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

(e) <u>Specific Enforcement, Consent to Jurisdiction</u>.   The Company and Subscriber acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the parties shall be entitled to seek an injunction or injunctions to prevent or cure breaches of the provisions of this Agreement and to

19

enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which any of them may be entitled by law or equity. Subject to Section 13(d) hereof, the Company hereby irrevocably waives, and agrees not to assert in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction in Nevada of such court, that the suit, action or proceeding is brought in an inconvenient forum or that the venue of the suit, action or proceeding is improper. Nothing in this Section shall affect or limit any right to serve process in any other manner permitted by law.

(f) <u>Maximum Payments</u>.   Nothing contained herein or in any document referred to herein or delivered in connection herewith shall be deemed to establish or require the payment of a rate of interest or other charges in excess of the maximum permitted by applicable law. In the event that the rate of interest or dividends required to be paid or other charges hereunder exceed the maximum permitted by such law, any payments in excess of such maximum shall be credited against amounts owed by the Company to the Subscriber and thus refunded to the Company.

(g) <u>Calendar Days</u>.   All references to "days" in the Transaction Documents shall mean calendar days unless otherwise stated. The terms "business days" and "trading days" shall mean days that the Nevada Stock Exchange is open for trading for three or more hours. Time periods shall be determined as if the relevant action, calculation or time period were occurring in Nevada City. Any deadline that falls on a non-business day in any of the Transaction Documents shall be automatically extended to the next business day and interest, if any, shall be calculated and payable through such extended period.

(h) <u>Captions: Certain Definitions</u>.   The captions of the various sections and paragraphs of this Agreement have been inserted only for the purposes of convenience; such captions are not a part of this Agreement and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions of this Agreement. As used in this Agreement the term "person" shall mean and include an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated organization and a government or any department or agency thereof.

(j) <u>Severability</u>.   In the event that any term or provision of this Agreement shall be finally determined to be superseded, invalid, illegal or otherwise unenforceable pursuant to applicable law by an authority having jurisdiction and venue, that determination shall not impair or otherwise affect the validity, legality or enforceability: (i) by or before that authority of the remaining terms and provisions of this Agreement, which shall be enforced as if the unenforceable term or provision were deleted, or (ii) by or before any other authority of any of the terms and provisions of this Agreement.

(k) <u>Successor Laws</u>.   References in the Transaction Documents to laws, rules, regulations and forms shall also include successors to and functionally equivalent replacements of such laws, rules, regulations and forms. A successor rule to Rule 144(b)(1)(i) shall include any rule that would be available to a non-Affiliate of the Company for the sale of Common Stock not subject to volume restrictions and after a six month holding period.

## SIGNATURE PAGE TO SUBSCRIPTION

Please acknowledge your acceptance of the foregoing Subscription Agreement by signing and returning a copy to the undersigned whereupon it shall become a binding agreement between us.

**NANOTECH ENTERTAINMENT, INC.,** a Nevada corporation

By: _____
Name: David R. Foley
Title: President

Dated: April 1, 2011

**LONG SIDE VENTURES LLC**


By:_____
Name: Ben Kaplan
Title: Managing Member

Dated: April 1, 2011

Composite Exhibit A

Exhibit B/Schedule 8(e)

## DISBURSEMENT SCHEDULE AND USE OF PROCEEDS

Closing Disbursements

| Closing | Recipient | Amount |
|---|---|---|
| Closing | NanoTech Entertainment | $50,000 |
| Closing | Jonathan D. Leinwand PA (Investor Legal Fees) | $5,000 |
| **Total Loan Amount** | | **$55,000** |

Use of Proceeds:

$ 2,000 for sales and marketing expenses
$  500 for homologation
$ 1,000 to transfer agent
$  450 to Ted Campbell for Audit related expenses
$ 1,000 for Audit related expenses (bookkeeping expenses)
$ 4,150 for miscellaneous expenses.
$ 2,000 for Audit related expenses (bookkeeping expenses)
$300 for Ted Campbell (June 2010 10K Narrative)
$ 9,000 for JJ consulting (June 2010 10K Financials)
$ 11,000 for Sadler Gibb (June 2010 10K Audit)
$ 2,000 for Vintage filings (June 2010 10K filing)
$4,500 for JJ Consulting (Sep 2010, Dec 2010, Mar 2011 10Q Financials)
$10,500 for Sadler Gibb ((Sep 2010, Dec 2010, Mar 2011 10Q Audit Reviews)
$650 for Ted Campbell (Sep 2010, Dec 2010, Mar 2011 10Q Narratives)
$1,500 for Vintage filings ((Sep 2010, Dec 2010, Mar 2011 10Q filings)

Any variation from the above of more than 20% or $1,000 shall be a default under the Note, Subscription and Security Agreement unless approved by the Investor

The Company and the Investor agree that the above referenced amounts are the agreed upon disbursements and use of proceeds for the sums invested.

NANOTECH ENTERTAINMENT INC.               LONG SIDE VENTURES LLC


_____           _____
David R. Foley, President                 Ben Kaplan, Managing Member

Date_____April 1, 2011_____              Date_____

NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT.  NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

Principal Amount: $55,000
Issue Date: April 1, 2011

## CONVERTIBLE PROMISSORY NOTE

FOR VALUE RECEIVED,  **NanoTech Entertainment, Inc.,** a Nevada corporation (hereinafter called "Borrower"), hereby promises to pay to Long Side Ventures LLC whose address is 1800 S. Ocean Dr. PH2, Hallandale Beach, FL 33009 (the "Holder") on order, without demand, the sum of FIFTY-FIVE THOUSAND DOLLARS ($55,000) ("Principal Amount") on April 1, 2013 (the "Maturity Date"), if not sooner paid.

This Note has been entered into pursuant to the terms of a subscription agreement between the Borrower and the Holder dated at or about the date hereof (the "Subscription Agreement"), and shall be governed by the terms of such Subscription Agreement. Unless otherwise separately defined herein, all capitalized terms used in this Note shall have the same meaning as is set forth in the Subscription Agreement.

## ARTICLE I
## GENERAL PROVISIONS

1.1 <u>Payment Grace Period</u>.  The Borrower shall have a five (5) day grace period to pay any monetary amounts due under this Note, after which grace period a default interest rate of fifteen percent (15%) per annum shall apply.

1.2 <u>Conversion Privileges</u>.  The Conversion Privileges set forth in Article II shall remain in full force and effect immediately from the date hereof and until the Note is paid in full regardless of the occurrence of an Event of Default.  The Note shall be payable in full on the Maturity Date, unless previously converted into Common Stock in accordance with Article II hereof.

1.3 <u>Security Interest</u> – The Borrower has caused 3,000,000 (THREE MILLION) to be deposited with Jonathan D. Leinwand, P.A. as collateral for the obligations of the Company pursuant to this note.

Composite Exhibit A

## ARTICLE II
## CONVERSION RIGHTS

The Borrower shall have the right to convert the principal and any interest due under this Note into Shares of the Borrower's Common Stock, $.001 par value per share ("Common Stock") as set forth below.

2.1. Conversion into the Borrower's Common Stock.

(a) The Borrower shall have the right from and after the date of the issuance of this Note and then at any time until this Note is fully paid, to convert any outstanding and unpaid principal portion of this Note (in whole or in part), and accrued interest, at the election of the Borrower (the date of giving of such notice of conversion being a "Conversion Date") into fully paid and nonassessable shares of Common Stock as such stock exists on the date of issuance of this Note, or any shares of capital stock of Borrower into which such Common Stock shall hereafter be changed or reclassified, at the Conversion Price as defined in Section 2.1(b) hereof, determined as provided herein.  Upon delivery to the Holder of a completed Notice of Conversion, a form of which is annexed hereto as Exhibit A, Borrower shall issue and deliver to the Holder within one (1) business day after the Conversion Date (such day being the "Delivery Date") that number of shares of Common Stock for the portion of the Note converted in accordance with the foregoing. Such shares are to be delivered via DWAC, if eligible, or otherwise shall deliver the certificate via overnight mail to the address provided by the Holder. The number of shares of Common Stock to be issued upon each conversion of this Note shall be determined by dividing that portion of the outstanding principal amount of the Note and accrued but unpaid interest calculated at 15% per annum, if any, to be converted, by the Conversion Price.

(b) Subject to adjustment as provided in Section 2.1(c) hereof, the conversion price per share shall be at a rate of 30% of the average the lowest intraday trading prices during the 15 trading days prior to conversion

(c) The Conversion Price and number and kind of shares or other securities to be issued upon conversion determined pursuant to Section 2.1(a), shall be subject to adjustment from time to time upon the happening of certain events while this conversion right remains outstanding, as follows:

(i). Merger, Sale of Assets, etc.  If (A) the Borrower effects any merger or consolidation of the Borrower with or into another entity, (B) the Borrower effects any sale of all or substantially all of its assets in one or a series of related transactions, (C) any tender offer or exchange offer (whether by the Borrower or another entity) is completed pursuant to which holders of Common Stock are permitted to tender or exchange their shares for other securities, cash or property, (D) the Borrower consummates a stock purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with one or more persons or entities whereby such other persons or entities acquire more than the 50% of the outstanding shares of Common Stock (not including any shares of Common Stock held by such other persons or entities making or party to, or associated or

affiliated with the other persons or entities making or party to, such stock purchase agreement or other business combination), (E) any "person" or "group" (as these terms are used for purposes of Sections 13(d) and 14(d) of the 1934 Act) is or shall become the "beneficial owner" (as defined in Rule 13d-3 under the 1934 Act), directly or indirectly, of 50% of the aggregate Common Stock of the Borrower, or (F) the Borrower effects any reclassification of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property (in any such case, a "Fundamental Transaction"), this Note, as to the unpaid principal portion thereof and accrued interest thereon, shall thereafter be deemed to evidence the right to convert into such number and kind of shares or other securities and property as would have been issuable or distributable on account of such Fundamental Transaction, upon or with respect to the securities subject to the conversion right immediately prior to such Fundamental Transaction. The foregoing provision shall similarly apply to successive Fundamental Transactions of a similar nature by any such successor or purchaser. Without limiting the generality of the foregoing, the anti-dilution provisions of this Section shall apply to such securities of such successor or purchaser after any such Fundamental Transaction.

(ii). Reclassification, etc. If the Borrower at any time shall, by reclassification or otherwise, change the Common Stock into the same or a different number of securities of any class or classes that may be issued or outstanding, this Note, as to the unpaid principal portion thereof and accrued interest thereon, shall thereafter be deemed to evidence the right to purchase an adjusted number of such securities and kind of securities as would have been issuable as the result of such change with respect to the Common Stock immediately prior to such reclassification or other change.

(d) During the period the conversion right exists, Borrower will reserve from its authorized and unissued Common Stock a sufficient number of shares of Common Stock so as to effect conversion of this Note. Borrower represents that upon issuance, such shares will be duly and validly issued, fully paid and non-assessable. Borrower agrees that its issuance of this Note shall constitute full authority to its officers, agents, and transfer agents who are charged with the duty of executing and issuing stock certificates to execute and issue the necessary certificates for shares of Common Stock upon the conversion of this Note.

2.2 <u>Method of Conversion</u>. This Note may be converted by the Borrower in whole or in part as described in Section 2.1(a) and the Subscription Agreement. Upon partial conversion of this Note, a new Note containing the same date and provisions of this Note shall, at the request of the Holder, be issued by the Borrower to the Holder for the principal balance of this Note and interest which shall not have been converted or paid.

2.3. <u>Maximum Conversion</u>. (a)     Notwithstanding anything to the contrary contained herein, the number of Conversion Shares that may be acquired by the Subscriber upon conversion of the Notes (or otherwise in respect hereof) shall be limited to the extent necessary to ensure that, following such conversion (or other issuance), the total number of shares of Common Stock then beneficially owned by such Subscriber and its affiliates and any other persons whose beneficial ownership of Common Stock would be aggregated with the

Composite Exhibit A

Subscriber's for purposes of Section 13(d) of the 1934 Act, does not exceed 4.999% of the total number of issued and outstanding shares of Common Stock (including for such purpose the shares of Common Stock issuable upon such conversion). For such purposes, beneficial ownership shall be determined in accordance with Section 13(d) of the 1934 Act and the rules and regulations promulgated thereunder. By written notice to the Company, a Subscriber may waive the provisions of this Section 2.3(a) as to itself but any such waiver will not be effective until the 61st day after delivery thereof and such waiver shall have no effect on any other Subscriber.

(b)     Notwithstanding anything to the contrary contained herein, the number of Conversion Shares that may be acquired by the Subscriber upon conversion of the Notes (or otherwise in respect hereof) shall be limited to the extent necessary to ensure that, following such conversion (or other issuance), the total number of shares of Common Stock then beneficially owned by such Subscriber and its affiliates and any other persons whose beneficial ownership of Common Stock would be aggregated with the Subscriber's for purposes of Section 13(d) of the 1934 Act, does not exceed 9.999% of the total number of issued and outstanding shares of Common Stock (including for such purpose the shares of Common Stock issuable upon such conversion). For such purposes, beneficial ownership shall be determined in accordance with Section 13(d) of the 1934 Act and the rules and regulations promulgated thereunder. This provision may not be waived.

2.4. Optional Redemption of Principal Amount.  Provided an Event of Default or an event which with the passage of time or the giving of notice could become an Event of Default has not occurred, whether or not such Event of Default has been cured, the Borrower will have the option of prepaying the outstanding Principal Amount of this Note ("Optional Redemption"), in whole or in part, by paying to the Holder a sum of money equal the Principal amount plus an additional 50% thereof, together with accrued but unpaid interest thereon and any and all other sums due, accrued or payable to the Holder arising under this Note or any Transaction Document through the Redemption Payment Date as defined below (the "Redemption Amount"). Borrower's election to exercise its right to prepay must be by notice in writing ("Notice of Redemption").  The Notice of Redemption shall specify the date for such Optional Redemption (the "Redemption Payment Date"), which date shall be at least thirty (30) business days after the date of the Notice of Redemption (the "Redemption Period").  A Notice of Redemption shall not be effective with respect to any portion of the Principal Amount for which the Holder has previously delivered an election to convert, or subject to the previous sentence, for conversions initiated or made by the Holder during the Redemption Period.  On the Redemption Payment Date, the Redemption Amount, less any portion of the Redemption Amount against which the Holder has permissibly exercised its conversion rights, shall be paid in good funds to the Holder. In the event the Borrower fails to pay the Redemption Amount on the Redemption Payment Date as set forth herein, then (i) such Notice of Redemption will be null and void, (ii) Borrower will have no right to deliver another Notice of Redemption, and (iii) Borrower's failure may be deemed by Holder to be a non-curable Event of Default.  A Notice of Redemption may not be given nor may the Borrower effectuate a Redemption without the consent of the Holder, if at any time during the Redemption Period an Event of Default, or an event which with the passage of time or giving of notice could become an Event of Default (whether or not such Event of Default

has been cured), has occurred.  During the Optional Redemption Period, the Company must abide by all of its obligations to the Note Holder.

## ARTICLE III
## EVENT OF DEFAULT

The occurrence of any of the following events of default ("Event of Default") shall, at the option of the Holder hereof, make all sums of principal and interest then remaining unpaid hereon and all other amounts payable hereunder immediately due and payable, upon demand, without presentment, or grace period, all of which hereby are expressly waived, except as set forth below:

3.1 Failure to Pay Principal or Interest.  The Borrower fails to pay the principal, interest or other sum due under this Note when due.

3.2 Breach of Covenant.  The Borrower breaches any material covenant or other term or condition of the Subscription Agreement or this Note in any material respect and such breach, if subject to cure, continues for a period of thirty (30) days after written notice to the Borrower from the Holder.

3.3 Breach of Representations and Warranties.  Any material representation or warranty of the Borrower made herein, in the Subscription Agreement or any Transaction Document shall be false or misleading in any material respect as of the date made and the Closing Date.

3.4 Liquidation.   Any dissolution, liquidation or winding up of Borrower or any substantial portion of its business.

3.5 Cessation of Operations.   Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they come due.

3.6 Maintenance of Assets.   The failure by Borrower to maintain any material intellectual property rights, personal, real property or other assets which are necessary to conduct its business (whether now or in the future).

3.7 Receiver or Trustee.  The Borrower or any Subsidiary of Borrower shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business; or such a receiver or trustee shall otherwise be appointed.

3.8 Judgments.  Any money judgment, writ or similar final process shall be entered or filed against Borrower or any of its property or other assets for more than $100,000.

3.9 Bankruptcy.  Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings or relief under any bankruptcy law or any law, or the issuance of any notice in

relation to such event, for the relief of debtors shall be instituted by or against the Borrower or any Subsidiary of Borrower.

3.10 <u>Non-Payment</u>.  A default by the Borrower under any one or more obligations in an aggregate monetary amount in excess of $100,000 for more than twenty days after the due date, unless the Borrower is contesting the validity of such obligation in good faith and has segregated cash funds equal to not less than one-half of the contested amount.

3.11 <u>Stop Trade</u>.  An SEC or judicial stop trade order or Principal Market trading suspension that lasts for five (5) or more consecutive trading days.

3.12 <u>Failure to Deliver Common Stock or Replacement Note</u>.  Borrower's failure to timely deliver Common Stock to the Holder pursuant to and in the form required by this Note and Sections 7 and 11 of the Subscription Agreement, or, if required, a replacement Note.

3.13 <u>Reservation Default</u>.  Failure by the Borrower to have reserved for issuance upon conversion of the Note or upon exercise of the Warrants issued in connection with the Subscription Agreement, the number of shares of Common Stock as required in the Subscription Agreement, this Note and the Warrants, and such failure continues for a period of thirty (30) days.

3.14 <u>Financial Statement Restatement</u>.  The restatement of any financial statements filed by the Borrower with the Securities and Exchange Commission for any date or period from two years prior to the Issue Date of this Note and until this Note is no longer outstanding, if the result of such restatement would, by comparison to the un-restated financial statements, have constituted a Material Adverse Effect.

3.15 <u>Event Described in Subscription Agreement</u>.  The occurrence of an Event of Default as described in the Subscription Agreement that, if susceptible to cure, is not cured during any designated cure period.

3.16 <u>Executive Officers Breach of Duties</u>.  Any of Borrower's named executive officers or directors is convicted of a violation of securities laws, or a settlement in excess of $250,000 is reached by any such officer or director relating to a violation of securities laws, breach of fiduciary duties or self-dealing.

**ARTICLE IV**
**MISCELLANEOUS**

4.1 <u>Failure or Indulgence Not Waiver</u>.  No failure or delay on the part of the Holder hereof in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.   All rights and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

Composite Exhibit A

4.2 <u>Notices</u>.   All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice.  Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the first business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.  The addresses for such communications shall be:

If to the Company, to:        NanoTech Entertainment, Inc.
                                      3883 Raymert Drive, Suite 3
                                        Las Vegas, NV  89121
                                        Attention:   David R. Foley
                                        Telephone:  (702) 518 7410

If to the Investor (s):        Long Side Ventures LLC
                                        1800 S. Ocean Dr. PH2
                                        Hallandale Beach, FL 33009
                                        Attention:  Ben Kaplan (Portfolio Manager)
                                        Telephone:  _____
                                        Facsimile:  _____

                                        With a copy to:
                                        Jonathan D. Leinwand, Esq.
                                        20801 Biscayne Blvd., Suite 403
                                        Aventura, FL 33180
                                        Tel. 954-903-7856
                                        Fax. 954-252-4265

4.3 <u>Amendment Provision</u>.  The term "Note" and all reference thereto, as used throughout this instrument, shall mean this instrument as originally executed, or if later amended or supplemented, then as so amended or supplemented.

4.4 <u>Assignability</u>.  This Note shall be binding upon the Borrower and its successors and assigns, and shall inure to the benefit of the Holder and its successors and assigns.

4.5 <u>Cost of Collection</u>.  If default is made in the payment of this Note, Borrower shall pay the Holder hereof reasonable costs of collection, including reasonable attorneys' fees.

4.6 <u>Governing Law</u>.  This Note shall be governed by and construed in accordance with the laws of the State of Florida without regard to conflicts of laws principles that would result in the application of the substantive laws of another jurisdiction.  Any action brought by either party against the other concerning the transactions contemplated by this Agreement must be brought only in the civil or state courts of Florida or in the federal courts located in the State and county of Broward.  Both parties and the individual signing this Agreement on behalf of the Borrower agree to submit to the jurisdiction of such courts.  The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs.  In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or unenforceability of any other provision of this Note. Nothing contained herein shall be deemed or operate to preclude the Holder from bringing suit or taking other legal action against the Borrower in any other jurisdiction to collect on the Borrower's obligations to Holder, to realize on any collateral or any other security for such obligations, or to enforce a judgment or other decision in favor of the Holder.  This Note shall be deemed an unconditional obligation of Borrower for the payment of money and, without limitation to any other remedies of Holder, may be enforced against Borrower by summary proceeding pursuant to Florida Civil Procedure Laws and Rules.

4.7 <u>Maximum Payments</u>.  Nothing contained herein shall be deemed to establish or require the payment of a rate of interest or other charges in excess of the maximum rate permitted by applicable law.  In the event that the rate of interest required to be paid or other charges hereunder exceed the maximum rate permitted by applicable law, any payments in excess of such maximum rate shall be credited against amounts owed by the Borrower to the Holder and thus refunded to the Borrower.

4.8 <u>Non-Business Days</u>.   Whenever any payment or any action to be made shall be due on a Saturday, Sunday or a public holiday under the laws of the State of Florida, such payment may be due or action shall be required on the next succeeding business day and, for such payment, such next succeeding day shall be included in the calculation of the amount of accrued interest payable on such date.

4.9 <u>Redemption</u>.  This Note may be redeemed or called in full or in part with or without the consent of the Holder at 150% of the principal amount then remaining, plus any accrued and unpaid interest.

4.10 <u>Shareholder Status</u>.  The Holder shall not have rights as a shareholder of the Borrower with respect to unconverted portions of this Note.  However, the Holder will have the rights of a shareholder of the Borrower with respect to the Shares of Common Stock to be received after delivery by the Holder of a Conversion Notice to the Borrower.

[Balance of this Page Intentionally Left Blank]

IN WITNESS WHEREOF, Borrower has caused this Note to be signed in its name by an authorized officer as of the 1st day of April, 2011.

Composite Exhibit A

**NANOTECH ENTERTAINMENT, INC.,** a Nevada corporation

By:_____

Name: David R. Foley

Title: President

Dated: April 1, 2011

**LONGSIDE VENTUERS LLC**

By:_____

Name: Ben Kaplan

Title: Portfolio Manager

Dated: April 1, 2011

Composite Exhibit A

# NANOTECH ENTERTAINMENT, INC.

## CONVERTIBLE NOTE
## SUBSCRIPTION AGREEMENT

**THIS SUBSCRIPTION AGREEMENT** (this "Agreement"), is dated as of April 8, 2011, by and between NanoTech Entertainment, Inc., a Nevada corporation (the "Company"), and the subscriber identified on the signature page hereto ("Subscriber").

**WHEREAS**, the Company and Subscriber are executing and delivering this Agreement in reliance upon an exemption from securities registration afforded by the provisions of Section 4(2), Section 4(6) and/or Regulation D ("Regulation D") as promulgated by the United States Securities and Exchange Commission (the "Commission") under the Securities Act of 1933, as amended (the "1933 Act"); and

**WHEREAS**, the parties desire that, upon the terms and subject to the conditions contained herein, the Subscriber shall lend to the Company $55,000 (the Principal Amount") as per the Disbursement Schedule set forth in Exhibit "A" under the terms and conditions outlined ("Principal Amount") in a Convertible Promissory Note from the Company ("Note"), the form of which is annexed hereto as Exhibit "B", convertible into shares of the Company's Common Stock, $0.001 par value (the "Common Stock") at a per share conversion price set forth in the Note ("Conversion Price") (collectively the "Offering"). The Convertible Promissory Note (the "Note") and the shares of Common Stock issuable upon conversion of the Note (the "Shares" or "Conversion Shares"), are collectively referred to herein as the "Securities."):

**NOW, THEREFORE**, in consideration of the mutual covenants and other agreements contained in this Agreement the Company and the Subscriber hereby agree as follows:

1. **Closing Date**.  The "Closing Date" shall be the date that the Principle Amount is transmitted by wire transfer or otherwise credited to or for the benefit of the Company. Subject to the satisfaction or waiver of the terms and conditions of this Agreement, on the Closing Date, Subscriber shall lend to the Company which shall be evidenced by the Note in the aggregate Principal Amount of $55,000.

2. **Closing Deliverables**.
   a.      Subject to the satisfaction or waiver of the terms and conditions of this Agreement, on the Closing Date, the Subscriber and Company shall execute a Convertible Promissory Note which shall detail the terms and conditions for repayment as indicated thereon.

   b.      The Company shall provide the Subscriber with warrant to purchase that number of shares into which the Note is convertible into if the Note was converted on the day of the Closing. The exercise price shall be equal to closing price on the trading day immediately preceding the Closing Date.



EXHIBIT

D

PENGAD 800-631-6989

1

Composite Exhibit A

c.     Pursuant hereto the Company shall provide the Subscriber a "royalty" equal to 1.5% of the Company's gross sales up to an aggregate amount not to exceed 2.5 times the Principal Amount of the Note.

d.     The Company shall issue 3,000,000 shares to be held in escrow, by the Escrow Agent, as security for the repayment of the loan. The Escrow Agreement is attached hereto as Exhibit C.

e.     The Company shall enter into a Security Agreement as attached hereto as Exhibit D.

3. **Subscriber Representations and Warranties.**   Subscriber hereby represents and warrants to and agrees with the Company that:

(a) Organization and Standing of the Subscriber.   If Subscriber is an entity, such Subscriber is a corporation, partnership or other entity duly incorporated or organized, validly existing and in good standing under the laws of the State of Nevada.

(b) Authorization and Power.   Such Subscriber has the requisite power and authority to enter into and perform this Agreement and the other Transaction Documents (as defined herein) and to purchase the Note being sold to it hereunder.   The execution, delivery and performance of this Agreement and the other Transaction Documents by such Subscriber and the consummation by it of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate or partnership action, and no further consent or authorization of such Subscriber or its Board of Directors, stockholders, partners, members, as the case may be, is required.   This Agreement and the other Transaction Documents have been duly authorized, executed and delivered by such Subscriber and constitutes, or shall constitute when executed and delivered, a valid and binding obligation of such Subscriber enforceable against such Subscriber in accordance with the terms thereof.

(c) No Conflicts.   The execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation by such Subscriber of the transactions contemplated hereby and thereby or relating hereto do not and will not (i) result in a violation of such Subscriber's charter documents or bylaws or other organizational documents or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of any agreement, indenture or instrument or obligation to which such Subscriber is a party or by which its properties or assets are bound, or result in a violation of any law, rule, or regulation, or any order, judgment or decree of any court or governmental agency applicable to such Subscriber or its properties (except for such conflicts, defaults and violations as would not, individually or in the aggregate, have a material adverse effect on such Subscriber).   Such Subscriber is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental agency in order for it to execute, deliver or perform any of its obligations under this Agreement and the other Transaction Documents or to purchase the Securities in accordance with the terms hereof, provided that for purposes of the

2

representation made in this sentence, such Subscriber is assuming and relying upon the accuracy of the relevant representations and agreements of the Company herein.

(d) Information on Company. Such Subscriber has been furnished with or has had access to the EDGAR Website of the Commission to the Company's Form 10-K filed on May 25, 2010 for the fiscal year ended June 30, 2009 and the financial statements included therein, Form 10-Q filed on May 25, 2010 for the quarter ended March 31, 2010, and for the quarter ended December 31, 2009 together with all other filings made with the Commission available at the EDGAR website until five days before the Closing Date (hereinafter referred to collectively as the "Reports"). In addition, such Subscriber may have received in writing from the Company such other information concerning its operations, financial condition and other matters as such Subscriber has requested in writing, identified thereon as Other Written Information (such other information is collectively, the "Other Written Information"), and considered all factors such Subscriber deems material in deciding on the advisability of investing in the Securities. Such Subscriber has relied on the Reports and Other Written Information in making its investment decision.

(e) <u>Information on Subscriber</u>. Subscriber is, and will be at the time of the conversion of the Notes, an "accredited investor", as such term is defined in Regulation D promulgated by the Commission under the 1933 Act, is experienced in investments and business matters, has made investments of a speculative nature and has purchased securities of United States publicly-owned companies in private placements in the past and, with its representatives, has such knowledge and experience in financial, tax and other business matters as to enable such Subscriber to utilize the information made available by the Company to evaluate the merits and risks of and to make an informed investment decision with respect to the proposed purchase, which represents a speculative investment. Subscriber has the authority and is duly and legally qualified to purchase and own the Securities. Subscriber is able to bear the risk of such investment for an indefinite period and to afford a complete loss thereof. The information set forth on the signature page hereto regarding such Subscriber is accurate.

(f) <u>Purchase of Note</u>. On the Closing Date, Subscriber will purchase the Note as principal for its own account for investment only and not with a view toward, or for resale in connection with, the public sale or any distribution thereof.

(g) <u>Compliance with Securities Act</u>. Such Subscriber understands and agrees that the Securities have not been registered under the 1933 Act or any applicable state securities laws, by reason of their issuance in a transaction that does not require registration under the 1933 Act (based in part on the accuracy of the representations and warranties of the Subscriber contained herein), and that such Securities must be held indefinitely unless a subsequent disposition is registered under the 1933 Act or any applicable state securities laws or is exempt from such registration. In any event, and subject to compliance with applicable securities laws, the Subscriber may enter into lawful hedging transactions in the course of hedging the position they assume and the Subscriber may also enter into lawful short positions or other derivative transactions relating to the Securities, or interests in the Securities, and deliver the Securities, or interests in the Securities, to close out their short or other positions or otherwise settle other

3

transactions, or loan or pledge the Securities, or interests in the Securities, to third parties who in turn may dispose of these Securities.

(h) <u>Conversion Shares Legend</u>.   Unless or until subject to an effective registration statement to be filed on Form S-1, or other appropriate registration statement, registering the conversion shares, the Conversion Shares, shall bear the following or similar legend:

> "THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, NOR APPLICABLE STATE SECURITIES LAWS.  THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT.

(i) <u>Note Legend</u>.  The Note shall bear the following legend:

> "BOTH THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE [CONVERTIBLE -OR-EXERCISABLE] HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS.  THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT.

(j) <u>Communication of Offer</u>.  The offer to sell the Securities was directly communicated to such Subscriber by the Company.  At no time was such Subscriber presented with or solicited by any leaflet, newspaper or magazine article, radio or television advertisement, or any other form of general advertising or solicited or invited to attend a promotional meeting otherwise than in connection and concurrently with such communicated offer.

(k) <u>Restricted Securities</u>.  Such Subscriber understands that the Securities have not been registered under the 1933 Act and such Subscriber will not sell, offer to sell, assign, pledge, hypothecate or otherwise transfer any of the Securities unless pursuant to an effective registration statement under the 1933 Act, or unless an exemption from registration is available. Notwithstanding anything to the contrary contained in this Agreement, such Subscriber may transfer (without restriction and without the need for an opinion of counsel) the Securities to its Affiliates (as defined below) provided that each such Affiliate is an "accredited investor" under Regulation D and such Affiliate agrees to be bound by the terms and conditions of this Agreement. For the purposes of this Agreement, an "Affiliate" of any person or entity means any other person or entity directly or indirectly controlling, controlled by or under direct or indirect common control with such person or entity.  Affiliate includes each Subsidiary of the Company. For purposes of this definition, "control" means the power to direct the management and policies

4

of such person or firm, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

(l) No Governmental Review.  Such Subscriber understands that no United States federal or state agency or any other governmental or state agency has passed on or made recommendations or endorsement of the Securities or the suitability of the investment in the Securities nor have such authorities passed upon or endorsed the merits of the offering of the Securities.

(m) Correctness of Representations.  Such Subscriber represents as to such Subscriber that the foregoing representations and warranties are true and correct as of the date hereof and, unless such Subscriber otherwise notifies the Company prior to the Closing Date shall be true and correct as of the Closing Date.

(n) Acknowledgement of Going Concern.  Such Subscriber recognizes and acknowledges that the Company is a "going concern" as disclosed in its Reports and Other Written Information and as reported by its auditor and may be unable to meet its financial obligations over the next twelve months.

(o) Survival.  The foregoing representations and warranties shall survive one (1) year from the Closing Date.

5. **Company Representations and Warranties**.  The Company represents and warrants to and agrees with each Subscriber that:

(a) Due Incorporation.  The Company is a corporation or other entity duly incorporated or organized, validly existing and in good standing under the laws of the State of Nevada and has the requisite corporate power to own its properties and to carry on its business as presently conducted. The Company is duly qualified as a foreign corporation to do business and is in good standing in each jurisdiction where the nature of the business conducted or property owned by it makes such qualification necessary, other than those jurisdictions in which the failure to so qualify would not have a Material Adverse Effect. For purposes of this Agreement, a "Material Adverse Effect" shall mean a material adverse effect on the financial condition, results of operations, prospects, properties or business of the Company and its Subsidiaries taken as a whole. For purposes of this Agreement, "Subsidiary" means, with respect to any entity at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity of which more than 30% of (i) the outstanding capital stock having (in the absence of contingencies) ordinary voting power to elect a majority of the board of directors or other managing body of such entity, (ii) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such entity. As of the Closing Date, all of the Company's Subsidiaries and the Company's ownership interest therein are set forth on Schedule 5(a).

5

(b) Outstanding Stock. All issued and outstanding shares of capital stock and equity interests in the Company have been duly authorized and validly issued and are fully paid and non-assessable.

(c) Authority; Enforceability. This Agreement, the Note and the Shares and any other agreements delivered together with this Agreement or in connection herewith (collectively "Transaction Documents") have been duly authorized, executed and delivered by the Company and/or Subsidiaries and are valid and binding agreements of the Company enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights generally and to general principles of equity. The Company has full corporate power and authority necessary to enter into and deliver the Transaction Documents and to perform its obligations thereunder.

(d) Capitalization and Additional Issuances. The authorized and outstanding capital stock of the Company and Subsidiaries on a fully diluted basis as of the date of this Agreement and the Closing Date (not including the Securities) are set forth on Schedule 5(d). Except as set forth on Schedule 5(d), there are no options, warrants, or rights to subscribe to, securities, rights, understandings or obligations convertible into or exchangeable for or giving any right to subscribe for any shares of capital stock or other equity interest of the Company or any of the Subsidiaries. The only officer, director, employee and consultant stock option or stock incentive plan or similar plan currently in effect or contemplated by the Company is described on Schedule 5(d). There are no outstanding agreements or preemptive or similar rights affecting the Company's Common Stock.

(e) Consents. No consent, approval, authorization or order of any court, governmental agency or body or arbitrator having jurisdiction over the Company, or any of its Affiliates, the OTC Markets or OTC Bulletin Board (the "Bulletin Board") or the Company's shareholders is required for the execution by the Company of the Transaction Documents and compliance and performance by the Company of its obligations under the Transaction Documents, including, without limitation, the issuance and sale of the Securities. The Transaction Documents and the Company's performance of its obligations thereunder have been unanimously approved by the Company's Board of Directors. No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any governmental authority in the world, including without limitation, the United States, or elsewhere is required by the Company or any Affiliate of the Company in connection with the consummation of the transactions contemplated by this Agreement, except as would not otherwise have a Material Adverse Effect or the consummation of any of the other agreements, covenants or commitments of the Company or any Subsidiary contemplated by the other Transaction Documents. Any such qualifications and filings will, in the case of qualifications, be effective on the Closing and will, in the case of filings, be made within the time prescribed by law.

(f) No Violation or Conflict. Assuming the representations and warranties of the Subscriber in Section 4 are true and correct, neither the issuance nor sale of the Securities nor the performance of the Company's obligations under this Agreement and all other agreements entered into by the Company relating thereto by the Company will:

6

(i) violate, conflict with, result in a breach of, or constitute a default (or an event which with the giving of notice or the lapse of time or both would be reasonably likely to constitute a default) under (A) the articles or certificate of incorporation, charter or bylaws of the Company, (B) to the Company's knowledge, any decree, judgment, order, law, treaty, rule, regulation or determination applicable to the Company of any court, governmental agency or body, or arbitrator having jurisdiction over the Company or over the properties or assets of the Company or any of its Affiliates, (C) the terms of any bond, debenture, note or any other evidence of indebtedness, or any agreement, stock option or other similar plan, indenture, lease, mortgage, deed of trust or other instrument to which the Company or any of its Affiliates is a party, by which the Company or any of its Affiliates is bound, or to which any of the properties of the Company or any of its Affiliates is subject, or (D) the terms of any "lock-up" or similar provision of any underwriting or similar agreement to which the Company, or any of its Affiliates is a party except the violation, conflict, breach, or default of which would not have a Material Adverse Effect; or

(ii) result in the creation or imposition of any lien, charge or encumbrance upon the Securities or any of the assets of the Company or any of its Affiliates except in favor of Subscriber as described herein; or

(iii) result in the activation of any anti-dilution rights or a reset or re-pricing of any debt, equity or security instrument of any creditor or equity holder of the Company, or the holder of the right to receive any debt, equity or security instrument of the Company nor result in the acceleration of the due date of any obligation of the Company; or

(iv) result in the triggering of any piggy-back or other registration rights of any person or entity holding securities of the Company or having the right to receive securities of the Company.

(g) The Securities. The Securities upon issuance:

(i) are, or will be, free and clear of any security interests, liens, claims or other encumbrances, subject only to restrictions upon transfer under the 1933 Act and any applicable state securities laws;

(ii) have been, or will be, duly and validly authorized and on the dates of issuance of the Conversion Shares upon conversion of the Note, such Shares will be duly and validly issued, fully paid and non- assessable, and if registered pursuant to the 1933 Act and resold pursuant to an effective registration statement or exempt from registration will be free trading, unrestricted and unlegended;

7

(iii) will not have been issued or sold in violation of any preemptive or other similar rights of the holders of any securities of the Company or rights to acquire securities of the Company; and

(iv) will not subject the holders thereof to personal liability by reason of being such holders.

(h) <u>Litigation</u>.  There is no pending or, to the best knowledge of the Company, threatened action, suit, proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over the Company, or any of its Affiliates that would affect the execution by the Company or the complete and timely performance by the Company of its obligations under the Transaction Documents. Except as disclosed in the Reports, there is no pending or, to the best knowledge of the Company, basis for or threatened action, suit, proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over the Company, or any of its Affiliates which litigation if adversely determined would have a Material Adverse Effect.

(i) <u>No Market Manipulation</u>.  The Company and its Affiliates have not taken, and will not take, directly or indirectly, any action designed to, or that might reasonably be expected to, cause or result in stabilization or manipulation of the price of the Common Stock to facilitate the sale or resale of the Securities or affect the price at which the Securities may be issued or resold.

(j) <u>Information Concerning Company</u>.   The Reports and Other Written Information contain all material information relating to the Company and its operations and financial condition as of their respective dates which information is required to be disclosed therein.   Since March 31, 2010, and except as modified in the Reports and Other Written Information or in the Schedules hereto, there has been no Material Adverse Effect relating to the Company's business, financial condition or affairs. The Reports and Other Written Information, including the financial statements included therein do not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, taken as a whole, not misleading in light of the circumstances and when made.

(k) <u>Defaults</u>.   The Company is not in material violation of its articles of incorporation or bylaws.  The Company is (i) not in default under or in violation of any other material agreement or instrument to which it is a party or by which it or any of its properties are bound or affected, which default or violation would have a Material Adverse Effect, (ii) not in default with respect to any order of any court, arbitrator or governmental body or subject to or party to any order of any court or governmental authority arising out of any action, suit or proceeding under any statute or other law respecting antitrust, monopoly, restraint of trade, unfair competition or similar matters which default would have a Material Adverse Effect, or (iii) not in violation of any statute, rule or regulation of any governmental authority which violation would have a Material Adverse Effect except as set forth in the note below.

8

(l) <u>No Integrated Offering</u>.   Neither the Company, nor any of its Affiliates, nor any person acting on its or their behalf, has directly or indirectly made any offers or sales of any security of the Company nor solicited any offers to buy any security of the Company under circumstances that would cause the offer of the Securities pursuant to this Agreement to be integrated with prior offerings by the Company for purposes of the 1933 Act or any applicable stockholder approval provisions, including, without limitation, under the rules and regulations of the Bulletin Board.  No prior offering will impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder.  Neither the Company nor any of its Affiliates will take any action or steps that would cause the offer or issuance of the Securities to be integrated with other offerings which would impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder.  The Company will not conduct any offering other than the transactions contemplated hereby that may be integrated with the offer or issuance of the Securities that would impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder.

(m) <u>No General Solicitation</u>.  Neither the Company, nor any of its Affiliates, nor to its knowledge, any person acting on its or their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D under the 1933 Act) in connection with the offer or sale of the Securities.

(n) <u>No Undisclosed Liabilities</u>.  The Company has no liabilities or obligations which are material, individually or in the aggregate, other than those incurred in the ordinary course of the Company businesses since March 31, 2009 (Form 10Q for third quarter then ended) and which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, except as disclosed in the Reports or on Schedule 5(n).

(o) <u>No Undisclosed Events or Circumstances</u>..  Since March 31, 2009, except as disclosed in the Reports, no event or circumstance has occurred or exists with respect to the Company or its businesses, properties, operations or financial condition, that, under applicable law, rule or regulation, requires public disclosure or announcement prior to the date hereof by the Company but which has not been so publicly announced or disclosed in the Reports.

(p) <u>Dilution</u>.  The Company's executive officers and directors understand the nature of the Securities being sold hereby and recognize that the issuance of the Securities will have a potential dilutive effect on the equity holdings of other holders of the Company's equity or rights to receive equity of the Company.  The board of directors of the Company has concluded, in its good faith business judgment that the issuance of the Securities is in the best interests of the Company.   The Company specifically acknowledges that its obligation to issue the Conversion Shares upon conversion of the Note is binding upon the Company and enforceable regardless of the dilution such

9

issuance may have on the ownership interests of other shareholders of the Company or parties entitled to receive equity of the Company.

(q) <u>No Disagreements with Accountants and Lawyers</u>.  Other than the opinion regarding the Company's ability to continue as a "going concern," as disclosed in the Company's Reports, there are no material disagreements of any kind presently existing, or reasonably anticipated by the Company to arise between the Company and the accountants and lawyers previously and presently employed by the Company, including but not limited to disputes or conflicts over payment owed to such accountants and lawyers, nor have there been any such disagreements during the two years prior to the Closing Date.

(r)  <u>Investment Company</u>.   Neither the Company nor any Affiliate of the Company is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(s) <u>Foreign Corrupt Practices</u>.  Neither the Company, nor to the knowledge of the Company, any agent or other person acting on behalf of the Company, has (i) directly or indirectly, used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to foreign or domestic political activity, (ii) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (iii) failed to disclose fully any contribution made by the Company (or made by any person acting on its behalf of which the Company is aware) which is in violation of law, or (iv) violated in any material respect any provision of the Foreign Corrupt Practices Act of 1977, as amended.

(t)  <u>Reporting Company/Shell Company</u>.   The Company is a publicly-held company subject to reporting obligations pursuant to Section 13 of the Securities Exchange Act of 1934, as amended (the "1934 Act") and has a class of Common Stock registered pursuant to Section 12(g) of the 1934 Act.  Pursuant to the provisions of the 1934 Act, the Company has <u>not</u> filed all reports and other materials required to be filed thereunder with the Commission during the preceding twelve months. The company is not now nor has ever been a "shell" as defined in Rule 12b-2 of the Exchange Act.

(u)  <u>Listing</u>.  The Company's Common Stock is quoted on the OTC Markets (formerly known as the Pink Sheets) under the symbol NTEK.

(v)  <u>Transfer Agent</u>.   The Company's transfer agent is a participant in the Depository Trust Company Automated Securities Transfer Program. The name, address, telephone number, fax number, contact person and email address of the Company transfer agent is as follows: Stalt, Inc., 671 Oak Grove Avenue, Menlo Park, California 94025 – Telephone (650) 321-7111 Fax (650) 321-7113.

(w) Company Predecessor and Subsidiaries.  The Company makes each of the representations contained in Sections 5(a), (b), (c), (d), (e), (f), (h), (j), (k), (n), (o), (p), (q), (r) and (s) of this Agreement, as same relate or could be applicable to each

10

Subsidiary.  All representations made by or relating to the Company of a historical or prospective nature and all undertakings described in Sections 9(g) through 9(l) shall relate, apply and refer to the Company and its predecessors and successors.  The Company represents that it owns all of the equity of the Subsidiaries and rights to receive equity of the Subsidiaries identified on Schedule 5(a), free and clear of all liens, encumbrances and claims, except as set forth on Schedule 5(a).  No person or entity other than the Company has the right to receive any equity interest in the Subsidiaries.  With the exception of the pre-merger name, Aldar Group, Inc., the Company further represents that the Subsidiaries have not been known by any other name for the prior five (5) years.

(x)  <u>Correctness of Representations</u>.   The Company represents that the foregoing representations and warranties are true and correct as of the date hereof in all material respects, and, unless the Company otherwise notifies the Subscriber prior to the Closing Date, shall be true and correct in all material respects as of the Closing Date; provided, that, if such representation or warranty is made as of a different date, in which case such representation or warranty shall be true as of such date.

(y)  <u>Survival</u>.  The foregoing representations and warranties shall survive for a period of one (1) year after the Closing Date.

**6. Regulation D Offering/Legal Opinion.**  The offer and issuance of the Securities to the Subscriber is being made pursuant to the exemption from the registration provisions of the 1933 Act afforded by Section 4(2) or Section 4(6) of the 1933 Act and/or Rule 506 of Regulation D promulgated thereunder.  The Company will provide, at the Company's expense, such other legal opinions, if any, as are reasonably necessary in each Subscriber's opinion for the issuance and resale of the Common Stock issuable upon conversion of the Notes pursuant to an effective registration statement, Rule 144 under the 1933 Act or an exemption from registration.

**7. Conversion of Note.**

(a) Upon the conversion of a Note or part thereof (which conversion is defined fully in the Note attached as Exhibit "A") , the Company shall, at its own cost and expense, take all necessary action, including obtaining and delivering, an opinion of counsel to assure that the Company's transfer agent shall issue stock certificates in the name of Subscriber (or its permitted nominee) or such other persons as designated by Subscriber and in such denominations to be specified at conversion representing the number of shares of Common Stock issuable upon such conversion.  The Company warrants that no instructions other than these instructions have been or will be given to the transfer agent of the Company's Common Stock and that the certificates representing such shares shall contain no legend other than the legend set forth in Section 4(h).  If and when Subscriber sells the Shares, assuming (i) a registration statement including such Shares for registration, filed with the Commission is effective and the prospectus, as supplemented or amended, contained therein is current and (ii) Subscriber or its agent confirms in writing to the transfer agent that Subscriber has complied with the prospectus delivery requirements, the Company will reissue the Shares without restrictive legend and the Shares will be free-trading, and freely transferable.   In the event that the Shares are sold in a manner that complies with an exemption from registration, the Company will promptly instruct its counsel to

11

issue to the transfer agent an opinion permitting removal of the legend indefinitely, if pursuant to Rule 144(b)(1)(i) of the 1933 Act, or for 90 days if pursuant to the other provisions of Rule 144 of the 1933 Act, provided that Subscriber delivers all reasonably requested representations in support of such opinion.

(b) Subscriber will give notice of its decision to exercise its right to convert the Note, interest, or part thereof by telecopying, or otherwise delivering a completed Notice of Conversion (a form of which is annexed as Exhibit A to the Note) to the Company via confirmed telecopier transmission or otherwise pursuant to Section 13(a) of this Agreement. Subscriber will not be required to surrender the Note until the Note has been fully converted or satisfied. Each date on which a Notice of Conversion is telecopied to the Company in accordance with the provisions hereof by 6 PM Eastern Time ("ET") (or if received by the Company after 6 PM ET, then the next business day) shall be deemed a "Conversion Date." The Company will itself or cause the Company's transfer agent to transmit the Company's Common Stock certificates representing the Conversion Shares issuable upon conversion of the Note to Subscriber via express courier for receipt by Subscriber within one (1) business day after the Conversion Date (such day being the "Delivery Date"). In the event the Conversion Shares are electronically transferable, then delivery of the Shares must be made by electronic transfer provided request for such electronic transfer has been made by the Subscriber. A Note representing the balance of the Note not so converted will be provided by the Company to Subscriber if requested by Subscriber, provided Subscriber delivers the original Note to the Company.

(c) The Company understands that a delay in the delivery of the Conversion Shares in the form required pursuant to Section 7.1 hereof could result in economic loss to the Subscriber. As compensation to Subscriber for such loss, the Company agrees to pay (as liquidated damages and not as a penalty) to Subscriber for late issuance of Conversion Shares in the form required pursuant to Section 7.1 hereof upon Conversion of the Note, the amount of $100 per business day after the Delivery Date for each $10,000 of Note principal amount and interest (and proportionately for other amounts) being converted of the corresponding Conversion Shares which are not timely delivered not to exceed a maximum of 15% of the principal amount outstanding on the Note. The Company shall pay any payments incurred under this Section upon demand.

(d) Adjustments.   The Conversion Price and the amount of Shares issuable upon conversion of the Notes shall be equitably adjusted and as otherwise described in this Agreement and the Note.

(e) Redemption.   The Note shall be redeemable in whole or in part or callable by the Company at any time prior to conversion for the face value of the Note, plus 50%, or part thereof, paid to Subscriber.

8. **Covenants of the Company**.   The Company covenants and agrees with the Subscriber as follows:

(a) Stop Orders.   Subject to the prior notice requirement described in Section 8(n), the Company will advise the Subscriber, within twenty-four hours after it receives notice

12

of issuance by the Commission, any state securities commission or any other regulatory authority of any stop order or of any order preventing or suspending any offering of any securities of the Company, or of the suspension of the qualification of the Common Stock of the Company for offering or sale in any jurisdiction, or the initiation of any proceeding for any such purpose. The Company will not issue any stop transfer order or other order impeding the sale, resale or delivery of any of the Securities, except as may be required by any applicable federal or state securities laws and unless contemporaneous notice of such instruction is given to the Subscriber.

(b) Listing/Quotation.  The Company shall promptly secure the quotation or listing of the Conversion Shares upon each national securities exchange, or automated quotation system on which the Company's Common Stock is quoted or listed and upon which such Conversion Shares are or become eligible for quotation or listing (subject to official notice of issuance). The Company will maintain the quotation or listing of its Common Stock and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of as applicable. The Company will provide Subscriber with copies of all notices it receives notifying the Company of the threatened and actual delisting of the Common Stock.

(c) Market Regulations.  If required, the Company shall notify the Commission, the Principal Market and applicable state authorities, in accordance with their requirements, of the transactions contemplated by this Agreement, and shall take all other necessary action and proceedings as may be required and permitted by applicable law, rule and regulation, for the legal and valid issuance of the Securities to the Subscriber and promptly provide copies thereof to the Subscriber.

(d) Filing Requirements.  From the date of this Agreement and until the last to occur of (i) two (2) years after the Closing Date, (ii) until all the Shares have been resold or transferred by the Subscriber pursuant to a registration statement or pursuant to Rule 144(b)(1)(i), or (iii) the Note is no longer outstanding (the date of such latest occurrence being the "End Date"), the Company will (A) cause its Common Stock to continue to be registered under Section 12(b) or 12(g) of the 1934 Act, (B) comply in all respects with its reporting and filing obligations under the 1934 Act, (C) voluntarily comply with all reporting requirements that are applicable to an issuer with a class of shares registered pursuant to Section 12(g) of the 1934 Act, if the Company is not subject to such reporting requirements, and (D) comply with all requirements related to any registration statement filed pursuant to this Agreement. The Company will use its best efforts not to take any action or file any document (whether or not permitted by the 1933 Act or the 1934 Act or the rules thereunder) to terminate or suspend such registration or to terminate or suspend its reporting and filing obligations under said acts until the End Date. Until the End Date, the Company will continue the listing or quotation of the Common Stock on a Principal Market and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Principal Market. The Company agrees to timely file a Form D with respect to the Securities if required under Regulation D and to provide a copy thereof to each Subscriber promptly after such filing.

13

(e) Use of Proceeds.   The proceeds of the Offering will be employed by the Company for expenses of the Offering, the filing of a registration statement pursuant to the 1933 Act, and general working capital.   Except as described on Schedule 8(e), the Purchase Price may not and will not be used for accrued and unpaid officer and director salaries, payment of financing related debt, redemption of outstanding notes or equity instruments of the Company nor non-trade obligations outstanding on a Closing Date. For so long as any Note is outstanding, the Company will not prepay any financing related debt obligations, except equipment payments or in the event such payments are made in the ordinary course of business, nor redeem any equity instruments of the Company without the prior consent of the Subscriber.

(f) Reservation.   Prior to the Closing, the Company undertakes to reserve on behalf of Subscriber from its authorized but unissued Common Stock, a sufficient number of shares of Common Stock necessary to allow Subscriber to be able to convert the entire Note.   Failure to have sufficient shares reserved pursuant to this Section 9(f) at any time shall be a material default of the Company's obligations under this Agreement and an Event of Default under the Note.   If at any time the Note is outstanding the Company has insufficient Common Stock reserved on behalf of the Subscriber in an amount less than the amount necessary for full conversion of the outstanding Note principal and interest at the conversion price that would be in effect on every such date ("Minimum Required Reservation"), the Company will promptly reserve the Minimum Required Reservation, or if there are insufficient authorized and available shares of Common Stock to do so, the Company will take all action necessary to increase its authorized capital to be able to fully satisfy its reservation requirements hereunder, including the filing of a preliminary proxy with the Commission not later than fifteen days after the first day the Company has less than the Minimum Required Reservation. The Company agrees to provide notice to the Subscriber not later than five days after the date the Company has less than the Minimum Required Reservation reserved on behalf of the Subscriber.

(g) DTC Program.   At all times that Notes are outstanding, the Company will employ as the transfer agent for the Common Stock, and Conversion Shares a participant in the Depository Trust Company Automated Securities Transfer Program.

(h) Taxes.   From the date of this Agreement and until the End Date, the Company will promptly pay and discharge, or cause to be paid and discharged, when due and payable, all lawful taxes, assessments and governmental charges or levies imposed upon the income, profits, property or business of the Company; provided, however, that any such tax, assessment, charge or levy need not be paid if the validity thereof shall currently be contested in good faith by appropriate proceedings and if the Company shall have set aside on its books adequate reserves with respect thereto, and provided, further, that the Company will pay all such taxes, assessments, charges or levies forthwith upon the commencement of proceedings to foreclose any lien which may have attached as security therefore.

14

(i) Insurance.  As reasonably necessary as determined by the Company, from the date of this Agreement and until the End Date, the Company will keep its assets which are of an insurable character insured by financially sound and reputable insurers against loss or damage by fire, explosion and other risks customarily insured against by companies in the Company's line of business and location, in amounts and to the extent and in the manner customary for companies in similar businesses similarly situated and located and to the extent available on commercially reasonable terms.

(j) Books and Records.  From the date of this Agreement and until the End Date, the Company will keep true records and books of account in which full, true and correct entries will be made of all dealings or transactions in relation to its business and affairs in accordance with generally accepted accounting principles applied on a consistent basis.

(k) Governmental Authorities.   From the date of this Agreement and until the End Date, the Company shall duly observe and conform in all material respects to all valid requirements of governmental authorities relating to the conduct of its business or to its properties or assets.

(l) Intellectual Property.  From the date of this Agreement and until the End Date, the Company shall maintain in full force and effect its corporate existence, rights and franchises and all licenses and other rights to use intellectual property owned or possessed by it and reasonably deemed to be necessary to the conduct of its business, unless it is sold for value.  Schedule 9(l) hereto identifies all of the intellectual property owned by the Company and Subsidiaries.

(m) Properties.  From the date of this Agreement and until the End Date, the Company will keep its properties in good repair, working order and condition, reasonable wear and tear excepted, and from time to time make all necessary and proper repairs, renewals, replacements, additions and improvements thereto; and the Company will at all times comply with each provision of all leases and claims to which it is a party or under which it occupies or has rights to property if the breach of such provision could reasonably be expected to have a Material Adverse Effect.  The Company will not abandon any of its assets except for those assets which have negligible or marginal value or for which it is prudent to do so under the circumstances.

(n) Negative Covenants.  So long as a Note is outstanding, without the consent of the Subscriber, the Company will not and will not permit any of its Subsidiaries to directly or indirectly:

(i) create, incur, assume or suffer to exist any pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, security title, mortgage, security deed or deed of trust, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement

15

perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction) (each, a "Lien") upon any of its property, whether now owned or hereafter acquired except for: (A) the Excepted Issuances (as defined in Section 12 hereof), and (B) (a) Liens imposed by law for taxes that are not yet due or are being contested in good faith and for which adequate reserves have been established in accordance with generally accepted accounting principles; (b) carriers', warehousemen's, mechanics', material men's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or that are being contested in good faith and by appropriate proceedings; (c) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (d) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business; (e) Liens created with respect to the financing of the purchase of new property in the ordinary course of the Company's business up to the amount of the purchase price of such property; and (f) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property (each of (a) through (f), a "Permitted Lien").

(ii) amend its certificate of incorporation, bylaws or its charter documents so as to materially and adversely affect any rights of the Subscriber (an increase in the amount of authorized shares and an increase in the number of directors will not be deemed adverse to the rights of the Subscriber);

(iii) repay, repurchase or offer to repay, repurchase or otherwise acquire or make any dividend or distribution in respect of any of its Common Stock, preferred stock, or other equity securities other than to the extent permitted or required under the Transaction Documents.

(iv) engage in any transactions with any officer, director, employee or any Affiliate of the Company, including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner, in each case in excess of $25,000 other than (i) for payment of salary, or fees for services rendered, (ii) reimbursement for expenses incurred on behalf of the Company, and (iii) for other employee benefits, including stock option agreements under any stock option plan of the Company; or

16

(v) prepay or redeem any financing related debt or past due obligations or securities outstanding as of the Closing Date, or past due obligations (except with respect to vendor obligations, any such obligations which in management's good faith, reasonable judgment must be repaid to avoid disruption of the Company's businesses. The Company agrees to provide Subscriber not less than ten (10) days notice prior to becoming obligated to or effectuating a Permitted Lien or Excepted Issuance.

(s) Seniority.   Except for Permitted Liens, until the Note is fully satisfied or converted, without the consent of the Subscriber, the Company shall not grant nor allow any security interest to be taken in the assets of the Company or any Subsidiary or any Subsidiary's assets; nor issue any debt, equity or other instrument which would give the holder thereof directly or indirectly, a right in any assets of the Company or any Subsidiary or any right to payment equal to or superior to any right of the Subscriber as a holder of the Note in or to such assets or payment, nor issue or incur any debt not in the ordinary course of business.

(t) Notices.   For so long as the Subscriber holds any Securities, the Company will maintain a United States address and United States fax number for notice purposes under the Transaction Documents.

(v) Blackout.   The Company undertakes and covenants that without the consent of the Subscriber, until the end of the Exclusion Period, the Company will not enter into any acquisition, merger, exchange or sale or other transaction or fail to take any action that could have the effect of delaying the effectiveness of any pending registration statement beyond the effective date, or causing an already effective registration statement to no longer be effective or current for a period of forty-five or more days in the aggregate during any three hundred and sixty-five day period.

## 9. <u>Covenants of the Company Regarding Indemnification</u>.

(a) The Company agrees to indemnify, hold harmless, reimburse and defend the Subscriber, the Subscriber's officers, directors, agents, Affiliates, members, managers, control persons, and principal shareholders, against any claim, cost, expense, liability, obligation, loss or damage (including reasonable legal fees) of any nature, incurred by or imposed upon the Subscriber or any such person which results, arises out of or is based upon (i) any material misrepresentation by Company or breach of any representation or warranty by Company in this Agreement or in any Exhibits or Schedules attached hereto in any Transaction Document, or (ii) after any applicable notice and/or cure periods, any breach or default in performance by the Company of any material covenant or undertaking to be performed by the Company hereunder, or any other material agreement entered into by the Company and Subscriber relating hereto.

(b) In no event shall the liability of the Subscriber or permitted successor hereunder or under any Transaction Document or other agreement delivered in connection herewith be greater in amount than the dollar amount of the net proceeds actually received by such Subscriber or successor upon the sale of Registrable Securities (as defined herein).

17

10. **Registration Rights**. The Company anticipates filing a Form S-1 Registration Statement pursuant to the Securities Act of 1933, as amended, with the Securities and Exchange Commission (the "SEC") no later one (1) year after execution of this Agreement (the "Registration Statement"). Pursuant to this Registration Statement, Subscriber will be classified as a "Selling Shareholder" and the Securities as defined in this Agreement will be fully registered.

11. **Miscellaneous**.

(a) Notices. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be as follows:

If to the Company, to:

NanoTech Entertainment, Inc.
3883 Raymert Drive, Suite 3
Las Vegas, NV  89121
Attention:  David R. Foley
Telephone:  (702) 518-7410

If to the Investor (s):

Long Side Ventures LLC
1800 S. Ocean Dr., PH2
Hallandale Beach, FL 33009
Attention:  Ben Kaplan (Managing Member)
Telephone:  _____
Facsimile:  _____

With a copy to:

Jonathan D. Leinwand, P.A.
20801 Biscayne Blvd., Suite 403
Aventura, FL 33180

18

Telephone (954) 903-7856
Fax:  (954) 252-4265

(b) Entire Agreement; Assignment.  This Agreement and other documents delivered in connection herewith represent the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by both parties.  Neither the Company nor the Subscriber has relied on any representations not contained or referred to in this Agreement and the documents delivered herewith.  No right or obligation of the Company shall be assigned without prior notice to and the written consent of the Subscriber.

(c) Counterparts/Execution.  This Agreement may be executed in any number of counterparts and by the different signatories hereto on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute but one and the same instrument.  This Agreement may be executed by facsimile transmission, PDF, electronic signature or other similar electronic means with the same force and effect as if such signature page were an original thereof.

(d) Law Governing this Agreement.  This Agreement shall be governed by and construed in accordance with the laws of the State of Florida without regard to principles of conflicts of laws.  Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of Florida or in the federal courts located in the State of Florida and county of Broward.  The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens.  The parties executing this Agreement and other agreements referred to herein or delivered in connection herewith on behalf of the Company agree to submit to the in personam jurisdiction of such courts and hereby irrevocably waive trial by jury.  The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs.  In the event that any provision of this Agreement or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law.  Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement.  Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement or any other Transaction Document by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

(e) Specific Enforcement, Consent to Jurisdiction.  The Company and Subscriber acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the parties shall be entitled to seek an injunction or injunctions to prevent or cure breaches of the provisions of this Agreement and to

19

Composite Exhibit A

enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which any of them may be entitled by law or equity. Subject to Section 13(d) hereof, the Company hereby irrevocably waives, and agrees not to assert in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction in Nevada of such court, that the suit, action or proceeding is brought in an inconvenient forum or that the venue of the suit, action or proceeding is improper. Nothing in this Section shall affect or limit any right to serve process in any other manner permitted by law.

(f) Maximum Payments. Nothing contained herein or in any document referred to herein or delivered in connection herewith shall be deemed to establish or require the payment of a rate of interest or other charges in excess of the maximum permitted by applicable law. In the event that the rate of interest or dividends required to be paid or other charges hereunder exceed the maximum permitted by such law, any payments in excess of such maximum shall be credited against amounts owed by the Company to the Subscriber and thus refunded to the Company.

(g) Calendar Days. All references to "days" in the Transaction Documents shall mean calendar days unless otherwise stated. The terms "business days" and "trading days" shall mean days that the Nevada Stock Exchange is open for trading for three or more hours. Time periods shall be determined as if the relevant action, calculation or time period were occurring in Nevada City. Any deadline that falls on a non-business day in any of the Transaction Documents shall be automatically extended to the next business day and interest, if any, shall be calculated and payable through such extended period.

(h) Captions: Certain Definitions. The captions of the various sections and paragraphs of this Agreement have been inserted only for the purposes of convenience; such captions are not a part of this Agreement and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions of this Agreement. As used in this Agreement the term "person" shall mean and include an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated organization and a government or any department or agency thereof.

(j) Severability. In the event that any term or provision of this Agreement shall be finally determined to be superseded, invalid, illegal or otherwise unenforceable pursuant to applicable law by an authority having jurisdiction and venue, that determination shall not impair or otherwise affect the validity, legality or enforceability: (i) by or before that authority of the remaining terms and provisions of this Agreement, which shall be enforced as if the unenforceable term or provision were deleted, or (ii) by or before any other authority of any of the terms and provisions of this Agreement.

(k) Successor Laws. References in the Transaction Documents to laws, rules, regulations and forms shall also include successors to and functionally equivalent replacements of such laws, rules, regulations and forms. A successor rule to Rule 144(b)(1)(i) shall include any rule that would be available to a non-Affiliate of the Company for the sale of Common Stock not subject to volume restrictions and after a six month holding period.

20

## SIGNATURE PAGE TO SUBSCRIPTION

Please acknowledge your acceptance of the foregoing Subscription Agreement by signing and returning a copy to the undersigned whereupon it shall become a binding agreement between us.

**NANOTECH ENTERTAINMENT, INC.**, a Nevada corporation

By: _____

Name: David R. Foley

Title: President

Dated: April 8, 2011

**LONG SIDE VENTURES LLC**

By: _____

Name: Ben Kaplan

Title: Managing Member

Dated: April 8, 2011

21

Exhibit B/Schedule 8(e)

### DISBURSEMENT SCHEDULE AND USE OF PROCEEDS

Closing Disbursements

| Closing | Recipient | Amount |
|---|---|---|
| Closing | NanoTech Entertainment | $54,000 |
| Closing | Jonathan D. Leinwand PA (Investor Legal Fees) | $1,000 |
| **Total Loan Amount** | | **$55,000** |

Use of Proceeds:

$ 3,600 for sales and marketing expenses
$ 4,000 for payroll
$ 4,850 for miscellaneous expenses.
$15,900 for Pinball Machine Tooling and Pre-Production Setup
$ 1,000 to Metal Shop
$20,000 for expenses related to the acquisition of the Code Split Agreement with the Travel Information Network
$ 4,000 for Payroll and employee expenses
$ 4,000 for sales and marketing expenses
$   650 for Ted Campbell 10Q narrative
Any variation from the above of more than 20% or $1,000 shall be a default under the Note, Subscription and Security Agreement unless approved by the Investor

The Company and the Investor agree that the above referenced amounts are the agreed upon disbursements and use of proceeds for the sums invested.

NANOTECH ENTERTAINMENT INC.                    LONG SIDE VENTURES LLC

_____                  _____
David R. Foley, President                      Ben Kaplan, Managing Member

Date_____April 8, 2011_____                Date_____

22

Composite Exhibit A

NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT.   NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

Principal Amount: $55,000
Issue Date: April 8, 2011

## CONVERTIBLE PROMISSORY NOTE

FOR VALUE RECEIVED,   **NanoTech Entertainment, Inc.**, a Nevada corporation (hereinafter called "Borrower"), hereby promises to pay to Long Side Ventures LLC whose address is 1800 S. Ocean Dr. PH2, Hallandale Beach, FL 33009 (the "Holder") on order, without demand, the sum of FIFTY-FIVE THOUSAND DOLLARS ($55,000) ("Principal Amount") on April 8, 2013 (the "Maturity Date"), if not sooner paid.

This Note has been entered into pursuant to the terms of a subscription agreement between the Borrower and the Holder dated at or about the date hereof (the "Subscription Agreement"), and shall be governed by the terms of such Subscription Agreement. Unless otherwise separately defined herein, all capitalized terms used in this Note shall have the same meaning as is set forth in the Subscription Agreement.

## ARTICLE I
## GENERAL PROVISIONS

1.1 Payment Grace Period.   The Borrower shall have a five (5) day grace period to pay any monetary amounts due under this Note, after which grace period a default interest rate of fifteen percent (15%) per annum shall apply.

1.2 Conversion Privileges.   The Conversion Privileges set forth in Article II shall remain in full force and effect immediately from the date hereof and until the Note is paid in full regardless of the occurrence of an Event of Default.   The Note shall be payable in full on the Maturity Date, unless previously converted into Common Stock in accordance with Article II hereof.

1.3 Security Interest – The Borrower has caused 3,000,000 (THREE MILLION) to be deposited with Jonathan D. Leinwand, P.A. as collateral for the obligations of the Company pursuant to this note.

Composite Exhibit A

# ARTICLE II
## CONVERSION RIGHTS

The Borrower shall have the right to convert the principal and any interest due under this Note into Shares of the Borrower's Common Stock, $.001 par value per share ("Common Stock") as set forth below.

2.1. Conversion into the Borrower's Common Stock.

(a) The Borrower shall have the right from and after the date of the issuance of this Note and then at any time until this Note is fully paid, to convert any outstanding and unpaid principal portion of this Note (in whole or in part), and accrued interest, at the election of the Borrower (the date of giving of such notice of conversion being a "Conversion Date") into fully paid and nonassessable shares of Common Stock as such stock exists on the date of issuance of this Note, or any shares of capital stock of Borrower into which such Common Stock shall hereafter be changed or reclassified, at the Conversion Price as defined in Section 2.1(b) hereof, determined as provided herein. Upon delivery to the Holder of a completed Notice of Conversion, a form of which is annexed hereto as Exhibit A, Borrower shall issue and deliver to the Holder within one (1) business day after the Conversion Date (such day being the "Delivery Date") that number of shares of Common Stock for the portion of the Note converted in accordance with the foregoing. Such shares are to be delivered via DWAC, if eligible, or otherwise shall deliver the certificate via overnight mail to the address provided by the Holder. The number of shares of Common Stock to be issued upon each conversion of this Note shall be determined by dividing that portion of the outstanding principal amount of the Note and accrued but unpaid interest calculated at 15% per annum, if any, to be converted, by the Conversion Price.

(b) Subject to adjustment as provided in Section 2.1(c) hereof, the conversion price per share shall be at a rate of 30% of the average the lowest intraday trading prices during the 15trading days prior to conversion

(c) The Conversion Price and number and kind of shares or other securities to be issued upon conversion determined pursuant to Section 2.1(a), shall be subject to adjustment from time to time upon the happening of certain events while this conversion right remains outstanding, as follows:

(i). Merger, Sale of Assets, etc. If (A) the Borrower effects any merger or consolidation of the Borrower with or into another entity, (B) the Borrower effects any sale of all or substantially all of its assets in one or a series of related transactions, (C) any tender offer or exchange offer (whether by the Borrower or another entity) is completed pursuant to which holders of Common Stock are permitted to tender or exchange their shares for other securities, cash or property, (D) the Borrower consummates a stock purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with one or more persons or entities whereby such other persons or entities acquire more than the 50% of the outstanding shares of Common Stock (not including any shares of Common Stock held by such other persons or entities making or party to, or associated or

Composite Exhibit A

affiliated with the other persons or entities making or party to, such stock purchase agreement or other business combination), (E) any "person" or "group" (as these terms are used for purposes of Sections 13(d) and 14(d) of the 1934 Act) is or shall become the "beneficial owner" (as defined in Rule 13d-3 under the 1934 Act), directly or indirectly, of 50% of the aggregate Common Stock of the Borrower, or (F) the Borrower effects any reclassification of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property (in any such case, a "Fundamental Transaction"), this Note, as to the unpaid principal portion thereof and accrued interest thereon, shall thereafter be deemed to evidence the right to convert into such number and kind of shares or other securities and property as would have been issuable or distributable on account of such Fundamental Transaction, upon or with respect to the securities subject to the conversion right immediately prior to such Fundamental Transaction. The foregoing provision shall similarly apply to successive Fundamental Transactions of a similar nature by any such successor or purchaser. Without limiting the generality of the foregoing, the anti-dilution provisions of this Section shall apply to such securities of such successor or purchaser after any such Fundamental Transaction.

(ii). Reclassification, etc. If the Borrower at any time shall, by reclassification or otherwise, change the Common Stock into the same or a different number of securities of any class or classes that may be issued or outstanding, this Note, as to the unpaid principal portion thereof and accrued interest thereon, shall thereafter be deemed to evidence the right to purchase an adjusted number of such securities and kind of securities as would have been issuable as the result of such change with respect to the Common Stock immediately prior to such reclassification or other change.

(d) During the period the conversion right exists, Borrower will reserve from its authorized and unissued Common Stock a sufficient number of shares of Common Stock so as to effect conversion of this Note. Borrower represents that upon issuance, such shares will be duly and validly issued, fully paid and non-assessable. Borrower agrees that its issuance of this Note shall constitute full authority to its officers, agents, and transfer agents who are charged with the duty of executing and issuing stock certificates to execute and issue the necessary certificates for shares of Common Stock upon the conversion of this Note.

2.2 <u>Method of Conversion</u>. This Note may be converted by the Borrower in whole or in part as described in Section 2.1(a) and the Subscription Agreement. Upon partial conversion of this Note, a new Note containing the same date and provisions of this Note shall, at the request of the Holder, be issued by the Borrower to the Holder for the principal balance of this Note and interest which shall not have been converted or paid.

2.3. <u>Maximum Conversion</u>. (a)     Notwithstanding anything to the contrary contained herein, the number of Conversion Shares that may be acquired by the Subscriber upon conversion of the Notes (or otherwise in respect hereof) shall be limited to the extent necessary to ensure that, following such conversion (or other issuance), the total number of shares of Common Stock then beneficially owned by such Subscriber and its affiliates and any other persons whose beneficial ownership of Common Stock would be aggregated with the

Subscriber's for purposes of Section 13(d) of the 1934 Act, does not exceed 4.999% of the total number of issued and outstanding shares of Common Stock (including for such purpose the shares of Common Stock issuable upon such conversion). For such purposes, beneficial ownership shall be determined in accordance with Section 13(d) of the 1934 Act and the rules and regulations promulgated thereunder. By written notice to the Company, a Subscriber may waive the provisions of this Section 2.3(a) as to itself but any such waiver will not be effective until the 61st day after delivery thereof and such waiver shall have no effect on any other Subscriber.

(b)       Notwithstanding anything to the contrary contained herein, the number of Conversion Shares that may be acquired by the Subscriber upon conversion of the Notes (or otherwise in respect hereof) shall be limited to the extent necessary to ensure that, following such conversion (or other issuance), the total number of shares of Common Stock then beneficially owned by such Subscriber and its affiliates and any other persons whose beneficial ownership of Common Stock would be aggregated with the Subscriber's for purposes of Section 13(d) of the 1934 Act, does not exceed 9.999% of the total number of issued and outstanding shares of Common Stock (including for such purpose the shares of Common Stock issuable upon such conversion). For such purposes, beneficial ownership shall be determined in accordance with Section 13(d) of the 1934 Act and the rules and regulations promulgated thereunder. This provision may not be waived.

2.4. Optional Redemption of Principal Amount.  Provided an Event of Default or an event which with the passage of time or the giving of notice could become an Event of Default has not occurred, whether or not such Event of Default has been cured, the Borrower will have the option of prepaying the outstanding Principal Amount of this Note ("Optional Redemption"), in whole or in part, by paying to the Holder a sum of money equal the Principal amount plus an additional 50% thereof, together with accrued but unpaid interest thereon and any and all other sums due, accrued or payable to the Holder arising under this Note or any Transaction Document through the Redemption Payment Date as defined below (the "Redemption Amount"). Borrower's election to exercise its right to prepay must be by notice in writing ("Notice of Redemption"). The Notice of Redemption shall specify the date for such Optional Redemption (the "Redemption Payment Date"), which date shall be at least thirty (30) business days after the date of the Notice of Redemption (the "Redemption Period"). A Notice of Redemption shall not be effective with respect to any portion of the Principal Amount for which the Holder has previously delivered an election to convert, or subject to the previous sentence, for conversions initiated or made by the Holder during the Redemption Period. On the Redemption Payment Date, the Redemption Amount, less any portion of the Redemption Amount against which the Holder has permissibly exercised its conversion rights, shall be paid in good funds to the Holder. In the event the Borrower fails to pay the Redemption Amount on the Redemption Payment Date as set forth herein, then (i) such Notice of Redemption will be null and void, (ii) Borrower will have no right to deliver another Notice of Redemption, and (iii) Borrower's failure may be deemed by Holder to be a non-curable Event of Default. A Notice of Redemption may not be given nor may the Borrower effectuate a Redemption without the consent of the Holder, if at any time during the Redemption Period an Event of Default, or an event which with the passage of time or giving of notice could become an Event of Default (whether or not such Event of Default

has been cured), has occurred.  During the Optional Redemption Period, the Company must abide by all of its obligations to the Note Holder.

**ARTICLE III**
**EVENT OF DEFAULT**

The occurrence of any of the following events of default ("Event of Default") shall, at the option of the Holder hereof, make all sums of principal and interest then remaining unpaid hereon and all other amounts payable hereunder immediately due and payable, upon demand, without presentment, or grace period, all of which hereby are expressly waived, except as set forth below:

3.1 <u>Failure to Pay Principal or Interest</u>.  The Borrower fails to pay the principal, interest or other sum due under this Note when due.

3.2 <u>Breach of Covenant</u>.  The Borrower breaches any material covenant or other term or condition of the Subscription Agreement or this Note in any material respect and such breach, if subject to cure, continues for a period of thirty (30) days after written notice to the Borrower from the Holder.

3.3 <u>Breach of Representations and Warranties</u>.  Any material representation or warranty of the Borrower made herein, in the Subscription Agreement or any Transaction Document shall be false or misleading in any material respect as of the date made and the Closing Date.

3.4 <u>Liquidation</u>.   Any dissolution, liquidation or winding up of Borrower or any substantial portion of its business.

3.5 <u>Cessation of Operations</u>.   Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they come due.

3.6 <u>Maintenance of Assets</u>.   The failure by Borrower to maintain any material intellectual property rights, personal, real property or other assets which are necessary to conduct its business (whether now or in the future).

3.7 <u>Receiver or Trustee</u>.  The Borrower or any Subsidiary of Borrower shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business; or such a receiver or trustee shall otherwise be appointed.

3.8 <u>Judgments</u>.  Any money judgment, writ or similar final process shall be entered or filed against Borrower or any of its property or other assets for more than $100,000.

3.9 <u>Bankruptcy</u>.  Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings or relief under any bankruptcy law or any law, or the issuance of any notice in

relation to such event, for the relief of debtors shall be instituted by or against the Borrower or any Subsidiary of Borrower.

3.10 <u>Non-Payment</u>. A default by the Borrower under any one or more obligations in an aggregate monetary amount in excess of $100,000 for more than twenty days after the due date, unless the Borrower is contesting the validity of such obligation in good faith and has segregated cash funds equal to not less than one-half of the contested amount.

3.11 <u>Stop Trade</u>. An SEC or judicial stop trade order or Principal Market trading suspension that lasts for five (5) or more consecutive trading days.

3.12 <u>Failure to Deliver Common Stock or Replacement Note</u>. Borrower's failure to timely deliver Common Stock to the Holder pursuant to and in the form required by this Note and Sections 7 and 11 of the Subscription Agreement, or, if required, a replacement Note.

3.13 <u>Reservation Default</u>. Failure by the Borrower to have reserved for issuance upon conversion of the Note or upon exercise of the Warrants issued in connection with the Subscription Agreement, the number of shares of Common Stock as required in the Subscription Agreement, this Note and the Warrants, and such failure continues for a period of thirty (30) days.

3.14 <u>Financial Statement Restatement</u>. The restatement of any financial statements filed by the Borrower with the Securities and Exchange Commission for any date or period from two years prior to the Issue Date of this Note and until this Note is no longer outstanding, if the result of such restatement would, by comparison to the un-restated financial statements, have constituted a Material Adverse Effect.

3.15 <u>Event Described in Subscription Agreement</u>. The occurrence of an Event of Default as described in the Subscription Agreement that, if susceptible to cure, is not cured during any designated cure period.

3.16 <u>Executive Officers Breach of Duties</u>. Any of Borrower's named executive officers or directors is convicted of a violation of securities laws, or a settlement in excess of $250,000 is reached by any such officer or director relating to a violation of securities laws, breach of fiduciary duties or self-dealing.

**ARTICLE IV**
**MISCELLANEOUS**

4.1 <u>Failure or Indulgence Not Waiver</u>. No failure or delay on the part of the Holder hereof in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege. All rights and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

4.2 <u>Notices</u>.   All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the first business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.  The addresses for such communications shall be:

If to the Company, to:        NanoTech Entertainment, Inc.
                              3883 Raymert Drive, Suite 3
                              Las Vegas, NV  89121
                              Attention:   David R. Foley
                              Telephone:  (702) 518 7410

If to the Investor (s):       Long Side Ventures LLC
                              1800 S. Ocean Dr. PH2
                              Hallandale Beach, FL 33009
                              Attention:  Ben Kaplan (Portfolio Manager)
                              Telephone:  _____
                              Facsimile:  _____

                              With a copy to:
                              Jonathan D. Leinwand, Esq.
                              20801 Biscayne Blvd., Suite 403
                              Aventura, FL 33180
                              Tel. 954-903-7856
                              Fax. 954-252-4265

4.3 <u>Amendment Provision</u>.  The term "Note" and all reference thereto, as used throughout this instrument, shall mean this instrument as originally executed, or if later amended or supplemented, then as so amended or supplemented.

4.4 <u>Assignability</u>.  This Note shall be binding upon the Borrower and its successors and assigns, and shall inure to the benefit of the Holder and its successors and assigns.

4.5 <u>Cost of Collection</u>.  If default is made in the payment of this Note, Borrower shall pay the Holder hereof reasonable costs of collection, including reasonable attorneys' fees.

Composite Exhibit A

4.6 <u>Governing Law</u>. This Note shall be governed by and construed in accordance with the laws of the State of Florida without regard to conflicts of laws principles that would result in the application of the substantive laws of another jurisdiction. Any action brought by either party against the other concerning the transactions contemplated by this Agreement must be brought only in the civil or state courts of Florida or in the federal courts located in the State and county of Broward. Both parties and the individual signing this Agreement on behalf of the Borrower agree to submit to the jurisdiction of such courts. The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or unenforceability of any other provision of this Note. Nothing contained herein shall be deemed or operate to preclude the Holder from bringing suit or taking other legal action against the Borrower in any other jurisdiction to collect on the Borrower's obligations to Holder, to realize on any collateral or any other security for such obligations, or to enforce a judgment or other decision in favor of the Holder. This Note shall be deemed an unconditional obligation of Borrower for the payment of money and, without limitation to any other remedies of Holder, may be enforced against Borrower by summary proceeding pursuant to Florida Civil Procedure Laws and Rules.

4.7 <u>Maximum Payments</u>. Nothing contained herein shall be deemed to establish or require the payment of a rate of interest or other charges in excess of the maximum rate permitted by applicable law. In the event that the rate of interest required to be paid or other charges hereunder exceed the maximum rate permitted by applicable law, any payments in excess of such maximum rate shall be credited against amounts owed by the Borrower to the Holder and thus refunded to the Borrower.

4.8 <u>Non-Business Days</u>. Whenever any payment or any action to be made shall be due on a Saturday, Sunday or a public holiday under the laws of the State of Florida, such payment may be due or action shall be required on the next succeeding business day and, for such payment, such next succeeding day shall be included in the calculation of the amount of accrued interest payable on such date.

4.9 <u>Redemption</u>. This Note may be redeemed or called in full or in part with or without the consent of the Holder at 150% of the principal amount then remaining, plus any accrued and unpaid interest.

4.10 <u>Shareholder Status</u>. The Holder shall not have rights as a shareholder of the Borrower with respect to unconverted portions of this Note. However, the Holder will have the rights of a shareholder of the Borrower with respect to the Shares of Common Stock to be received after delivery by the Holder of a Conversion Notice to the Borrower.

[Balance of this Page Intentionally Left Blank]

Composite Exhibit A

IN WITNESS WHEREOF, Borrower has caused this Note to be signed in its name by an authorized officer as of the 1st day of April, 2011.

**NANOTECH ENTERTAINMENT, INC.,** a Nevada corporation

By: _____
Name: David R. Foley
Title: President

Dated: April 8, 2011

**LONGSIDE VENTUERS LLC**

By: _____
Name: Ben Kaplan
Title: Portfolio Manager

Dated: April 8, 2011

# NANOTECH ENTERTAINMENT, INC.

## CONVERTIBLE NOTE
## SUBSCRIPTION AGREEMENT

**THIS SUBSCRIPTION AGREEMENT** (this "Agreement"), is dated as of May 9, 2011, by and between NanoTech Entertainment, Inc., a Nevada corporation (the "Company"), and the subscriber identified on the signature page hereto ("Subscriber").

**WHEREAS,** the Company and Subscriber are executing and delivering this Agreement in reliance upon an exemption from securities registration afforded by the provisions of Section 4(2), Section 4(6) and/or Regulation D ("Regulation D") as promulgated by the United States Securities and Exchange Commission (the "Commission") under the Securities Act of 1933, as amended (the "1933 Act"); and

**WHEREAS,** the parties desire that, upon the terms and subject to the conditions contained herein, the Subscriber shall lend to the Company $55,000 (the Principal Amount") as per the Disbursement Schedule set forth in Exhibit "A" under the terms and conditions outlined ("Principal Amount") in a Convertible Promissory Note from the Company ("Note"), the form of which is annexed hereto as Exhibit "B", convertible into shares of the Company's Common Stock, $0.001 par value (the "Common Stock") at a per share conversion price set forth in the Note ("Conversion Price") (collectively the "Offering"). The Convertible Promissory Note (the "Note") and the shares of Common Stock issuable upon conversion of the Note (the "Shares" or "Conversion Shares"), are collectively referred to herein as the "Securities."):

**NOW, THEREFORE,** in consideration of the mutual covenants and other agreements contained in this Agreement the Company and the Subscriber hereby agree as follows:

1. **Closing Date.** The "Closing Date" shall be the date that the Principle Amount is transmitted by wire transfer or otherwise credited to or for the benefit of the Company. Subject to the satisfaction or waiver of the terms and conditions of this Agreement, on the Closing Date, Subscriber shall lend to the Company which shall be evidenced by the Note in the aggregate Principal Amount of $55,000.

2. **Closing Deliverables.**

   a.     Subject to the satisfaction or waiver of the terms and conditions of this Agreement, on the Closing Date, the Subscriber and Company shall execute a Convertible Promissory Note which shall detail the terms and conditions for repayment as indicated thereon.

   b.     The Company shall provide the Subscriber with warrant to purchase that number of shares into which the Note is convertible into if the Note was converted on the day of the Closing. The exercise price shall be equal to closing price on the trading day immediately preceding the Closing Date.



EXHIBIT

E

.1

c.     Pursuant hereto the Company shall provide the Subscriber a "royalty" equal to 1.5% of the Company's gross sales up to an aggregate amount not to exceed 2.5 times the Principal Amount of the Note.

d.     The Company shall issue 3,000,000 shares to be held in escrow, by the Escrow Agent, as security for the repayment of the loan. The Escrow Agreement is attached hereto as Exhibit C.

e.     The Company shall enter into a Security Agreement as attached hereto as Exhibit D.

3. **Subscriber Representations and Warranties**.   Subscriber hereby represents and warrants to and agrees with the Company that:

(a) Organization and Standing of the Subscriber.     If Subscriber is an entity, such Subscriber is a corporation, partnership or other entity duly incorporated or organized, validly existing and in good standing under the laws of the State of Nevada.

(b) Authorization and Power.   Such Subscriber has the requisite power and authority to enter into and perform this Agreement and the other Transaction Documents (as defined herein) and to purchase the Note being sold to it hereunder.  The execution, delivery and performance of this Agreement and the other Transaction Documents by such Subscriber and the consummation by it of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate or partnership action, and no further consent or authorization of such Subscriber or its Board of Directors, stockholders, partners, members, as the case may be, is required.  This Agreement and the other Transaction Documents have been duly authorized, executed and delivered by such Subscriber and constitutes, or shall constitute when executed and delivered, a valid and binding obligation of such Subscriber enforceable against such Subscriber in accordance with the terms thereof.

(c) No Conflicts.   The execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation by such Subscriber of the transactions contemplated hereby and thereby or relating hereto do not and will not (i) result in a violation of such Subscriber's charter documents or bylaws or other organizational documents or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of any agreement, indenture or instrument or obligation to which such Subscriber is a party or by which its properties or assets are bound, or result in a violation of any law, rule, or regulation, or any order, judgment or decree of any court or governmental agency applicable to such Subscriber or its properties (except for such conflicts, defaults and violations as would not, individually or in the aggregate, have a material adverse effect on such Subscriber).  Such Subscriber is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental agency in order for it to execute, deliver or perform any of its obligations under this Agreement and the other Transaction Documents or to purchase the Securities in accordance with the terms hereof, provided that for purposes of the

2

Composite Exhibit A

NANOTECH000069

representation made in this sentence, such Subscriber is assuming and relying upon the accuracy of the relevant representations and agreements of the Company herein

(d) Information on Company.    Such Subscriber has been furnished with or has had access to the EDGAR Website of the Commission to the Company's Form 10-K filed on May 25, 2010 for the fiscal year ended June 30, 2009 and the financial statements included therein, Form 10-Q filed on May 25, 2010 for the quarter ended March 31, 2010, and for the quarter ended December 31, 2009 together with all other filings made with the Commission available at the EDGAR website until five days before the Closing Date (hereinafter referred to collectively as the "Reports").   In addition, such Subscriber may have received in writing from the Company such other information concerning its operations, financial condition and other matters as such Subscriber has requested in writing, identified thereon as Other Written Information (such other information is collectively, the "Other Written Information"), and considered all factors such Subscriber deems material in deciding on the advisability of investing in the Securities.   Such Subscriber has relied on the Reports and Other Written Information in making its investment decision.

(e) Information on Subscriber.   Subscriber is, and will be at the time of the conversion of the Notes, an "accredited investor", as such term is defined in Regulation D promulgated by the Commission under the 1933 Act, is experienced in investments and business matters, has made investments of a speculative nature and has purchased securities of United States publicly-owned companies in private placements in the past and, with its representatives, has such knowledge and experience in financial, tax and other business matters as to enable such Subscriber to utilize the information made available by the Company to evaluate the merits and risks of and to make an informed investment decision with respect to the proposed purchase, which represents a speculative investment.   Subscriber has the authority and is duly and legally qualified to purchase and own the Securities.   Subscriber is able to bear the risk of such investment for an indefinite period and to afford a complete loss thereof.   The information set forth on the signature page hereto regarding such Subscriber is accurate.

(f) Purchase of Note.   On the Closing Date, Subscriber will purchase the Note as principal for its own account for investment only and not with a view toward, or for resale in connection with, the public sale or any distribution thereof.

(g) Compliance with Securities Act.   Such Subscriber understands and agrees that the Securities have not been registered under the 1933 Act or any applicable state securities laws, by reason of their issuance in a transaction that does not require registration under the 1933 Act (based in part on the accuracy of the representations and warranties of the Subscriber contained herein), and that such Securities must be held indefinitely unless a subsequent disposition is registered under the 1933 Act or any applicable state securities laws or is exempt from such registration.   In any event, and subject to compliance with applicable securities laws, the Subscriber may enter into lawful hedging transactions in the course of hedging the position they assume and the Subscriber may also enter into lawful short positions or other derivative transactions relating to the Securities, or interests in the Securities, and deliver the Securities, or interests in the Securities, to close out their short or other positions or otherwise settle other

3

Composite Exhibit A

NANOTECH000070

transactions, or loan or pledge the Securities, or interests in the Securities, to third parties who in turn may dispose of these Securities.

(h) <u>Conversion Shares Legend</u>.   Unless or until subject to an effective registration statement to be filed on Form S-1, or other appropriate registration statement, registering the conversion shares, the Conversion Shares, shall bear the following or similar legend:

"THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, NOR APPLICABLE STATE SECURITIES LAWS.  THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT.

(i) <u>Note Legend</u>.  The Note shall bear the following legend:

"BOTH THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE [CONVERTIBLE -OR-EXERCISABLE] HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS.  THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT.

(j) <u>Communication of Offer</u>.  The offer to sell the Securities was directly communicated to such Subscriber by the Company.  At no time was such Subscriber presented with or solicited by any leaflet, newspaper or magazine article, radio or television advertisement, or any other form of general advertising or solicited or invited to attend a promotional meeting otherwise than in connection and concurrently with such communicated offer.

(k) <u>Restricted Securities</u>.  Such Subscriber understands that the Securities have not been registered under the 1933 Act and such Subscriber will not sell, offer to sell, assign, pledge, hypothecate or otherwise transfer any of the Securities unless pursuant to an effective registration statement under the 1933 Act, or unless an exemption from registration is available. Notwithstanding anything to the contrary contained in this Agreement, such Subscriber may transfer (without restriction and without the need for an opinion of counsel) the Securities to its Affiliates (as defined below) provided that each such Affiliate is an "accredited investor" under Regulation D and such Affiliate agrees to be bound by the terms and conditions of this Agreement. For the purposes of this Agreement, an "Affiliate" of any person or entity means any other person or entity directly or indirectly controlling, controlled by or under direct or indirect common control with such person or entity. Affiliate includes each Subsidiary of the Company. For purposes of this definition, "control" means the power to direct the management and policies

4

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY,
FLORIDA

NANOTECH ENTERTAINMENT, INC.,
a Nevada Corporation,

CASE NO: CACE 14-011482

CIRCUIT CIVIL DIVISION

      Plaintiff,

v.

R&T SPORTS MARKETING, INC., a Florida
corporation; LONG SIDE VENTURES, LLC, a
Florida limited liability company; BEN
KAPLAN, an individual; and DANIEL
KAPLAN, an individual,

      Defendants.

_____/

### NOTICE OF FILING

    Plaintiff, NANOTECH ENTERTAINMENT, INC., by and through their undersigned

counsel, hereby serve this Notice of Filing Exhibit E to the Complaint filed on June 17, 2014.

                              Respectfully Submitted,

                                 */s/ Daniel Zumpano*

BY:_____
        Daniel Zumpano, Esq.
        Bar. No. 0063485
        Zumpano Castro
        Attorneys for Defendant
        500 S. Dixie Hwy, Ste. 302
        Coral Gables, FL. 33146
        305.503.2990 (Tel)
        305.774.5908 (Fax)
        Daniel.zumpano@zumpanocastro.com

Composite Exhibit A

# NANOTECH ENTERTAINMENT, INC.

### CONVERTIBLE NOTE
### SUBSCRIPTION AGREEMENT

**THIS SUBSCRIPTION AGREEMENT** (this "Agreement"), is dated as of May 9, 2011, by and between NanoTech Entertainment, Inc., a Nevada corporation (the "Company"), and the subscriber identified on the signature page hereto ("Subscriber").

**WHEREAS,** the Company and Subscriber are executing and delivering this Agreement in reliance upon an exemption from securities registration afforded by the provisions of Section 4(2), Section 4(6) and/or Regulation D ("Regulation D") as promulgated by the United States Securities and Exchange Commission (the "Commission") under the Securities Act of 1933, as amended ("the "1933 Act"); and

**WHEREAS,** the parties desire that, upon the terms and subject to the conditions contained herein, the Subscriber shall lend to the Company $55,000 (the Principal Amount") as per the Disbursement Schedule set forth in Exhibit "A" under the terms and conditions outlined ("Principal Amount") in a Convertible Promissory Note from the Company ("Note"), the form of which is annexed hereto as Exhibit "B", convertible into shares of the Company's Common Stock, $0.001 par value (the "Common Stock") at a per share conversion price set forth in the Note ("Conversion Price") (collectively the "Offering"). The Convertible Promissory Note (the "Note") and the shares of Common Stock issuable upon conversion of the Note (the "Shares" or "Conversion Shares"), are collectively referred to herein as the "Securities."):

**NOW, THEREFORE,** in consideration of the mutual covenants and other agreements contained in this Agreement the Company and the Subscriber hereby agree as follows:

1. **Closing Date.** The "Closing Date" shall be the date that the Principle Amount is transmitted by wire transfer or otherwise credited to or for the benefit of the Company. Subject to the satisfaction or waiver of the terms and conditions of this Agreement, on the Closing Date, Subscriber shall lend to the Company which shall be evidenced by the Note in the aggregate Principal Amount of $55,000.

2. **Closing Deliverables.**
    a.     Subject to the satisfaction or waiver of the terms and conditions of this Agreement, on the Closing Date, the Subscriber and Company shall execute a Convertible Promissory Note which shall detail the terms and conditions for repayment as indicated thereon.

    b.     The Company shall provide the Subscriber with warrant to purchase that number of shares into which the Note is convertible into if the Note was converted on the day of the Closing. The exercise price shall be equal to closing price on the trading day immediately preceding the Closing Date.



EXHIBIT

E

PENGAD 800-631-6989

.1

    c.    Pursuant hereto the Company shall provide the Subscriber a "royalty" equal to 1.5% of the Company's gross sales up to an aggregate amount not to exceed 2.5 times the Principal Amount of the Note.

    d.    The Company shall issue 3,000,000 shares to be held in escrow, by the Escrow Agent, as security for the repayment of the loan. The Escrow Agreement is attached hereto as Exhibit C.

    e.    The Company shall enter into a Security Agreement as attached hereto as Exhibit D.

    3. **Subscriber Representations and Warranties**.  Subscriber hereby represents and warrants to and agrees with the Company that:

    (a) Organization and Standing of the Subscriber.  If Subscriber is an entity, such Subscriber is a corporation, partnership or other entity duly incorporated or organized, validly existing and in good standing under the laws of the State of Nevada.

    (b) Authorization and Power.  Such Subscriber has the requisite power and authority to enter into and perform this Agreement and the other Transaction Documents (as defined herein) and to purchase the Note being sold to it hereunder.  The execution, delivery and performance of this Agreement and the other Transaction Documents by such Subscriber and the consummation by it of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate or partnership action, and no further consent or authorization of such Subscriber or its Board of Directors, stockholders, partners, members, as the case may be, is required.  This Agreement and the other Transaction Documents have been duly authorized, executed and delivered by such Subscriber and constitutes, or shall constitute when executed and delivered, a valid and binding obligation of such Subscriber enforceable against such Subscriber in accordance with the terms thereof.

    (c) No Conflicts.  The execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation by such Subscriber of the transactions contemplated hereby and thereby or relating hereto do not and will not (i) result in a violation of such Subscriber's charter documents or bylaws or other organizational documents or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of any agreement, indenture or instrument or obligation to which such Subscriber is a party or by which its properties or assets are bound, or result in a violation of any law, rule, or regulation, or any order, judgment or decree of any court or governmental agency applicable to such Subscriber or its properties (except for such conflicts, defaults and violations as would not, individually or in the aggregate, have a material adverse effect on such Subscriber).  Such Subscriber is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental agency in order for it to execute, deliver or perform any of its obligations under this Agreement and the other Transaction Documents or to purchase the Securities in accordance with the terms hereof, provided that for purposes of the

2

Composite Exhibit A·

NANOTECH000069

representation made in this sentence, such Subscriber is assuming and relying upon the accuracy of the relevant representations and agreements of the Company herein

(d) Information on Company.   Such Subscriber has been furnished with or has had access to the EDGAR Website of the Commission to the Company's Form 10-K filed on May 25, 2010 for the fiscal year ended June 30, 2009 and the financial statements included therein, Form 10-Q filed on May 25, 2010 for the quarter ended March 31, 2010, and for the quarter ended December 31, 2009 together with all other filings made with the Commission available at the EDGAR website until five days before the Closing Date (hereinafter referred to collectively as the "Reports").   In addition, such Subscriber may have received in writing from the Company such other information concerning its operations, financial condition and other matters as such Subscriber has requested in writing, identified thereon as Other Written Information (such other information is collectively, the "Other Written Information"), and considered all factors such Subscriber deems material in deciding on the advisability of investing in the Securities.   Such Subscriber has relied on the Reports and Other Written Information in making its investment decision.

(e) Information on Subscriber.   Subscriber is, and will be at the time of the conversion of the Notes, an "accredited investor", as such term is defined in Regulation D promulgated by the Commission under the 1933 Act, is experienced in investments and business matters, has made investments of a speculative nature and has purchased securities of United States publicly-owned companies in private placements in the past and, with its representatives, has such knowledge and experience in financial, tax and other business matters as to enable such Subscriber to utilize the information made available by the Company to evaluate the merits and risks of and to make an informed investment decision with respect to the proposed purchase, which represents a speculative investment.   Subscriber has the authority and is duly and legally qualified to purchase and own the Securities.   Subscriber is able to bear the risk of such investment for an indefinite period and to afford a complete loss thereof.   The information set forth on the signature page hereto regarding such Subscriber is accurate.

(f) Purchase of Note.   On the Closing Date, Subscriber will purchase the Note as principal for its own account for investment only and not with a view toward, or for resale in connection with, the public sale or any distribution thereof.

(g) Compliance with Securities Act.   Such Subscriber understands and agrees that the Securities have not been registered under the 1933 Act or any applicable state securities laws, by reason of their issuance in a transaction that does not require registration under the 1933 Act (based in part on the accuracy of the representations and warranties of the Subscriber contained herein), and that such Securities must be held indefinitely unless a subsequent disposition is registered under the 1933 Act or any applicable state securities laws or is exempt from such registration.   In any event, and subject to compliance with applicable securities laws, the Subscriber may enter into lawful hedging transactions in the course of hedging the position they assume and the Subscriber may also enter into lawful short positions or other derivative transactions relating to the Securities, or interests in the Securities, and deliver the Securities, or interests in the Securities, to close out their short or other positions or otherwise settle other

3

transactions, or loan or pledge the Securities, or interests in the Securities, to third parties who in turn may dispose of these Securities.

(h) Conversion Shares Legend.   Unless or until subject to an effective registration statement to be filed on Form S-1, or other appropriate registration statement, registering the conversion shares, the Conversion Shares, shall bear the following or similar legend:

"THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, NOR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT.

(i) Note Legend.   The Note shall bear the following legend:

"BOTH THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE [CONVERTIBLE -OR-EXERCISABLE] HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT.

(j) Communication of Offer.   The offer to sell the Securities was directly communicated to such Subscriber by the Company.  At no time was such Subscriber presented with or solicited by any leaflet, newspaper or magazine article, radio or television advertisement, or any other form of general advertising or solicited or invited to attend a promotional meeting otherwise than in connection and concurrently with such communicated offer.

(k) Restricted Securities.   Such Subscriber understands that the Securities have not been registered under the 1933 Act and such Subscriber will not sell, offer to sell, assign, pledge, hypothecate or otherwise transfer any of the Securities unless pursuant to an effective registration statement under the 1933 Act, or unless an exemption from registration is available. Notwithstanding anything to the contrary contained in this Agreement, such Subscriber may transfer (without restriction and without the need for an opinion of counsel) the Securities to its Affiliates (as defined below) provided that each such Affiliate is an "accredited investor" under Regulation D and such Affiliate agrees to be bound by the terms and conditions of this Agreement. For the purposes of this Agreement, an "Affiliate" of any person or entity means any other person or entity directly or indirectly controlling, controlled by or under direct or indirect common control with such person or entity. Affiliate includes each Subsidiary of the Company. For purposes of this definition, "control" means the power to direct the management and policies

4

of such person or firm, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

(l) <u>No Governmental Review</u>.  Such Subscriber understands that no United States federal or state agency or any other governmental or state agency has passed on or made recommendations or endorsement of the Securities or the suitability of the investment in the Securities nor have such authorities passed upon or endorsed the merits of the offering of the Securities.

(m) <u>Correctness of Representations</u>.  Such Subscriber represents as to such Subscriber that the foregoing representations and warranties are true and correct as of the date hereof and, unless such Subscriber otherwise notifies the Company prior to the Closing Date shall be true and correct as of the Closing Date.

(n) <u>Acknowledgement of Going Concern</u>.  Such Subscriber recognizes and acknowledges that the Company is a "going concern" as disclosed in its Reports and Other Written Information and as reported by its auditor and may be unable to meet its financial obligations over the next twelve months.

(o) <u>Survival</u>.  The foregoing representations and warranties shall survive one (1) year from the Closing Date.

5. <u>Company Representations and Warranties</u>.  The Company represents and warrants to and agrees with each Subscriber that:

(a) <u>Due Incorporation</u>.  The Company is a corporation or other entity duly incorporated or organized, validly existing and in good standing under the laws of the State of Nevada and has the requisite corporate power to own its properties and to carry on its business as presently conducted.  The Company is duly qualified as a foreign corporation to do business and is in good standing in each jurisdiction where the nature of the business conducted or property owned by it makes such qualification necessary, other than those jurisdictions in which the failure to so qualify would not have a Material Adverse Effect.  For purposes of this Agreement, a "Material Adverse Effect" shall mean a material adverse effect on the financial condition, results of operations, prospects, properties or business of the Company and its Subsidiaries taken as a whole.  For purposes of this Agreement, "Subsidiary" means, with respect to any entity at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity of which more than 30% of (i) the outstanding capital stock having (in the absence of contingencies) ordinary voting power to elect a majority of the board of directors or other managing body of such entity, (ii) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such entity.  As of the Closing Date, all of the Company's Subsidiaries and the Company's ownership interest therein are set forth on Schedule 5(a).

5

(b) Outstanding Stock.  All issued and outstanding shares of capital stock and equity interests in the Company have been duly authorized and validly issued and are fully paid and non-assessable.

(c) Authority; Enforceability.  This Agreement, the Note and the Shares and any other agreements delivered together with this Agreement or in connection herewith (collectively "Transaction Documents") have been duly authorized, executed and delivered by the Company and/or Subsidiaries and are valid and binding agreements of the Company enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights generally and to general principles of equity.  The Company has full corporate power and authority necessary to enter into and deliver the Transaction Documents and to perform its obligations thereunder.

(d) Capitalization and Additional Issuances.   The authorized and outstanding capital stock of the Company and Subsidiaries on a fully diluted basis as of the date of this Agreement and the Closing Date (not including the Securities) are set forth on Schedule 5(d).  Except as set forth on Schedule 5(d), there are no options, warrants, or rights to subscribe to, securities, rights, understandings or obligations convertible into or exchangeable for or giving any right to subscribe for any shares of capital stock or other equity interest of the Company or any of the Subsidiaries.  The only officer, director, employee and consultant stock option or stock incentive plan or similar plan currently in effect or contemplated by the Company is described on Schedule 5(d).   There are no outstanding agreements or preemptive or similar rights affecting the Company's Common Stock.

(e) Consents.  No consent, approval, authorization or order of any court, governmental agency or body or arbitrator having jurisdiction over the Company, or any of its Affiliates, the OTC Markets or OTC Bulletin Board (the "Bulletin Board") or the Company's shareholders is required for the execution by the Company of the Transaction Documents and compliance and performance by the Company of its obligations under the Transaction Documents, including, without limitation, the issuance and sale of the Securities.  The Transaction Documents and the Company's performance of its obligations thereunder have been unanimously approved by the Company's Board of Directors.  No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any governmental authority in the world, including without limitation, the United States, or elsewhere is required by the Company or any Affiliate of the Company in connection with the consummation of the transactions contemplated by this Agreement, except as would not otherwise have a Material Adverse Effect or the consummation of any of the other agreements, covenants or commitments of the Company or any Subsidiary contemplated by the other Transaction Documents. Any such qualifications and filings will, in the case of qualifications, be effective on the Closing and will, in the case of filings, be made within the time prescribed by law.

(f) No Violation or Conflict.  Assuming the representations and warranties of the Subscriber in Section 4 are true and correct, neither the issuance nor sale of the Securities nor the performance of the Company's obligations under this Agreement and all other agreements entered into by the Company relating thereto by the Company will:

6

Composite Exhibit A

NANOTECH000073

(i) violate, conflict with, result in a breach of, or constitute a default (or an event which with the giving of notice or the lapse of time or both would be reasonably likely to constitute a default) under (A) the articles or certificate of incorporation, charter or bylaws of the Company, (B) to the Company's knowledge, any decree, judgment, order, law, treaty, rule, regulation or determination applicable to the Company of any court, governmental agency or body, or arbitrator having jurisdiction over the Company or over the properties or assets of the Company or any of its Affiliates, (C) the terms of any bond, debenture, note or any other evidence of indebtedness, or any agreement, stock option or other similar plan, indenture, lease, mortgage, deed of trust or other instrument to which the Company or any of its Affiliates is a party, by which the Company or any of its Affiliates is bound, or to which any of the properties of the Company or any of its Affiliates is subject, or (D) the terms of any "lock-up" or similar provision of any underwriting or similar agreement to which the Company, or any of its Affiliates is a party except the violation, conflict, breach, or default of which would not have a Material Adverse Effect; or

(ii) result in the creation or imposition of any lien, charge or encumbrance upon the Securities or any of the assets of the Company or any of its Affiliates except in favor of Subscriber as described herein; or

(iii) result in the activation of any anti-dilution rights or a reset or re-pricing of any debt, equity or security instrument of any creditor or equity holder of the Company, or the holder of the right to receive any debt, equity or security instrument of the Company nor result in the acceleration of the due date of any obligation of the Company; or

(iv) result in the triggering of any piggy-back or other registration rights of any person or entity holding securities of the Company or having the right to receive securities of the Company.

(g) The Securities. The Securities upon issuance:

(i) are, or will be, free and clear of any security interests, liens, claims or other encumbrances, subject only to restrictions upon transfer under the 1933 Act and any applicable state securities laws;

(ii) have been, or will be, duly and validly authorized and on the dates of issuance of the Conversion Shares upon conversion of the Note, such Shares will be duly and validly issued, fully paid and non- assessable, and if registered pursuant to the 1933 Act and resold pursuant to an effective registration statement or exempt from registration will be free trading, unrestricted and unlegended;

7

Composite Exhibit A

NANOTECH000074

(iii) will not have been issued or sold in violation of any preemptive or other similar rights of the holders of any securities of the Company or rights to acquire securities of the Company; and

(iv) will not subject the holders thereof to personal liability by reason of being such holders.

(h) <u>Litigation</u>.  There is no pending or, to the best knowledge of the Company, threatened action, suit, proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over the Company, or any of its Affiliates that would affect the execution by the Company or the complete and timely performance by the Company of its obligations under the Transaction Documents. Except as disclosed in the Reports, there is no pending or, to the best knowledge of the Company, basis for or threatened action, suit, proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over the Company, or any of its Affiliates which litigation if adversely determined would have a Material Adverse Effect.

(i) <u>No Market Manipulation</u>.  The Company and its Affiliates have not taken, and will not take, directly or indirectly, any action designed to, or that might reasonably be expected to, cause or result in stabilization or manipulation of the price of the Common Stock to facilitate the sale or resale of the Securities or affect the price at which the Securities may be issued or resold.

(j) <u>Information Concerning Company</u>.    The Reports and Other Written Information contain all material information relating to the Company and its operations and financial condition as of their respective dates which information is required to be disclosed therein.    Since March 31, 2010, and except as modified in the Reports and Other Written Information or in the Schedules hereto, there has been no Material Adverse Effect relating to the Company's business, financial condition or affairs. The Reports and Other Written Information, including the financial statements included therein do not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, taken as a whole, not misleading in light of the circumstances and when made.

(k) <u>Defaults</u>.    The Company is not in material violation of its articles of incorporation or bylaws.    The Company is (i) not in default under or in violation of any other material agreement or instrument to which it is a party or by which it or any of its properties are bound or affected, which default or violation would have a Material Adverse Effect, (ii) not in default with respect to any order of any court, arbitrator or governmental body or subject to or party to any order of any court or governmental authority arising out of any action, suit or proceeding under any statute or other law respecting antitrust, monopoly, restraint of trade, unfair competition or similar matters which default would have a Material Adverse Effect, or (iii) not in violation of any statute, rule or regulation of any governmental authority which violation would have a Material Adverse Effect except as set forth in the note below.

8

Composite Exhibit A
NANOTECH000075

(l) No Integrated Offering.   Neither the Company, nor any of its Affiliates, nor any person acting on its or their behalf, has directly or indirectly made any offers or sales of any security of the Company nor solicited any offers to buy any security of the Company under circumstances that would cause the offer of the Securities pursuant to this Agreement to be integrated with prior offerings by the Company for purposes of the 1933 Act or any applicable stockholder approval provisions, including, without limitation, under the rules and regulations of the Bulletin Board.  No prior offering will impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder.  Neither the Company nor any of its Affiliates will take any action or steps that would cause the offer or issuance of the Securities to be integrated with other offerings which would impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder. The Company will not conduct any offering other than the transactions contemplated hereby that may be integrated with the offer or issuance of the Securities that would impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder.

(m) No General Solicitation.   Neither the Company, nor any of its Affiliates, nor to its knowledge, any person acting on its or their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D under the 1933 Act) in connection with the offer or sale of the Securities.

(n) No Undisclosed Liabilities.   The Company has no liabilities or obligations which are material, individually or in the aggregate, other than those incurred in the ordinary course of the Company businesses since March 31, 2009 (Form 10Q for third quarter then ended) and which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, except as disclosed in the Reports or on Schedule 5(n).

(o) No Undisclosed Events or Circumstances.   Since March 31, 2009, except as disclosed in the Reports, no event or circumstance has occurred or exists with respect to the Company or its businesses, properties, operations or financial condition, that, under applicable law, rule or regulation, requires public disclosure or announcement prior to the date hereof by the Company but which has not been so publicly announced or disclosed in the Reports.

(p) Dilution.   The Company's executive officers and directors understand the nature of the Securities being sold hereby and recognize that the issuance of the Securities will have a potential dilutive effect on the equity holdings of other holders of the Company's equity or rights to receive equity of the Company.  The board of directors of the Company has concluded, in its good faith business judgment that the issuance of the Securities is in the best interests of the Company.   The Company specifically acknowledges that its obligation to issue the Conversion Shares upon conversion of the Note is binding upon the Company and enforceable regardless of the dilution such

9

Composite Exhibit A

NANOTECH000076

issuance may have on the ownership interests of other shareholders of the Company or parties entitled to receive equity of the Company.

(q) No Disagreements with Accountants and Lawyers. Other than the opinion regarding the Company's ability to continue as a "going concern," as disclosed in the Company's Reports, there are no material disagreements of any kind presently existing, or reasonably anticipated by the Company to arise between the Company and the accountants and lawyers previously and presently employed by the Company, including but not limited to disputes or conflicts over payment owed to such accountants and lawyers, nor have there been any such disagreements during the two years prior to the Closing Date.

(r) Investment Company. Neither the Company nor any Affiliate of the Company is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(s) Foreign Corrupt Practices. Neither the Company, nor to the knowledge of the Company, any agent or other person acting on behalf of the Company, has (i) directly or indirectly, used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to foreign or domestic political activity, (ii) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (iii) failed to disclose fully any contribution made by the Company (or made by any person acting on its behalf of which the Company is aware) which is in violation of law, or (iv) violated in any material respect any provision of the Foreign Corrupt Practices Act of 1977, as amended.

(t) Reporting Company/Shell Company. The Company is a publicly-held company subject to reporting obligations pursuant to Section 13 of the Securities Exchange Act of 1934, as amended (the "1934 Act") and has a class of Common Stock registered pursuant to Section 12(g) of the 1934 Act. Pursuant to the provisions of the 1934 Act, the Company has not filed all reports and other materials required to be filed thereunder with the Commission during the preceding twelve months. The company is not now nor has ever been a "shell" as defined in Rule 12b-2 of the Exchange Act.

(u) Listing. The Company's Common Stock is quoted on the OTC Markets (formerly known as the Pink Sheets) under the symbol NTEK.

(v) Transfer Agent. The Company's transfer agent is a participant in the Depository Trust Company Automated Securities Transfer Program. The name, address, telephone number, fax number, contact person and email address of the Company transfer agent is as follows: Stalt, Inc., 671 Oak Grove Avenue, Menlo Park, California 94025 – Telephone (650) 321-7111 Fax (650) 321-7113.

(w) Company Predecessor and Subsidiaries. The Company makes each of the representations contained in Sections 5(a), (b), (c), (d), (e), (f), (h), (j), (k), (n), (o), (p), (q), (r) and (s) of this Agreement, as same relate or could be applicable to each

10

Composite Exhibit A

NANOTECH000077

Subsidiary. All representations made by or relating to the Company of a historical or prospective nature and all undertakings described in Sections 9(g) through 9(l) shall relate, apply and refer to the Company and its predecessors and successors. The Company represents that it owns all of the equity of the Subsidiaries and rights to receive equity of the Subsidiaries identified on Schedule 5(a), free and clear of all liens, encumbrances and claims, except as set forth on Schedule 5(a). No person or entity other than the Company has the right to receive any equity interest in the Subsidiaries. With the exception of the pre-merger name, Aldar Group, Inc., the Company further represents that the Subsidiaries have not been known by any other name for the prior five (5) years.

(x) <u>Correctness of Representations</u>. The Company represents that the foregoing representations and warranties are true and correct as of the date hereof in all material respects, and, unless the Company otherwise notifies the Subscriber prior to the Closing Date, shall be true and correct in all material respects as of the Closing Date; provided, that, if such representation or warranty is made as of a different date, in which case such representation or warranty shall be true as of such date.

(y) <u>Survival</u>. The foregoing representations and warranties shall survive for a period of one (1) year after the Closing Date.

6. **Regulation D Offering/Legal Opinion**. The offer and issuance of the Securities to the Subscriber is being made pursuant to the exemption from the registration provisions of the 1933 Act afforded by Section 4(2) or Section 4(6) of the 1933 Act and/or Rule 506 of Regulation D promulgated thereunder. The Company will provide, at the Company's expense, such other legal opinions, if any, as are reasonably necessary in each Subscriber's opinion for the issuance and resale of the Common Stock issuable upon conversion of the Notes pursuant to an effective registration statement, Rule 144 under the 1933 Act or an exemption from registration.

7. **Conversion of Note**.

(a) Upon the conversion of a Note or part thereof (which conversion is defined fully in the Note attached as Exhibit "A") , the Company shall, at its own cost and expense, take all necessary action, including obtaining and delivering, an opinion of counsel to assure that the Company's transfer agent shall issue stock certificates in the name of Subscriber (or its permitted nominee) or such other persons as designated by Subscriber and in such denominations to be specified at conversion representing the number of shares of Common Stock issuable upon such conversion. The Company warrants that no instructions other than these instructions have been or will be given to the transfer agent of the Company's Common Stock and that the certificates representing such shares shall contain no legend other than the legend set forth in Section 4(h). If and when Subscriber sells the Shares, assuming (i) a registration statement including such Shares for registration, filed with the Commission is effective and the prospectus, as supplemented or amended, contained therein is current and (ii) Subscriber or its agent confirms in writing to the transfer agent that Subscriber has complied with the prospectus delivery requirements, the Company will reissue the Shares without restrictive legend and the Shares will be free-trading, and freely transferable. In the event that the Shares are sold in a manner that complies with an exemption from registration, the Company will promptly instruct its counsel to

11

issue to the transfer agent an opinion permitting removal of the legend indefinitely, if pursuant to Rule 144(b)(1)(i) of the 1933 Act, or for 90 days if pursuant to the other provisions of Rule 144 of the 1933 Act, provided that Subscriber delivers all reasonably requested representations in support of such opinion.

(b) Subscriber will give notice of its decision to exercise its right to convert the Note, interest, or part thereof by telecopying, or otherwise delivering a completed Notice of Conversion (a form of which is annexed as Exhibit A to the Note) to the Company via confirmed telecopier transmission or otherwise pursuant to Section 13(a) of this Agreement. Subscriber will not be required to surrender the Note until the Note has been fully converted or satisfied. Each date on which a Notice of Conversion is telecopied to the Company in accordance with the provisions hereof by 6 PM Eastern Time ("ET") (or if received by the Company after 6 PM ET, then the next business day) shall be deemed a "Conversion Date." The Company will itself or cause the Company's transfer agent to transmit the Company's Common Stock certificates representing the Conversion Shares issuable upon conversion of the Note to Subscriber via express courier for receipt by Subscriber within one (1) business day after the Conversion Date (such day being the "Delivery Date"). In the event the Conversion Shares are electronically transferable, then delivery of the Shares must be made by electronic transfer provided request for such electronic transfer has been made by the Subscriber. A Note representing the balance of the Note not so converted will be provided by the Company to Subscriber if requested by Subscriber, provided Subscriber delivers the original Note to the Company.

(c) The Company understands that a delay in the delivery of the Conversion Shares in the form required pursuant to Section 7.1 hereof could result in economic loss to the Subscriber. As compensation to Subscriber for such loss, the Company agrees to pay (as liquidated damages and not as a penalty) to Subscriber for late issuance of Conversion Shares in the form required pursuant to Section 7.1 hereof upon Conversion of the Note, the amount of $100 per business day after the Delivery Date for each $10,000 of Note principal amount and interest (and proportionately for other amounts) being converted of the corresponding Conversion Shares which are not timely delivered not to exceed a maximum of 15% of the principal amount outstanding on the Note. The Company shall pay any payments incurred under this Section upon demand.

(d) <u>Adjustments</u>.   The Conversion Price and the amount of Shares issuable upon conversion of the Notes shall be equitably adjusted and as otherwise described in this Agreement and the Note.

(e) <u>Redemption</u>.   The Note shall be redeemable in whole or in part or callable by the Company at any time prior to conversion for the face value of the Note, plus 50%, or part thereof, paid to Subscriber.

8. <u>Covenants of the Company</u>.  The Company covenants and agrees with the Subscriber as follows:

(a) <u>Stop Orders</u>.  Subject to the prior notice requirement described in Section 8(n), the Company will advise the Subscriber, within twenty-four hours after it receives notice

12

Composite Exhibit A
NANOTECH000079

of issuance by the Commission, any state securities commission or any other regulatory authority of any stop order or of any order preventing or suspending any offering of any securities of the Company, or of the suspension of the qualification of the Common Stock of the Company for offering or sale in any jurisdiction, or the initiation of any proceeding for any such purpose.   The Company will not issue any stop transfer order or other order impeding the sale, resale or delivery of any of the Securities, except as may be required by any applicable federal or state securities laws and unless contemporaneous notice of such instruction is given to the Subscriber.

(b) Listing/Quotation.   The Company shall promptly secure the quotation or listing of the Conversion Shares upon each national securities exchange, or automated quotation system on which the Company's Common Stock is quoted or listed and upon which such Conversion Shares are or become eligible for quotation or listing (subject to official notice of issuance).   The Company will maintain the quotation or listing of its Common Stock and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of as applicable. The Company will provide Subscriber with copies of all notices it receives notifying the Company of the threatened and actual delisting of the Common Stock.

(c) Market Regulations.   If required, the Company shall notify the Commission, the Principal Market and applicable state authorities, in accordance with their requirements, of the transactions contemplated by this Agreement, and shall take all other necessary action and proceedings as may be required and permitted by applicable law, rule and regulation, for the legal and valid issuance of the Securities to the Subscriber and promptly provide copies thereof to the Subscriber.

(d) Filing Requirements.   From the date of this Agreement and until the last to occur of (i) two (2) years after the Closing Date, (ii) until all the Shares have been resold or transferred by the Subscriber pursuant to a registration statement or pursuant to Rule 144(b)(1)(i), or (iii) the Note is no longer outstanding (the date of such latest occurrence being the "End Date"), the Company will (A) cause its Common Stock to continue to be registered under Section 12(b) or 12(g) of the 1934 Act, (B) comply in all respects with its reporting and filing obligations under the 1934 Act, (C) voluntarily comply with all reporting requirements that are applicable to an issuer with a class of shares registered pursuant to Section 12(g) of the 1934 Act, if the Company is not subject to such reporting requirements, and (D) comply with all requirements related to any registration statement filed pursuant to this Agreement.   The Company will use its best efforts not to take any action or file any document (whether or not permitted by the 1933 Act or the 1934 Act or the rules thereunder) to terminate or suspend such registration or to terminate or suspend its reporting and filing obligations under said acts until the End Date.   Until the End Date, the Company will continue the listing or quotation of the Common Stock on a Principal Market and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Principal Market.   The Company agrees to timely file a Form D with respect to the Securities if required under Regulation D and to provide a copy thereof to each Subscriber promptly after such filing.

13

Composite Exhibit A

NANOTECH000080

(e) <u>Use of Proceeds</u>.   The proceeds of the Offering will be employed by the Company for expenses of the Offering, the filing of a registration statement pursuant to the 1933 Act, and general working capital.   Except as described on Schedule 8(e), the Purchase Price may not and will not be used for accrued and unpaid officer and director salaries, payment of financing related debt, redemption of outstanding notes or equity instruments of the Company nor non-trade obligations outstanding on a Closing Date. For so long as any Note is outstanding, the Company will not prepay any financing related debt obligations, except equipment payments or in the event such payments are made in the ordinary course of business, nor redeem any equity instruments of the Company without the prior consent of the Subscriber.

(f) Reservation.   Prior to the Closing, the Company undertakes to reserve on behalf of Subscriber from its authorized but unissued Common Stock, a sufficient number of shares of Common Stock necessary to allow Subscriber to be able to convert the entire Note.   Failure to have sufficient shares reserved pursuant to this Section 9(f) at any time shall be a material default of the Company's obligations under this Agreement and an Event of Default under the Note.   If at any time the Note is outstanding the Company has insufficient Common Stock reserved on behalf of the Subscriber in an amount less than the amount necessary for full conversion of the outstanding Note principal and interest at the conversion price that would be in effect on every such date ("Minimum Required Reservation"), the Company will promptly reserve the Minimum Required Reservation, or if there are insufficient authorized and available shares of Common Stock to do so, the Company will take all action necessary to increase its authorized capital to be able to fully satisfy its reservation requirements hereunder, including the filing of a preliminary proxy with the Commission not later than fifteen days after the first day the Company has less than the Minimum Required Reservation. The Company agrees to provide notice to the Subscriber not later than five days after the date the Company has less than the Minimum Required Reservation reserved on behalf of the Subscriber.

(g) <u>DTC Program</u>.   At all times that Notes are outstanding, the Company will employ as the transfer agent for the Common Stock, and Conversion Shares a participant in the Depository Trust Company Automated Securities Transfer Program.

(h) <u>Taxes</u>.   From the date of this Agreement and until the End Date, the Company will promptly pay and discharge, or cause to be paid and discharged, when due and payable, all lawful taxes, assessments and governmental charges or levies imposed upon the income, profits, property or business of the Company; provided, however, that any such tax, assessment, charge or levy need not be paid if the validity thereof shall currently be contested in good faith by appropriate proceedings and if the Company shall have set aside on its books adequate reserves with respect thereto, and provided, further, that the Company will pay all such taxes, assessments, charges or levies forthwith upon the commencement of proceedings to foreclose any lien which may have attached as security therefore.

14

Composite Exhibit A

NANOTECH000081

(i) Insurance.  As reasonably necessary as determined by the Company, from the date of this Agreement and until the End Date, the Company will keep its assets which are of an insurable character insured by financially sound and reputable insurers against loss or damage by fire, explosion and other risks customarily insured against by companies in the Company's line of business and location, in amounts and to the extent and in the manner customary for companies in similar businesses similarly situated and located and to the extent available on commercially reasonable terms.

(j) Books and Records.  From the date of this Agreement and until the End Date, the Company will keep true records and books of account in which full, true and correct entries will be made of all dealings or transactions in relation to its business and affairs in accordance with generally accepted accounting principles applied on a consistent basis.

(k) Governmental Authorities.   From the date of this Agreement and until the End Date, the Company shall duly observe and conform in all material respects to all valid requirements of governmental authorities relating to the conduct of its business or to its properties or assets.

(l) Intellectual Property.  From the date of this Agreement and until the End Date, the Company shall maintain in full force and effect its corporate existence, rights and franchises and all licenses and other rights to use intellectual property owned or possessed by it and reasonably deemed to be necessary to the conduct of its business, unless it is sold for value.  Schedule 9(l) hereto identifies all of the intellectual property owned by the Company and Subsidiaries.

(m) Properties.  From the date of this Agreement and until the End Date, the Company will keep its properties in good repair, working order and condition, reasonable wear and tear excepted, and from time to time make all necessary and proper repairs, renewals, replacements, additions and improvements thereto; and the Company will at all times comply with each provision of all leases and claims to which it is a party or under which it occupies or has rights to property if the breach of such provision could reasonably be expected to have a Material Adverse Effect.   The Company will not abandon any of its assets except for those assets which have negligible or marginal value or for which it is prudent to do so under the circumstances.

(n) Negative Covenants.  So long as a Note is outstanding, without the consent of the Subscriber, the Company will not and will not permit any of its Subsidiaries to directly or indirectly:

(i) create, incur, assume or suffer to exist any pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, security title, mortgage, security deed or deed of trust, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement

15

perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction) (each, a "Lien") upon any of its property, whether now owned or hereafter acquired except for: (A) the Excepted Issuances (as defined in Section 12 hereof), and (B) (a) Liens imposed by law for taxes that are not yet due or are being contested in good faith and for which adequate reserves have been established in accordance with generally accepted accounting principles; (b) carriers', warehousemen's, mechanics', material men's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or that are being contested in good faith and by appropriate proceedings; (c) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (d) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business; (e) Liens created with respect to the financing of the purchase of new property in the ordinary course of the Company's business up to the amount of the purchase price of such property; and (f) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property (each of (a) through (f), a "Permitted Lien").

(ii) amend its certificate of incorporation, bylaws or its charter documents so as to materially and adversely affect any rights of the Subscriber (an increase in the amount of authorized shares and an increase in the number of directors will not be deemed adverse to the rights of the Subscriber);

(iii) repay, repurchase or offer to repay, repurchase or otherwise acquire or make any dividend or distribution in respect of any of its Common Stock, preferred stock, or other equity securities other than to the extent permitted or required under the Transaction Documents.

(iv) engage in any transactions with any officer, director, employee or any Affiliate of the Company, including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner, in each case in excess of $25,000 other than (i) for payment of salary, or fees for services rendered, (ii) reimbursement for expenses incurred on behalf of the Company, and (iii) for other employee benefits, including stock option agreements under any stock option plan of the Company; or

16

(v) prepay or redeem any financing related debt or past due obligations or securities outstanding as of the Closing Date, or past due obligations (except with respect to vendor obligations, any such obligations which in management's good faith, reasonable judgment must be repaid to avoid disruption of the Company's businesses. The Company agrees to provide Subscriber not less than ten (10) days notice prior to becoming obligated to or effectuating a Permitted Lien or Excepted Issuance.

(s) Seniority.   Except for Permitted Liens, until the Note is fully satisfied or converted, without the consent of the Subscriber, the Company shall not grant nor allow any security interest to be taken in the assets of the Company or any Subsidiary or any Subsidiary's assets; nor issue any debt, equity or other instrument which would give the holder thereof directly or indirectly, a right in any assets of the Company or any Subsidiary or any right to payment equal to or superior to any right of the Subscriber as a holder of the Note in or to such assets or payment, nor issue or incur any debt not in the ordinary course of business.

(t) Notices.   For so long as the Subscriber holds any Securities, the Company will maintain a United States address and United States fax number for notice purposes under the Transaction Documents.

(v) Blackout.   The Company undertakes and covenants that without the consent of the Subscriber, until the end of the Exclusion Period, the Company will not enter into any acquisition, merger, exchange or sale or other transaction or fail to take any action that could have the effect of delaying the effectiveness of any pending registration statement beyond the effective date, or causing an already effective registration statement to no longer be effective or current for a period of forty-five or more days in the aggregate during any three hundred and sixty-five day period.

## 9. Covenants of the Company Regarding Indemnification.

(a) The Company agrees to indemnify, hold harmless, reimburse and defend the Subscriber, the Subscriber's officers, directors, agents, Affiliates, members, managers, control persons, and principal shareholders, against any claim, cost, expense, liability, obligation, loss or damage (including reasonable legal fees) of any nature, incurred by or imposed upon the Subscriber or any such person which results, arises out of or is based upon (i) any material misrepresentation by Company or breach of any representation or warranty by Company in this Agreement or in any Exhibits or Schedules attached hereto in any Transaction Document, or (ii) after any applicable notice and/or cure periods, any breach or default in performance by the Company of any material covenant or undertaking to be performed by the Company hereunder, or any other material agreement entered into by the Company and Subscriber relating hereto.

(b) In no event shall the liability of the Subscriber or permitted successor hereunder or under any Transaction Document or other agreement delivered in connection herewith be greater in amount than the dollar amount of the net proceeds actually received by such Subscriber or successor upon the sale of Registrable Securities (as defined herein).

17

10. <u>**Registration Rights**</u>. The Company anticipates filing a Form S-1 Registration Statement pursuant to the Securities Act of 1933, as amended, with the Securities and Exchange Commission (the "SEC") no later one (1) year after execution of this Agreement (the "Registration Statement"). Pursuant to this Registration Statement, Subscriber will be classified as a "Selling Shareholder" and the Securities as defined in this Agreement will be fully registered.

11. <u>**Miscellaneous**</u>.

(a) Notices.   All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice.  Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be as follows:

If to the Company, to:   NanoTech Entertainment, Inc.
3883 Raymert Drive, Suite 3
Las Vegas, NV  89121
Attention:   David R. Foley
Telephone:   (702) 518-7410


If to the Investor (s):   R&T Sports Marketing
15440 SW 82nd Ave
Palmetto Bay, FL 33157
Telephone:   _____
Facsimile:   _____

With a copy to:   Jonathan D. Leinwand, P.A.
20801 Biscayne Blvd., Suite 403
Aventura, FL 33180
Telephone (954) 903-7856
Fax:  (954) 252-4265

18

(b) <u>Entire Agreement; Assignment</u>.  This Agreement and other documents delivered in connection herewith represent the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by both parties.  Neither the Company nor the Subscriber has relied on any representations not contained or referred to in this Agreement and the documents delivered herewith.   No right or obligation of the Company shall be assigned without prior notice to and the written consent of the Subscriber.

(c) <u>Counterparts/Execution</u>.   This Agreement may be executed in any number of counterparts and by the different signatories hereto on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute but one and the same instrument.  This Agreement may be executed by facsimile transmission, PDF, electronic signature or other similar electronic means with the same force and effect as if such signature page were an original thereof.

(d) <u>Law Governing this Agreement</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Florida without regard to principles of conflicts of laws.  Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of Florida or in the federal courts located in the State of Florida and county of Broward.   The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens.  The parties executing this Agreement and other agreements referred to herein or delivered in connection herewith on behalf of the Company agree to submit to the in personam jurisdiction of such courts and hereby irrevocably waive trial by jury.  The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs.  In the event that any provision of this Agreement or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law.  Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement.  Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement or any other Transaction Document by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.   Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

(e) <u>Specific Enforcement, Consent to Jurisdiction</u>.   The Company and Subscriber acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.   It is accordingly agreed that the parties shall be entitled to seek an injunction or injunctions to prevent or cure breaches of the provisions of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which any of them may be entitled by law or equity.   Subject to Section 13(d) hereof, the Company hereby irrevocably waives, and agrees not to assert in any such suit, action or

19

Composite Exhibit A

NANOTECH000086

proceeding, any claim that it is not personally subject to the jurisdiction in Nevada of such court, that the suit, action or proceeding is brought in an inconvenient forum or that the venue of the suit, action or proceeding is improper. Nothing in this Section shall affect or limit any right to serve process in any other manner permitted by law.

(f) <u>Maximum Payments</u>. Nothing contained herein or in any document referred to herein or delivered in connection herewith shall be deemed to establish or require the payment of a rate of interest or other charges in excess of the maximum permitted by applicable law. In the event that the rate of interest or dividends required to be paid or other charges hereunder exceed the maximum permitted by such law, any payments in excess of such maximum shall be credited against amounts owed by the Company to the Subscriber and thus refunded to the Company.

(g) <u>Calendar Days</u>. All references to "days" in the Transaction Documents shall mean calendar days unless otherwise stated. The terms "business days" and "trading days" shall mean days that the Nevada Stock Exchange is open for trading for three or more hours. Time periods shall be determined as if the relevant action, calculation or time period were occurring in Nevada City. Any deadline that falls on a non-business day in any of the Transaction Documents shall be automatically extended to the next business day and interest, if any, shall be calculated and payable through such extended period.

(h) <u>Captions: Certain Definitions</u>. The captions of the various sections and paragraphs of this Agreement have been inserted only for the purposes of convenience; such captions are not a part of this Agreement and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions of this Agreement. As used in this Agreement the term "person" shall mean and include an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated organization and a government or any department or agency thereof.

(j) <u>Severability</u>. In the event that any term or provision of this Agreement shall be finally determined to be superseded, invalid, illegal or otherwise unenforceable pursuant to applicable law by an authority having jurisdiction and venue, that determination shall not impair or otherwise affect the validity, legality or enforceability: (i) by or before that authority of the remaining terms and provisions of this Agreement, which shall be enforced as if the unenforceable term or provision were deleted, or (ii) by or before any other authority of any of the terms and provisions of this Agreement.

(k) <u>Successor Laws</u>. References in the Transaction Documents to laws, rules, regulations and forms shall also include successors to and functionally equivalent replacements of such laws, rules, regulations and forms. A successor rule to Rule 144(b)(1)(i) shall include any rule that would be available to a non-Affiliate of the Company for the sale of Common Stock not subject to volume restrictions and after a six month holding period.

20

## SIGNATURE PAGE TO SUBSCRIPTION

Please acknowledge your acceptance of the foregoing Subscription Agreement by signing and returning a copy to the undersigned whereupon it shall become a binding agreement between us.

**NANOTECH ENTERTAINMENT, INC.**, a Nevada corporation

By: _____

Name: David R. Foley

Title: President

Dated: May 9, 2011

R&T SPORTS MARKETING, INC.

By: _____

      Daniel Kaplan, President

Dated: May 9, 2011

21

Composite Exhibit A

NANOTECH000088

Exhibit B/Schedule 8(e)

## DISBURSEMENT SCHEDULE AND USE OF PROCEEDS

Closing Disbursements

| Closing | Recipient | Amount |
|---|---|---|
| Closing | NanoTech Entertainment | $54,000 |
| Closing | Jonathan D. Leinwand PA (Investor Legal Fees) | $1,000 |
| **Total Loan Amount** | | $55,000 |

The Company and the Investor agree that the above referenced amounts are the agreed upon disbursements for the sums invested.

NANOTECH ENTERTAINMENT INC.                    R&T SPORTS MARKETING, INC

David R. Foley, President                    Daniel Kaplan, President

Date____May 9, 2011_____                Date_____

22

Composite Exhibit A

NANOTECH000089

## SIGNATURE PAGE TO SUBSCRIPTION

Please acknowledge your acceptance of the foregoing Subscription Agreement by signing and returning a copy to the undersigned whereupon it shall become a binding agreement between us.

**NANOTECH ENTERTAINMENT, INC.**, a Nevada corporation

By: _____

Name: David R. Foley

Title: President

Dated: May 9, 2011

**R&T SPORTS MARKETING, INC.**

By: _____

Daniel Kaplan, President

Dated: May 9, 2011

21

Exhibit B/Schedule 8(e)

## DISBURSEMENT SCHEDULE AND USE OF PROCEEDS

Closing Disbursements

| Closing | Recipient | Amount |
|---|---|---|
| Closing | NanoTech Entertainment | $54,000 |
| Closing | Jonathan D. Leinwand PA (Investor Legal Fees) | $1,000 |
| **Total Loan Amount** | | $55,000 |

The Company and the Investor agree that the above referenced amounts are the agreed upon disbursements for the sums invested.

NANOTECH ENTERTAINMENT INC.

David R. Foley, President

Date___ May 9, 2011 ___

R&T SPORTS MARKETING, INC

Daniel Kaplan, President

Date 5/10/11

22

## SIGNATURE PAGE TO SUBSCRIPTION

Please acknowledge your acceptance of the foregoing Subscription Agreement by signing and returning a copy to the undersigned whereupon it shall become a binding agreement between us.

**NANOTECH ENTERTAINMENT, INC.**, a Nevada corporation

By: _____

Name: David R. Foley

Title: President

Dated: May 9, 2011

**R&T SPORTS MARKETING, INC.**

By: _____

Daniel Kaplan, President

Dated: May 9, 2011

21

Composite Exhibit A
NANOTECH000092

NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT.   NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

Principal Amount: $55,000
Issue Date: May 9, 2011

## CONVERTIBLE PROMISSORY NOTE

FOR VALUE RECEIVED, **NanoTech Entertainment, Inc.,** a Nevada corporation (hereinafter called "Borrower"), hereby promises to pay to R&T Sports Marketing, Inc. whose address is 15440 SW 82nd Ave, Palmetto Bay, FL 33157 (the "Holder") on order, without demand, the sum of FIFTY-FIVE THOUSAND DOLLARS ($55,000) ("Principal Amount") on May 8, 2013 (the "Maturity Date"), if not sooner paid.

This Note has been entered into pursuant to the terms of a subscription agreement between the Borrower and the Holder dated at or about the date hereof (the "Subscription Agreement"), and shall be governed by the terms of such Subscription Agreement. Unless otherwise separately defined herein, all capitalized terms used in this Note shall have the same meaning as is set forth in the Subscription Agreement.

## ARTICLE I
## GENERAL PROVISIONS

1.1 Payment Grace Period.  The Borrower shall have a five (5) day grace period to pay any monetary amounts due under this Note, after which grace period a default interest rate of fifteen percent (15%) per annum shall apply.

1.2 Conversion Privileges.  The Conversion Privileges set forth in Article II shall remain in full force and effect immediately from the date hereof and until the Note is paid in full regardless of the occurrence of an Event of Default.  The Note shall be payable in full on the Maturity Date, unless previously converted into Common Stock in accordance with Article II hereof.

1.3 Security Interest – The Borrower has caused 3,000,000 (THREE MILLION) to be deposited with Jonathan D. Leinwand, P.A. as collateral for the obligations of the Company pursuant to this note.

# ARTICLE II
## CONVERSION RIGHTS

The Borrower shall have the right to convert the principal and any interest due under this Note into Shares of the Borrower's Common Stock, $.001 par value per share ("Common Stock") as set forth below.

2.1. Conversion into the Borrower's Common Stock.

(a) The Borrower shall have the right from and after the date of the issuance of this Note and then at any time until this Note is fully paid, to convert any outstanding and unpaid principal portion of this Note (in whole or in part), and accrued interest, at the election of the Borrower (the date of giving of such notice of conversion being a "Conversion Date") into fully paid and nonassessable shares of Common Stock as such stock exists on the date of issuance of this Note, or any shares of capital stock of Borrower into which such Common Stock shall hereafter be changed or reclassified, at the Conversion Price as defined in Section 2.1(b) hereof, determined as provided herein. Upon delivery to the Holder of a completed Notice of Conversion, a form of which is annexed hereto as Exhibit A, Borrower shall issue and deliver to the Holder within one (1) business day after the Conversion Date (such day being the "Delivery Date") that number of shares of Common Stock for the portion of the Note converted in accordance with the foregoing. Such shares are to be delivered via DWAC, if eligible, or otherwise shall deliver the certificate via overnight mail to the address provided by the Holder. The number of shares of Common Stock to be delivered upon each conversion of this Note shall be determined by dividing that portion of the outstanding principal amount of the Note and accrued but unpaid interest calculated at 15% per annum, if any, to be converted, by the Conversion Price.

(b) Subject to adjustment as provided in Section 2.1(c) hereof, the conversion price per share shall be at a rate of 30% of the average the 5 lowest intraday trading prices during the 15 trading days prior to conversion. Trading days being those days upon which the shares actually traded. For example if the shares traded on March 5 at an intraday low of $.01, and not again until March 10 at intraday low of $.02, then March 5 and March 10 would constitute trading days and the days in between would not be sued in the calculation of the conversion price. Likewise, if the average of the prices on the trading days was $.015, then the conversion price would be $.0045 per share.

(c) The Conversion Price and number and kind of shares or other securities to be issued upon conversion determined pursuant to Section 2.1(a), shall be subject to adjustment from time to time upon the happening of certain events while this conversion right remains outstanding, as follows:

(i). Merger, Sale of Assets, etc. If (A) the Borrower effects any merger or consolidation of the Borrower with or into another entity, (B) the Borrower effects any sale of all or substantially all of its assets in one or a series of related transactions, (C) any tender offer or exchange offer (whether by the Borrower or another entity) is completed pursuant to which holders of Common Stock are permitted to tender or exchange their shares for other securities, cash or property, (D) the Borrower

consummates a stock purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with one or more persons or entities whereby such other persons or entities acquire more than the 50% of the outstanding shares of Common Stock (not including any shares of Common Stock held by such other persons or entities making or party to, or associated or affiliated with the other persons or entities making or party to, such stock purchase agreement or other business combination), (E) any "person" or "group" (as these terms are used for purposes of Sections 13(d) and 14(d) of the 1934 Act) is or shall become the "beneficial owner" (as defined in Rule 13d-3 under the 1934 Act), directly or indirectly, of 50% of the aggregate Common Stock of the Borrower, or (F) the Borrower effects any reclassification of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property (in any such case, a "Fundamental Transaction"), this Note, as to the unpaid principal portion thereof and accrued interest thereon, shall thereafter be deemed to evidence the right to convert into such number and kind of shares or other securities and property as would have been issuable or distributable on account of such Fundamental Transaction, upon or with respect to the securities subject to the conversion right immediately prior to such Fundamental Transaction. The foregoing provision shall similarly apply to successive Fundamental Transactions of a similar nature by any such successor or purchaser. Without limiting the generality of the foregoing, the anti-dilution provisions of this Section shall apply to such securities of such successor or purchaser after any such Fundamental Transaction.

(ii). Reclassification, etc. If the Borrower at any time shall, by reclassification or otherwise, change the Common Stock into the same or a different number of securities of any class or classes that may be issued or outstanding, this Note, as to the unpaid principal portion thereof and accrued interest thereon, shall thereafter be deemed to evidence the right to purchase an adjusted number of such securities and kind of securities as would have been issuable as the result of such change with respect to the Common Stock immediately prior to such reclassification or other change.

(d) During the period the conversion right exists, Borrower will reserve from its authorized and unissued Common Stock a sufficient number of shares of Common Stock so as to effect conversion of this Note. Borrower represents that upon issuance, such shares will be duly and validly issued, fully paid and non-assessable. Borrower agrees that its issuance of this Note shall constitute full authority to its officers, agents, and transfer agents who are charged with the duty of executing and issuing stock certificates to execute and issue the necessary certificates for shares of Common Stock upon the conversion of this Note.

2.2 <u>Method of Conversion</u>. This Note may be converted by the Borrower in whole or in part as described in Section 2.1(a) and the Subscription Agreement. Upon partial conversion of this Note, a new Note containing the same date and provisions of this Note shall, at the request of the Holder, be issued by the Borrower to the Holder for the principal balance of this Note and interest which shall not have been converted or paid.

2.3. <u>Maximum Conversion</u>. (a)      Notwithstanding anything to the contrary contained

Composite Exhibit A
NANOTECH000095

herein, the number of Conversion Shares that may be acquired by the Subscriber upon conversion of the Notes (or otherwise in respect hereof) shall be limited to the extent necessary to ensure that, following such conversion (or other issuance), the total number of shares of Common Stock then beneficially owned by such Subscriber and its affiliates and any other persons whose beneficial ownership of Common Stock would be aggregated with the Subscriber's for purposes of Section 13(d) of the 1934 Act, does not exceed 4.999% of the total number of issued and outstanding shares of Common Stock (including for such purpose the shares of Common Stock issuable upon such conversion). For such purposes, beneficial ownership shall be determined in accordance with Section 13(d) of the 1934 Act and the rules and regulations promulgated thereunder. By written notice to the Company, a Subscriber may waive the provisions of this Section 2.3(a) as to itself but any such waiver will not be effective until the 61st day after delivery thereof and such waiver shall have no effect on any other Subscriber.

(b)    Notwithstanding anything to the contrary contained herein, the number of Conversion Shares that may be acquired by the Subscriber upon conversion of the Notes (or otherwise in respect hereof) shall be limited to the extent necessary to ensure that, following such conversion (or other issuance), the total number of shares of Common Stock then beneficially owned by such Subscriber and its affiliates and any other persons whose beneficial ownership of Common Stock would be aggregated with the Subscriber's for purposes of Section 13(d) of the 1934 Act, does not exceed 9.999% of the total number of issued and outstanding shares of Common Stock (including for such purpose the shares of Common Stock issuable upon such conversion). For such purposes, beneficial ownership shall be determined in accordance with Section 13(d) of the 1934 Act and the rules and regulations promulgated thereunder. This provision may not be waived.

2.4. Optional Redemption of Principal Amount.   Provided an Event of Default or an event which with the passage of time or the giving of notice could become an Event of Default has not occurred, whether or not such Event of Default has been cured, the Borrower will have the option of prepaying the outstanding Principal Amount of this Note ("Optional Redemption"), in whole or in part, by paying to the Holder a sum of money equal the Principal amount plus an additional 50% thereof, together with accrued but unpaid interest thereon and any and all other sums due, accrued or payable to the Holder arising under this Note or any Transaction Document through the Redemption Payment Date as defined below (the "Redemption Amount"). Borrower's election to exercise its right to prepay must be by notice in writing ("Notice of Redemption"). The Notice of Redemption shall specify the date for such Optional Redemption (the "Redemption Payment Date"), which date shall be at least thirty (30) business days after the date of the Notice of Redemption (the "Redemption Period"). A Notice of Redemption shall not be effective with respect to any portion of the Principal Amount for which the Holder has previously delivered an election to convert, or subject to the previous sentence, for conversions initiated or made by the Holder during the Redemption Period. On the Redemption Payment Date, the Redemption Amount, less any portion of the Redemption Amount against which the Holder has permissibly exercised its conversion rights, shall be paid in good funds to the Holder. In the event the Borrower fails to pay the Redemption Amount on the Redemption Payment Date as set forth herein, then (i) such Notice of Redemption will be null and void, (ii) Borrower will

have no right to deliver another Notice of Redemption, and (iii) Borrower's failure may be deemed by Holder to be a non-curable Event of Default. A Notice of Redemption may not be given nor may the Borrower effectuate a Redemption without the consent of the Holder, if at any time during the Redemption Period an Event of Default, or an event which with the passage of time or giving of notice could become an Event of Default (whether or not such Event of Default has been cured), has occurred. During the Optional Redemption Period, the Company must abide by all of its obligations to the Note Holder.

## ARTICLE III
## EVENT OF DEFAULT

The occurrence of any of the following events of default ("Event of Default") shall, at the option of the Holder hereof, make all sums of principal and interest then remaining unpaid hereon and all other amounts payable hereunder immediately due and payable, upon demand, without presentment, or grace period, all of which hereby are expressly waived, except as set forth below:

3.1 <u>Failure to Pay Principal or Interest</u>. The Borrower fails to pay the principal, interest or other sum due under this Note when due.

3.2 <u>Breach of Covenant</u>. The Borrower breaches any material covenant or other term or condition of the Subscription Agreement or this Note in any material respect and such breach, if subject to cure, continues for a period of thirty (30) days after written notice to the Borrower from the Holder.

3.3 <u>Breach of Representations and Warranties</u>. Any material representation or warranty of the Borrower made herein, in the Subscription Agreement or any Transaction Document shall be false or misleading in any material respect as of the date made and the Closing Date.

3.4 <u>Liquidation</u>. Any dissolution, liquidation or winding up of Borrower or any substantial portion of its business.

3.5 <u>Cessation of Operations</u>. Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they come due.

3.6 <u>Maintenance of Assets</u>. The failure by Borrower to maintain any material intellectual property rights, personal, real property or other assets which are necessary to conduct its business (whether now or in the future).

3.7 <u>Receiver or Trustee</u>. The Borrower or any Subsidiary of Borrower shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business; or such a receiver or trustee shall otherwise be appointed.

3.8 <u>Judgments</u>.  Any money judgment, writ or similar final process shall be entered or filed against Borrower or any of its property or other assets for more than $100,000.

3.9 <u>Bankruptcy</u>.  Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings or relief under any bankruptcy law or any law, or the issuance of any notice in relation to such event, for the relief of debtors shall be instituted by or against the Borrower or any Subsidiary of Borrower.

3.10 <u>Non-Payment</u>.  A default by the Borrower under any one or more obligations in an aggregate monetary amount in excess of $100,000 for more than twenty days after the due date, unless the Borrower is contesting the validity of such obligation in good faith and has segregated cash funds equal to not less than one-half of the contested amount.

3.11 <u>Stop Trade</u>.  An SEC or judicial stop trade order or Principal Market trading suspension that lasts for five (5) or more consecutive trading days.

3.12 <u>Failure to Deliver Common Stock or Replacement Note</u>.  Borrower's failure to timely deliver Common Stock to the Holder pursuant to and in the form required by this Note and Sections 7 and 11 of the Subscription Agreement, or, if required, a replacement Note.

3.13 <u>Reservation Default</u>.  Failure by the Borrower to have reserved for issuance upon conversion of the Note or upon exercise of the Warrants issued in connection with the Subscription Agreement, the number of shares of Common Stock as required in the Subscription Agreement, this Note and the Warrants, and such failure continues for a period of thirty (30) days.

3.14 <u>Financial Statement Restatement</u>.  The restatement of any financial statements filed by the Borrower with the Securities and Exchange Commission for any date or period from two years prior to the Issue Date of this Note and until this Note is no longer outstanding, if the result of such restatement would, by comparison to the un-restated financial statements, have constituted a Material Adverse Effect.

3.15 <u>Event Described in Subscription Agreement</u>.  The occurrence of an Event of Default as described in the Subscription Agreement that, if susceptible to cure, is not cured during any designated cure period.

3.16 <u>Executive Officers Breach of Duties</u>.  Any of Borrower's named executive officers or directors is convicted of a violation of securities laws, or a settlement in excess of $250,000 is reached by any such officer or director relating to a violation of securities laws, breach of fiduciary duties or self-dealing.

### ARTICLE IV
### MISCELLANEOUS

4.1 <u>Failure or Indulgence Not Waiver</u>.  No failure or delay on the part of the Holder hereof in the exercise of any power, right or privilege hereunder shall operate as a waiver

thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.   All rights and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

4.2   Notices.   All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the first business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.  The addresses for such communications shall be:

If to the Company, to:        NanoTech Entertainment, Inc.
                              3883 Raymert Drive, Suite 3
                              Las Vegas, NV 89121
                              Attention:   David R. Foley
                              Telephone:   (702) 518 7410

If to the Investor (s):       Long Side Ventures LLC
                              1800 S. Ocean Dr. PH2
                              Hallandale Beach, FL 33009
                              Attention:  Ben Kaplan (Portfolio Manager)
                              Telephone:   _____
                              Facsimile:   _____

                              With a copy to:
                              Jonathan D. Leinwand, Esq.
                              20801 Biscayne Blvd., Suite 403
                              Aventura, FL 33180
                              Tel. 954-903-7856
                              Fax. 954-252-4265

4.3   Amendment Provision.   The term "Note" and all reference thereto, as used throughout this instrument, shall mean this instrument as originally executed, or if later amended or supplemented, then as so amended or supplemented.

4.4   Assignability.   This Note shall be binding upon the Borrower and its successors and assigns,

Composite Exhibit A
NANOTECH000099

and shall inure to the benefit of the Holder and its successors and assigns.

4.5 <u>Cost of Collection</u>.  If default is made in the payment of this Note, Borrower shall pay the Holder hereof reasonable costs of collection, including reasonable attorneys' fees.

4.6 <u>Governing Law</u>.  This Note shall be governed by and construed in accordance with the laws of the State of Florida without regard to conflicts of laws principles that would result in the application of the substantive laws of another jurisdiction.  Any action brought by either party against the other concerning the transactions contemplated by this Agreement must be brought only in the civil or state courts of Florida or in the federal courts located in the State and county of Broward.  Both parties and the individual signing this Agreement on behalf of the Borrower agree to submit to the jurisdiction of such courts.  The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs.  In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law.  Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or unenforceability of any other provision of this Note. Nothing contained herein shall be deemed or operate to preclude the Holder from bringing suit or taking other legal action against the Borrower in any other jurisdiction to collect on the Borrower's obligations to Holder, to realize on any collateral or any other security for such obligations, or to enforce a judgment or other decision in favor of the Holder.  This Note shall be deemed an unconditional obligation of Borrower for the payment of money and, without limitation to any other remedies of Holder, may be enforced against Borrower by summary proceeding pursuant to Florida Civil Procedure Laws and Rules.

4.7 <u>Maximum Payments</u>.  Nothing contained herein shall be deemed to establish or require the payment of a rate of interest or other charges in excess of the maximum rate permitted by applicable law.  In the event that the rate of interest required to be paid or other charges hereunder exceed the maximum rate permitted by applicable law, any payments in excess of such maximum rate shall be credited against amounts owed by the Borrower to the Holder and thus refunded to the Borrower.

4.8 <u>Non-Business Days</u>.  Whenever any payment or any action to be made shall be due on a Saturday, Sunday or a public holiday under the laws of the State of Florida, such payment may be due or action shall be required on the next succeeding business day and, for such payment, such next succeeding day shall be included in the calculation of the amount of accrued interest payable on such date.

4.9 <u>Redemption</u>.  This Note may be redeemed or called in full or in part with or without the consent of the Holder at 150% of the principal amount then remaining, plus any accrued and unpaid interest.

4.10 <u>Shareholder Status</u>.  The Holder shall not have rights as a shareholder of the Borrower with respect to unconverted portions of this Note.  However, the Holder will have the rights of a shareholder of the Borrower with respect to the Shares of Common Stock to be

IN WITNESS WHEREOF, Borrower has caused this Note to be signed in its name by an authorized officer as of the 9th day of May, 2011.

**NANOTECH ENTERTAINMENT, INC.,** a Nevada corporation

By: _____

Name: David R. Foley

Title: President

Dated: May 9, 2011